# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LISA A. ABRAHAM, LISA CAVE,
SCOTT CAVE, LEE ANN KAMINSKI,
and MARK E. KAMINSKI, on behalf of
themselves and all others similarly
situated,

              Plaintiffs,

v.

OCWEN LOAN SERVICING, LLC,

              Defendant.

Civil Action No. 5:14-cv-04977-JP

## DEFENDANT OCWEN LOAN SERVICING, LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

### REDACTED

R. Bruce Allensworth (admitted *pro hac vice*)
Brian M. Forbes (admitted *pro hac vice*)
Robert W. Sparkes, III (admitted *pro hac vice*)
K&L GATES LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
(617) 261-3100 (telephone)
(617) 261-3175 (facsimile)

David R. Fine
K&L GATES LLP
17 North Second Street, 18th Floor
Harrisburg, PA 17101
(717) 231-4500 (telephone)
(717) 231-4501 (facsimile)

*Attorneys for Defendant*
*Ocwen Loan Servicing, LLC*

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION .................................................................................................. 1

II.     FACTUAL BACKGROUND.................................................................................. 2

     A.      Overview of Ocwen and Its Loan Modification Programs ......................................... 2

          1.      Ocwen's Loss Mitigation Commitment ............................................. 2

          2.      Ocwen's In-House Loan Modifications with a Balloon Feature...................... 4

     B.      The Named Plaintiffs' Loan Modification Agreements ........................................... 6

          1.      Plaintiff Lisa A. Abraham ......................................................... 6

          2.      Plaintiffs Lisa and Scott Cave ..................................................... 8

          3.      Plaintiffs Lee Ann and Mark Kaminski ............................................ 11

     C.      Plaintiffs' Motion for Class Certification ...................................................... 13

III.    APPLICABLE STANDARD................................................................................ 14

     A.      Plaintiffs Must Affirmatively Demonstrate Each Of The Requirements For Class
         Certification Under Rule 23........................................................................ 14

     B.      The Elements of Plaintiffs' Putative Class Claims .................................................. 15

IV.     PLAINTIFFS' FLAWED THEORY OF LOSS AND DAMAGES................................ 17

     A.      Plaintiffs' Proposed Method For Determining The Fact Of Ascertainable Loss And
         The Measure Of Damages ......................................................................... 17

     B.      Plaintiffs' Theory Of Harm Is Incomplete And Incorrect ....................................... 21

V.      ARGUMENT.................................................................................................... 25

     A.      Plaintiffs' Proposed Class Definitions Are Fundamentally Flawed And Cannot Be
         Certified Under Rule 23............................................................................ 25

          1.      Plaintiffs' Pennsylvania and New Jersey Classes are Overbroad ................... 25

          2.      The Caves' FDCPA claims are time-barred and the FDCPA Class lacks a
             representative........................................................................ 27

          3.      The Caves Lack Standing to Assert FDCPA Claims and the FDCPA Class is
             Overbroad .......................................................................... 28

     B.      Plaintiffs' Proposed Pennsylvania And New Jersey Classes Do Not Satisfy The
         Requirements Of Rule 23(b)(2) .................................................................. 31

1. Plaintiffs are Not Entitled to each Form of Injunctive Relief Requested in their Motion .................................................................................................................. 32

    a. The UTPCPL does not provide for injunctive or declaratory relief ......... 32

    b. Plaintiffs lack standing to obtain their requested prohibitory injunctive relief ................................................................................................................ 33

    c. Plaintiffs have not demonstrated an entitlement to the extraordinary remedy of a mandatory injunction ............................................................ 35

2. Plaintiffs' Proposed Rule 23(b)(2) Classes Lack the "Cohesiveness" Necessary for Certification under that Rule ...................................................................... 37

    a. Plaintiffs' putative class claims require individualized proof of ascertainable loss, causation, and reliance, which defeat the cohesiveness of the putative classes .............................................................................. 38

    b. The injunctive and monetary relief sought by plaintiffs are too individualized to support certification of Rule 23(b)(2) classes .............. 39

3. Plaintiffs' Requests for Monetary Relief Predominate over Injunctive Relief; Certification of a Rule 23(b)(2) Class is Impermissible .................................... 44

C. Plaintiffs' Claims Do Not Satisfy The Requirements Of Rule 23(b)(3) And Cannot Be Certified ................................................................................................................ 46

1. Plaintiffs Have Failed to Establish that their Classes are Ascertainable and thus Appropriate for Certification under Rule 23(b)(3) ........................................... 46

    a. Plaintiffs do not present any evidence regarding the ascertainability of the FDCPA Class ...................................................................................... 47

    b. The alleged ascertainability of the Pennsylvania and New Jersey Classes rests solely on inadmissible "expert" testimony ..................................... 49

2. Plaintiffs have Failed to Establish Predominance; Individual Inquiries are Necessary to Resolve Each Putative Class Member's Claim ......................... 50

    a. The issue of whether putative class members suffered "ascertainable loss" or "actual harm" is an individual question ................................................. 51

    b. Proof of "causation" requires individualized evidence for each putative class member .......................................................................................... 53

    c. The Pennsylvania Class cannot establish justifiable reliance without delving into individualized inquiries and evidence ................................. 56

3. Plaintiffs have Failed to Establish Superiority ................................................. 58

D. Plaintiffs Have Failed To Affirmatively Demonstrate That Their Claims Satisfy Each Of The Requirements Of Rule 23(a) ............................................................ 60

1. Plaintiffs have Failed to Present Evidence to Prove that the FDCPA Class Satisfies the Numerosity Requirement ............................................................ 60

  2. Plaintiffs have Failed to Establish Commonality ............................................... 62

  3. Plaintiffs' Claims are not Typical and Plaintiffs are not Adequate Class Representatives................................................................................................. 64

VI. CONCLUSION............................................................................................................. 67

## <u>TABLE OF AUTHORITIES</u>

**<u>Page</u>**

### <u>Federal Cases</u>

*Abraham v. Ocwen Loan Servicing, LLC*,
   No. 14-4977, 2016 WL 2866537 (E.D. Pa. May 17, 2016)...................................16, 19, 28

*Allison v. Citgo Petroleum Corp.*,
   151 F.3d 402 (5th Cir. 1998)........................................................................................44

*Amchem Products, Inc. v. Windsor*,
   521 U.S. 591 (1997).....................................................................................................14

*Andrews v. Chevy Chase Bank*,
   545 F.3d 570 (7th Cir. 2008).......................................................................................41

*Barabin v. Aramark Corp.*,
   210 F.R.D. 152 (E.D. Pa. 2002)...................................................................................44

*Barnes v. American Tobacco Co.*,
   161 F.3d 127 (3d Cir. 1998)...........................................................................31, 37, 44

*Beck v. Maximus, Inc.*,
   457 F.3d 291 (3d Cir. 2006).........................................................................................65

*Blunt v. Lower Merion Sch. Dist.*,
   262 F.R.D. 481 (E.D. Pa. 2009)...................................................................................39

*Bock v. Pressler & Pressler, LLP*,
   --- F. App'x ---, 2016 WL 4011150 (3d Cir. July 27, 2016)..........................................29

*Bright v. Asset Acceptance, LLC*,
   292 F.R.D. 190 (D.N.J. 2013).......................................................................................26

*Byrd v. Aaron's Inc.*,
   784 F.3d 154 (3d Cir. 2015).........................................................................................25

*Carrera v. Bayer Corp.*,
   727 F.3d 300 (3d Cir. 2013)...................................................................................46, 47

*Cave v. Saxon Mortgage Services, Inc.*,
   Nos. 11-4586, 12-5366, 2015 WL 6153754 (E.D. Pa. Oct. 20, 2015)...........................19

*Cohen v. Chicago Title Insurance Co.*,
   No. 06-873, 2013 WL 842706 (E.D. Pa. Mar. 7, 2013)..................................................58

*Coleman v. Commonwealth Land Title Insurance Co.*,
   Nos. 09-679, 09-841, 2016 WL 4705454 (E.D. Pa. Aug. 17, 2016).................................49

*Danvers Motor Co., Inc. v. Ford Motor Co.*,
   543 F.3d 141 (3d Cir. 2008).........................................................................59, 63, 65, 67

*Diabate v. MV Transportation, Inc.*,
   No. CIV A. 14-857, 2015 WL 4496616 (E.D. Pa. July 20, 2015)....................................64

*Donaldson v. Exelon Corp.*,
   No. CIV. A. 05-1542, 2006 WL 2668573 (E.D. Pa. Sept. 14, 2006)...............................66

*East Texas Motor Freight Systems Inc. v. Rodriguez*,
   431 U.S. 395 (1977).................................................................................................64, 66

*Gates v. Rohm and Haas Co.*,
   655 F.3d 255 (3d Cir. 2011)..............................................................................31, 37, 39

*Gates v. Rohm and Haas Co.*,
   265 F.R.D. 208 (E.D. Pa. 2010)...................................................................................39

*Glover v. F.D.I.C.*,
   698 F.3d 139 (3d Cir. 2012)........................................................................................28

*Glover v. Udren*,
   No. 08-990, 2013 WL 6237990 (W.D. Pa. Dec. 3, 2013)....................................42, 52, 60

*Goleman v. York International Corp.*,
   No. 11-1328, 2011 WL 3330423 (E.D. Pa. Aug. 3, 2011)................................................33

*Harnish v. Widener University School of Law*,
   --- F.3d ---, 2016 WL 4363133 (3d Cir. Aug. 16, 2016)...........................................passim

*Hayes v. Wal-Mart Stores, Inc.*,
   725 F.3d 349 (3d Cir. 2013).............................................................................28, 61, 62

*Hohider v. United Parcel Serv., Inc.*,
   574 F.3d 169 (3d Cir. 2009)........................................................................................31

*Hunt v. U.S. Tobacco Co.*,
   538 F.3d 217 (3d Cir. 2008)..............................................................................56, 57, 58

*In re Blood Reagents Antitrust Litigation*,
   783 F.3d 183 (3d Cir. 2015).................................................................................14, 49

*In re Ford Motor Co. E-350 Van Products Liability Litigation*,
   No. 03-4558, 2012 WL 379944 (D.N.J. Feb. 6, 2012)......................................................42

*In re Hydrogen Peroxide Antitrust Litigation*,
   552 F.3d 305 (3d Cir. 2009)..............................................................................14, 15

*In re Modafinil Antitrust Litigation*,
   --- F.3d ---, 2016 WL 4757793 (3d Cir. Sept. 13, 2016)......................................14

*In re Paulsboro Derailment Cases*,
   Nos. 13–784 (RBK/KMW), 12–7586 (RBK/KMW), 12–7648 (RBK/KMW),
   13–410 (RBK/KMW), 13–721 (RBK/KMW), 13–761 (RBK/KMW),
   2014 WL 4162790 (D.N.J. Aug. 20, 2014).....................................................61

*In re Processed Egg Products Antitrust Litigation*,
   312 F.R.D. 124 (E.D. Pa. 2015)........................................................................46

*In re Schering Plough Corp. ERISA Litigation*,
   589 F.3d 585 (3d Cir. 2009)..............................................................................62

*In re Soto*,
   221 B.R. 343 (Bankr. E.D. Pa. 1998)..............................................................32

*Jensen v. Pressler & Pressler*,
   791 F.3d 413 (3d Cir. 2015).............................................................................16

*Kostur v. Goodman Global, Inc.*,
   No. 14-1147, 2016 WL 4430609 (E.D. Pa. Aug. 22, 2016)..............................42

*Lewis v. Ford Motor Co.*,
   263 F.R.D. 252 (W.D. Pa. 2009).......................................................................15

*Lester v. Percudani*,
   217 F.R.D. 345 (M.D. Pa. 2003)..................................................................53, 54

*Marcus v. BMW of North America, LLC*,
   687 F.3d 583 (3d Cir. 2012).......................................................................passim

*McAndrew v. Deutsche Bank National Trust Co.*,
   977 F. Supp. 2d 440 (M.D. Pa. 2013)..............................................................16

*McCray v. Fidelity National Title Insurance Co.*,
   682 F.3d 229 (3d Cir. 2012).............................................................................34

*McKenna v. First Horizon Home Loan Corp.*,
   475 F.3d 418 (1st Cir. 2007).............................................................................41

*McNair v. Synapse Group Inc.*,
    672 F.3d 213 (3d Cir. 2012)....................................................................33, 34

*McNair v. Synapse Group, Inc.*,
    No. 06-5072 (JLL), 2010 WL 4777483 (D.N.J. Nov. 15, 2010)......................................42

*Mladenov v. Wegmans Food Markets, Inc.*,
    124 F. Supp. 3d 360 (D.N.J. 2015)..........................................................31, 42

*Mueller v. CBS, Inc.*,
    200 F.R.D. 227 (W.D. Pa. 2001)..............................................................64, 66

*Mwantembe v. TD Bank, N.A.*,
    268 F.R.D. 548 (E.D. Pa. 2010)..............................................................64, 65

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    259 F.3d 154 (3d Cir. 2001)............................................................52, 59, 60

*Parsons v. Philadelphia Parking Authority*,
    No. 13-0955, 2016 WL 538215 (E.D. Pa. Feb. 11, 2016)................................................48

*Pinter v. Dahl*,
    486 U.S. 622 (1988).........................................................................36

*Rauso v. Fein*,
    No. 13-cv-693, 2015 WL 2217411 (E.D. Pa. May 12, 2015)........................................33

*Robinson v. Holiday Universal, Inc.*,
    No. 05-cv-5726, 2006 WL 2642323 (E.D. Pa. Sept. 11, 2006).....................................33

*Shelton v. Bledsoe*,
    775 F.3d 554 (3d Cir. 2015)..............................................................31, 38

*Slapikas v. First American Title Insurance Co.*,
    298 F.R.D. 285 (W.D. Pa. 2014)............................................................57, 58

*Snyder v. Millersville University*,
    No. 07-1660, 2008 WL 5093140 (E.D. Pa. Dec. 3, 2008)...............................................35

*Spokeo, Inc. v. Robins*,
    --- U.S. ---, 136 S. Ct. 1540 (2016).........................................................29

*Trinity Industries, Inc. v. Chicago Bridge & Iron Co.*,
    735 F.3d 131 (3d Cir. 2013)..............................................................35

*Tyson Foods, Inc. v. Bouaphakeo*,
    --- U.S. ---, 136 S. Ct. 1036 (2016)...........................................................30, 50

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011).................................................................................passim

*Yarger v. ING Bank, FSB*,
    285 F.R.D. 308 (D. Del. 2012)...............................................................39, 40

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012)....................................................................33, 34

## State Cases

*Debbs v. Chrysler Corp.*,
    810 A.2d 137 (Pa. Super. Ct. 2002)........................................................57, 58

*Grimes v. Enterprise Leasing Co. of Philadelphia, LLC*,
    66 A.3d 330 (Pa. Super. Ct. 2013)................................................................57

## Federal Statutes

Fair Debt Collection Practices Act,
    15 U.S.C. §§ 1692, *et seq.*........................................................................passim

## State Statutes

New Jersey Consumer Fraud Act,
    N.J.S.A. §§ 56:801, *et seq.*......................................................................passim

Pennsylvania Unfair Trade Practices and Consumer Protection Law,
    73 P.S. § 201, *et seq.*...............................................................................passim

## Rules

Federal Rules of Civil Procedure,
    Fed. R. Civ. P. 23....................................................................................passim

## Miscellaneous

Black's Law Dictionary,
    1308 (7th ed. 1999)........................................................................................36

## I.      **INTRODUCTION**

Defendant Ocwen Loan Servicing, LLC ("Ocwen") submits this Opposition to the Motion for Class Certification filed by Plaintiffs Lisa A. Abraham, Lisa Cave and Scott Cave, and Lee Ann Kaminski and Mark E. Kaminski (collectively "plaintiffs").

Plaintiffs seek certification of three proposed classes asserting separate claims under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-2(xxi) ("UTPCPL"), the New Jersey Consumer Fraud Act, N.J.S.A. §§ 56:8-1, *et seq.* ("NJCFA"), or the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692, *et seq.* ("FDPCA").  *See* Pls. Brief at 1.  Those claims are based on a single underlying theory:  that the loan modification agreements provided by Ocwen to plaintiffs and putative class members did not disclose the estimated dollar amount of the balloon payment due at the maturity date of the loans, the method for calculating the balloon payment amount, or the applicable amortization period.  *See* Second Amended Class Action Complaint ("SAC") at ¶¶ 1-2, 8-9, 28.  Ignoring the benefits provided by those loan modification agreements - including lower monthly payment amounts, reduced interest rates, forgiveness of principal, and avoidance of foreclosure - plaintiffs contend the absence of the estimated balloon amount caused them harm in the form of having to pay "greater amounts of interest" over the course of their loans as a result of longer amortization periods.  Pls. Brief at 51.

In their Brief, plaintiffs repeatedly point to the relative uniformity of Ocwen's pre-2014 template loan modification agreements and balloon disclosures and attempt to portray that similarity as the only relevant factor in the class certification analysis.  *See id.* at 3-5.  The balloon disclosure, however, is only the starting point of an individualized analysis that produces differing results for each plaintiff and putative class member.  Based on the claims alleged in the SAC, the Court must also assess, among other things, whether plaintiffs and putative class members can establish ascertainable loss, causation, and reliance on a class-wide basis.

Ascertainable loss and causation are essential elements of the UTPCPL and the NJCFA, and a plaintiff must establish these elements, along with justifiable reliance under the UTPCPL, to demonstrate Ocwen's liability and an individual right to relief.  Plaintiffs cannot dispatch with these requirements at the class certification stage, and they have failed to prove that these elements can be established on a class-wide basis without examining the unique circumstances of each putative member.  These inherently individualized issues preclude certification.  In light of these, among other flaws in their putative class claims, plaintiffs have failed to affirmatively demonstrate that their proposed classes satisfy the requirements of Fed. R. Civ. P. 23.

First, plaintiffs' proposed classes are overbroad as defined because they contain putative class members that have not suffered actual harm and lack standing to assert individual claims.

Second, the proposed Rule 23(b)(2) classes cannot be certified because plaintiffs are not entitled to injunctive or declaratory relief, the proposed classes lack cohesiveness, and the monetary relief sought predominates over plaintiffs' requested injunctive relief.

Third, plaintiffs fail to prove that their proposed classes are sufficiently ascertainable, that common questions predominate over individual questions, or that the class action is the superior method of adjudication of their claims; thus, their proposed classes are not suitable for class action treatment under Rule 23(b)(3).

Finally, plaintiffs' putative class claims do not satisfy the requirements of Rule 23(a), as the Caves provide no evidence regarding numerosity of the FDCPA claim, and plaintiffs do not otherwise satisfy commonality, typicality, or adequacy of representation for any of their claims.

## II.     FACTUAL BACKGROUND

### A.      Overview of Ocwen and Its Loan Modification Programs

#### 1.      Ocwen's Loss Mitigation Commitment

Ocwen is primarily a residential mortgage loan servicer that services loans throughout the

country, including in the Commonwealth of Pennsylvania and the State of New Jersey. *See* Declaration of Max Nieves, dated Oct. 4, 2016 ("Nieves Decl.") at ¶ 5. Ocwen has a long history of working with its customers to help them stay in their homes and avoid foreclosure. *Id.* at ¶ 6. Consistent with this history, when a borrower has difficulty making loan payments and the loan becomes delinquent, or is at risk of default, Ocwen will work with the borrower to identify options to assist the borrower in catching up on payments, curing the default, avoiding foreclosure, and staying in his or her home. *Id.* at ¶ 7. To that end, Ocwen has a comprehensive loss mitigation program to pursue workout options and foreclosure alternatives for loans in or at imminent risk of default. *Id.* at ¶¶ 8-9.

For borrowers who want to stay in their homes, a loan modification is often the preferred option. *Id.* at ¶ 10. Ocwen offers modifications through the government-sponsored Home Affordable Modification Program ("HAMP") and through its own in-house, non-HAMP modification programs. *Id.* Whether provided through HAMP or an in-house program, loan modifications employ a variety of mechanisms to alleviate borrowers' hardships, such as lowering monthly payment amounts, reducing interest rates (and/or changing adjustable rates to fixed rates), forgiving portions of unpaid principal balance, extending the loan term, deferring principal amounts, and extending the amortization period by which monthly payments are calculated. *Id.* at ¶ 11. The most obvious benefits of a loan modification include: (1) lower monthly payments as compared to the pre-modification loan terms; (2) avoidance of foreclosure and continued use of the home; (3) a no cost option to benefit from the home's appreciation; and (4) avoiding the adverse consequences of potential bankruptcy filings. *Id.* at ¶ 12; Expert Report of Joseph J. Floyd, dated Jan. 27, 2016 ("Floyd Report") at 5, 16-18, 23-26 (Ex. A to the Declaration of Brian M. Forbes, dated Oct. 7, 2016 ("Forbes Decl.")).

**2.      Ocwen's In-House Loan Modifications with a Balloon Feature**

In this case, the named plaintiffs and putative class members each received a loan modification from Ocwen (and, in some cases, multiple loan modifications).  As reflected by the named plaintiffs' loan modifications, these modifications provided borrowers with lower monthly payments and reduced interest rates, and allowed them to cure their loan delinquencies and remain in their homes.  The loan modifications provided to the named plaintiffs and the putative class member also contained a balloon feature - that is, they required a single, lump sum payment of unpaid principal and other outstanding amounts due, if any, at the end of the loan's term (*i.e.*, the maturity date).  *Id.* at ¶¶ 13-15.

As noted above, one tool used to lower a borrower's monthly principal and interest payments is to extend the amortization period up to 480 months.  *Id.* at ¶ 16.  Where the amortization period of a loan exceeds the remaining loan term, a balloon payment due at the maturity date results.  *Id.* at ¶ 17.  A balloon payment is not a penalty, a new obligation, or an additional sum owed after a borrower pays off the principal balance.  *Id.* at ¶ 18.  A balloon payment, instead, consists of a portion of unpaid principal balance that is effectively deferred until the end of the loan term, and may also include fees, charges, or other amounts that a borrower incurs after modification but has not paid by the maturity date.  *Id.* at ¶ 19.  A balloon payment will be "in an amount equal to all remaining amounts [due] under the Note and Modification" at maturity.  *Id.* at ¶ 20.  The purpose of a balloon feature is to lower the borrower's monthly payments as much as possible, remove the threat of foreclosure, and permit the borrower with lower monthly payments to regain equity in the home, while providing until the maturity date to consider financing options before the balloon payment is due.  *Id.* at ¶ 21.

Plaintiffs' claims are premised on the allegation that balloon disclosures contained in their loan modification agreements did not include the amount of the balloon payment.  The

4

exact amount of a balloon payment is not determined, or determinable, until the maturity date.
*Id.* at ¶ 23.  Although Ocwen can provide an estimate based on the assumption that the borrower
will make all scheduled monthly payments in full and on time, that amount will likely change
over the life of a loan.  *Id.* at ¶¶ 24-25.[1]  At the time a borrower enters a modification agreement
with a balloon feature, the estimated balloon payment would only include a portion of unpaid
principal balance that will be due at maturity.  *Id.* at ¶ 26.[2]  The balloon payment will increase
over the life of the loan if the borrower fails to make full and timely monthly payments or incurs
late fees or other charges that are due and unpaid at the maturity date.  *Id.* at ¶ 27.  The balloon
payment amount will decrease if the borrower makes all monthly payments in full and on time
and makes additional principal payments before maturity.  *Id.* at ¶ 28.  As such, it is impossible
to predict the final amount of a balloon payment until the maturity date.  *Id.* at ¶ 29.[3]

      Ocwen's current practice is to include the estimated amount of the balloon payment in its
in-house loan modification agreements and balloon disclosures.  *Id.* at ¶ 30.[4]  Ocwen began
including an estimated balloon payment amount in certain of its disclosures as early as December
2012, with the vast majority of older disclosures updated or discontinued by January 2014.  *Id.* at
¶ 31.[5]  Additionally, Ocwen will provide borrowers with an estimate of their balloon payment
amount upon request; Ocwen's employees are trained to identify and provide that information to

---

[1]    *See also* Deposition of Paul Myers, dated Dec. 20, 2013 ("Myers Dep."), at 80-81 (Ex. C to Forbes Decl.); Deposition of Rashad Blanchard, dated Oct. 2, 2015 ("Blanchard Dep."), at 134-37 (Ex. D to Forbes Decl.).

[2]    *See also* Deposition of Max Nieves, dated Oct. 28, 2015 ("Nieves Dep."), at 119-20 (Ex. E to Forbes Decl.); Blanchard Dep. at 138-41, 239.

[3]    *See also* Myers Dep. at 80-81; Blanchard Dep. at 134-37.

[4]    *See also* Nieves Dep. at 40-42, 63-64, 70-72, 115-16; Ocwen's Objs. and Resps. to Pl. Mark Kaminski's Second Set of Interrogatories, dated Dec. 21, 2015, at Resp. No. 3 (Ex. F to Forbes Decl.").

[5]    *See also* Nieves Dep. at 40-42, 63-64, 70-72, 115-16; Ocwen's Resps. to M. Kaminski's Second Set of Interrogatories, at Resp. No. 3.

borrowers. *Id.* at ¶¶ 32-35.[6]  Similarly, beginning at the latest in March 2011, Ocwen's online account website disclosed the applicable amortization periods for balloon loans. *Id.* at ¶ 36.[7] Ocwen employees are also trained and able to provide borrowers with amortization schedules for their loans. *Id.* at ¶ 37.[8]

### B.   The Named Plaintiffs' Loan Modification Agreements

#### 1.   Plaintiff Lisa A. Abraham

Plaintiff Lisa A. Abraham ("Abraham") fell behind on her mortgage obligations multiple times.  In response and to help her stay in her home, Ocwen provided Abraham with two separate loan modification agreements.

On June 18, 2007, Abraham executed a mortgage note, pursuant to which she promised to repay her lender the principal amount of $263,500.00 over 30 years with interest calculated at an annual rate of 8.59%.[9]  Under the original terms of her loan, Abraham's monthly principal and interest ("P&I") payments were $1,949.76 for the first 10 years and scheduled to increase to $2,196.79.[10]  As security for the note, Abraham executed a mortgage.[11]  Ocwen began servicing Abraham's loan shortly after its origination and before it became delinquent.[12]  In early 2009, Abraham began having difficulty making her monthly mortgage payment.[13]

---

[6]      *See also* Nieves Dep. at 82-83, 87, 126 (████████████████████████████████████████ ██████████████████████████████); Myers Dep. at 72, 80-81.

[7]      *See* Nieves Dep. at 73-75 (████████████████████████████████████████████████████ ██████████████████████); *id.* at 127-30.

[8]      *See id.* at 81-83.

[9]      *See* Deposition of Lisa A. Abraham, dated Aug. 28, 2015 ("Abraham Dep."), at 147-55 (Ex. G to the Forbes Decl.; *see also* Abraham Note (Ex. H to Forbes Decl.).

[10]     *See* Abraham Dep. at 154-55; Abraham Note at 1-2.

[11]     *See* Abraham Dep. at 148-50; Abraham Mortgage (Ex. I to Forbes Decl.).

[12]     *See* Ocwen's Detail Transaction History and Comment Log for Abraham loan (identifying first entries in or around June 2007) (Ex. J to Forbes Decl.).

[13]     *See id.* at 1 (████████████████████████████████████████████████ ████████████); Abraham Dep. at 169-70 (testifying that she had difficulty making payments before 2010).

Effective June 18, 2010, Abraham entered into a loan modification agreement with Ocwen.[14]   Abraham's mortgage loan was modified as follows: (a) the new principal balance was increased to $322,838.81; (b) the annual interest rate was reduced to a fixed rate of 6.4%; and (c) her monthly P&I payment was reduced to $1,867.13.[15]   The agreement also changed the amortization period to 480 months, which resulted in a balloon payment that would become due at maturity.[16]   Despite the modification, in or around February 2011, Abraham fell behind on her payments and was facing potential foreclosure.[17]

On or about November 23, 2012, Ocwen offered Abraham another modification, an in-house loan-modification agreement ("Abraham Loan Modification Agreement" or "Abraham Agreement"), which Abraham signed and returned in December 2012.[18]   At the time Abraham received her Loan Modification Agreement, ██████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████.[19]

The Abraham Agreement favorably modified the terms of Abraham's loan: (1) it reduced the principal balance to $236,040.80 (a significant reduction from the $322,838.81 principal balance under her earlier modification); (2) it forgave about $91,000.00 of her total outstanding debt; (3) it reduced her monthly P&I payments from $1,867.13 to $714.79; (4) it lowered her total monthly payment, including escrow items, from $2,535.16 to $1,319.75; and (5) it cut the

---

[14]     *See* Abraham Dep. at 189-206; Abraham 2010 Loan Modification Agreement (Ex. K to Forbes Decl.); Blanchard Dep. at 225-31.

[15]     *See* Abraham 2010 Loan Modification Agreement at 3-4; Blanchard Dep. at 225-31.

[16]     *See* Abraham 2010 Loan Modification Agreement at 3-4; Blanchard Dep. at 229-31.

[17]     *See* Abraham Dep. at 210-12; *see also* Act 91 Letter Notice dated Sept. 30, 2011 (Ex. L to Forbes Decl.); Letter to Abraham dated Nov. 30, 2012 (Ex. II to Forbes Decl.).

[18]     *See* Abraham Dep. at 227-29; *id.* at 228-29 (testifying that she signed the Agreement on December 28 or 29, 2012); Abraham Loan Modification Agreement at 2 (Ex. M to Forbes Decl.).

[19]     *See* Abraham Loan Comment Log, at Ocwen003526 (entry dated February 1, 2013 listing pre-modification reinstatement amount).

interest rate from 6.4% to 2.0%.[20] 

.[21]

The Abraham Loan Modification Agreement included a "Balloon Disclosure," which provided that Abraham would be required to make a single balloon payment on July 1, 2037, to pay off the remaining principal balance and any other outstanding amounts due at maturity.[22] The Balloon Disclosure informed Abraham that "even if [she] make[s] all payments full and on time, the loan will not be paid in full by the final payment date," that a balloon payment would be due "in an amount equal to all remaining amounts under the Note and Modification" as of July 1, 2037, and that "[t]he balloon payment may vary depending on your payment history . . . ."[23] The Balloon Disclosure did not identify the estimated amount of the balloon payment or the amortization period.[24] At the time Abraham received the Agreement, the estimated balloon payment amount, assuming she made all monthly payments in full and on time, was projected to be $████████.[25] The final amount of the balloon payment at maturity, however, will depend on Abraham's future payment history.

### 2. Plaintiffs Lisa and Scott Cave

On November 23, 2005, Plaintiffs Lisa and Scott Cave (the "Caves") obtained a loan from Saxon Mortgage, Inc., pursuant to which they promised to repay the principal amount of $236,300.00 over 30 years with interest calculated at an annual rate of 8.65%.[26] As security for

---

[20]     *See* Abraham Loan Modification Agreement at 1-3; Blanchard Dep. at 196-99.

[21]     *See* Blanchard Dep. at 229-31.

[22]     *See* Abraham Loan Modification Agreement at 4; Abraham Dep. at 241-44.

[23]     *See* Abraham Loan Modification Agreement at 3-4; Abraham Dep. at 241-44.

[24]     *See* Abraham Loan Modification Agreement, at 3-4.

[25]     *See* Abraham Dep. at 203-05, 211; *see also* Ocwen's Objs. and Resps. to Pls.' Requests for Admission, dated Jan. 26, 2015, at Resp. No. 14 (Ex. N to Forbes Decl.).

[26]     *See* Deposition of Lisa M. Cave, dated June 23, 2014 and July 7, 2014 ("L. Cave Dep."), at 97-100 (Ex. O to Forbes Decl.); *see also* Cave Note (Ex. 28 to Declaration of Eric Lechtzin in Support of Plaintiffs' Motion for Class Certification, dated Sept. 2, 2016 ("Lechtzin Decl.")).

their loan, the Caves executed a mortgage.[27]  Under the original terms of their loan, the Caves'

monthly P&I payments were $1,842.12.[28]  In or around May 2011, the servicing of the Caves'

mortgage was transferred to Ocwen, and at the time of transfer, ███████████████████████

██████████████████████████████████████████.[29]  As the Caves were

struggling to meet their monthly mortgage payments and facing foreclosure, they reached out to

Ocwen for assistance.[30]

On or about June 28, 2011, approximately one month after Ocwen began servicing their

loan, Ocwen offered the Caves an in-house loan modification agreement ("Cave Loan

Modification Agreement" or "Cave Agreement"), which the Caves signed and returned on July

8, 2011.[31]  At the time the Caves received their Agreement, █████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████.[32]  The Cave Agreement reduced the Caves' initial

monthly P&I payments to $1,000.02.[33]  The Cave Agreement also reduced the interest rate from

8.65% to: (1) 2.00% from the time of modification until August 1, 2016; and (2) 4.5% from

August 1, 2016 through maturity.[34]  The new principal balance of the loan was $278,203.09,

████████████████████████████████████████████████████

---

[27]     *See* L. Cave Dep. at 98-99; Cave Mortgage (Ex. 29 to Lechtzin Decl.).

[28]     *See* L. Cave Dep. at 99-100; Cave Note.

[29]     *See* Myers Dep. at 36-49; Letter to Caves dated May 19, 2011 (Ex. P to Forbes Decl.); Cave Detail Transaction History (identifying first activity in or around May 2011) (Ex. Q to Forbes Decl.).

[30]     *See* L. Cave Dep. at 298-99, 304, 331-32; Myers Dep. at 36-49.

[31]     L. Cave Dep. at 304-06, 421-22; Cave Mod. Agreement at 1-3 (Ex. R to Forbes Decl.).

[32]     Cave Loan Comment Log, dated Dec. 17, 2014, at Ocwen001505 (Ex. Q to Forbes Decl.).

[33]     *See* Cave Loan Modification Agreement at 1-2.

[34]     *See id.*

████████████████████████████████████████████████████████████

████████████████████████████████████████. [36]

The Cave Agreement included a "Balloon Disclosure," which provided that the Caves would be required to make a single balloon payment due on December 1, 2035, to pay off the remaining principal balance and any other outstanding amounts due on that date. [37] The Balloon Disclosure informed the Caves that "even if [they] make all payments full and on time, the loan will not be paid in full by the final payment date," that a balloon payment would be due "in an amount equal to all remaining amounts under the Note and Modification" as of December 1, 2035, and that "[t]he balloon payment may vary depending on your payment history . . . ." [38] The Balloon Disclosure did not identify the estimated dollar amount of the balloon payment or the applicable amortization period. [39] At the time the Caves received their Agreement, the estimated balloon payment amount, assuming they made all monthly payments in full and on time, was projected to be $████████. [40] The final amount of the balloon payment, however, will depend on the Caves' future payment history. ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████. [41]

---

[35]      *Id.*; Blanchard Dep. at 239-42; Ocwen's Resps. to Pls.' Requests for Admission, at No. 36.

[36]      *See* Myers Dep. at 86; Blanchard Dep. at 237-39.

[37]      *See* Cave Loan Modification Agreement at 1, 3.

[38]      *Id.* at 1, 3.

[39]      *Id.*

[40]      *See* Myers Dep. at 75; Blanchard Dep. at 235-36.

[41]      *See* Cave Payment Reconciliation History, dated Oct. 14, 2015, at Ocwen011932 - Ocwen011933 (████████████████████████████) (Ex. S to Forbes Decl.).

### 3.    Plaintiffs Lee Ann and Mark Kaminski

Plaintiffs Lee Ann and Mark Kaminski (the "Kaminskis") fell behind on their mortgage obligations multiple times.  In response and to help them stay in their home, Ocwen provided the Kaminskis with three separate loan modification agreements.

On February 24, 2006, the Kaminskis executed a mortgage note pursuant to which they promised to repay $344,250.00 over 30 years with interest calculated at an annual rate of 9.44%.[42]  As security for the note, the Kaminskis executed a mortgage.[43]  Under the original terms of their loan, the Kaminskis' monthly P&I payments were $2,772.58 for the first 10 years and scheduled to increase to $3,076.64.[44]  Ocwen began servicing the Kaminskis' loan shortly after origination and before it became delinquent.[45]  In or around 2007, the Kaminskis fell behind on their mortgage loan payments (█████████████████████████), went into default, and were facing foreclosure.[46]

On January 19, 2008, Ocwen provided the Kaminskis with a forbearance and loan modification agreement.[47]  Pursuant to the terms of that agreement, the Kaminskis' mortgage loan was modified, ████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████.[48]  The Kaminskis again fell behind on their mortgage loan payments,[49] and on or

---

[42]     *See* Deposition of Lee Ann Kaminski, dated Sept. 10, 2015 ("L. Kaminski Dep."), at 42-43, 50-52 (Ex. T to Forbes Decl.); Kaminski Note (Ex. U to Forbes Decl.).

[43]     *See* L. Kaminski Dep. at 52-54; Kaminski Mortgage (Ex. V to Forbes Decl.).

[44]     *See* L. Kaminski Dep. at 50-52; Kaminski Note.

[45]     *See* Kaminksi Payment Reconciliation History, dated Oct. 14, 2015, at Ocwen011934 - Ocwen011939 (listing first servicing activity in April 2006) (Ex. W to Forbes Decl.).

[46]     *See* L. Kaminski Dep. at 58, 63-65, 70-73; Kaminski Forbearance Agreement, dated Jan. 19, 2008, at 1 (█████████████████████████████) (Ex. X to Forbes Decl.).

[47]     *See* L. Kaminski Dep. at 66-69; Kaminski Forbearance Agreement at 1-5.

[48]     *See* Kaminski Forbearance Agreement at 2; L. Kaminski Dep. at 60-70.

[49]     *See* L. Kaminski Dep. at 72-80; Hardship Affidavit dated Mar. 19, 2009 (Ex. Y to Forbes Decl.).

about October 1, 2009, Ocwen provided the Kaminskis with a second modification, a permanent

HAMP loan modification agreement.[50] ███████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████.[52]  Despite the prior modifications, the Kaminskis again fell behind on their

loan payments in or around March 2011, and were again facing potential foreclosure.[53]

On or about March 9, 2011, Ocwen offered the Kaminskis a third loan modification

agreement ("Kaminski Loan Modification Agreement" or "Kaminski Agreement"), which the

Kaminskis signed on or about March 24, 2011.[54]  At the time the Kaminskis received their

Agreement, ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████.[55]  The Kaminski

Agreement reduced the interest rate on the Kaminskis' loan to a fixed rate of 2.0% and lowered

their monthly P&I payments to $1,143.32.[56]  The Kaminski Agreement increased the principal

balance due under the Kaminskis' loan to $377,555.05, ████████████████████████████

███████████████████████████████.[57] █████████████████████████████████████

---

[50]     Kaminski HAMP Loan Modification Agreement, dated June 17, 2009 (Ex. Z to Forbes Decl.).

[51]     ████████████████████████████████████████████████████████████████████████
███████████████████████████   *See id.* at 2-3; L. Kaminski Dep. at 98-100.

[52]     *See* Kaminski HAMP Loan Modification Agreement at 2; L. Kaminski Dep. at 93-99.

[53]     *See* L. Kaminski Dep. at 101-05; Letter dated Feb. 25, 2011 (Ex. AA to Forbes Decl.).

[54]     *See* L. Kaminski Dep. at 110-14; Letter dated Mar. 9, 2011 (enclosing Loan Modification
Agreement) (Ex. BB to Forbes Decl.); Kaminski Loan Mod. Agreement at 2-3 (Ex. CC to Forbes Decl.).

[55]     Kaminski Loan Comment Log, dated Feb. 12, 2015, at Ocwen005800 (Ex. HH to Forbes Decl.).

[56]     *See* Kaminski Loan Modification Agreement at 1; L. Kaminski Dep. at 118.

[57]     *See* Kaminski Loan Modification Agreement at 1; Blanchard Dep. at 83-84, 88-89, 140-45.

███████████████████.[58]   █████████████████████████████████████

██████████████████████████.[59]

The Kaminski Agreement included a "Balloon Disclosure," which provided that the Kaminskis would be required to make a single balloon payment on September 1, 2036, to pay off the remaining principal balance and any other outstanding amounts due on that date.[60]  The Balloon Disclosure informed the Kaminskis that "even if [they] make all payments full and on time, the loan will not be paid in full by the final payment date," that a balloon payment would be due "in an amount equal to all remaining amounts under the Note and Modification" as of September 1, 2036, and that "[t]he balloon payment may be more or less depending on your payment history . . . .[61]  The Balloon Disclosure did not identify the estimated dollar amount of the balloon payment or the amortization period.[62]  At the time the Kaminskis received the Agreement, the estimated balloon payment amount, assuming they made all monthly payments in full and on time, was projected to be $██████.[63]  The final amount of the balloon payment at maturity, however, will depend on the Kaminskis' future payment history.

### C.    Plaintiffs' Motion for Class Certification

On September 2, 2016, Plaintiffs filed a Motion for Class Certification in which they seek certification of three putative classes.  Abraham and the Caves seek to certify a class of Pennsylvania borrowers asserting claims under the UTPCPL (the "Pennsylvania Class").  *See* Pls. Brief at 2.  The Kaminskis seek to certify a similar class of New Jersey borrowers asserting

---

[58]      *See* Blanchard Dep. at 105-06.

[59]      *See* L. Kaminski Dep. at 130; *see also* Kaminski Payment Reconciliation History, at Ocwen011933 - Ocwen011939.

[60]      *See* Kaminski Loan Modification Agreement at 1, 3.

[61]      *Id.* at 1, 3.

[62]      *See id.*

[63]      *See* Blanchard Dep. at 129-30; Ocwen's Objs. and Resps. to Pl. Mark Kaminski's Interrogatories, dated May 18, 2015, at Resp. No. 10 (Ex. DD to Forbes Decl.).

claims under the NJCFA (the "New Jersey Class").  *Id.*  Finally, the Caves seek to certify a class

of Pennsylvania and New Jersey borrowers asserting FDCPA claims (the "FDCPA Class").  *Id.*

Plaintiffs appear to seek certification of the proposed Pennsylvania and New Jersey

Classes under both Rule 23(b)(2) and Rule 23(b)(3) of the Federal Rules of Civil Procedure.

Plaintiffs' request, however, is unclear.  In one section of their Brief, Plaintiffs request

certification "pursuant to Rule 23(b)(2) ***or, in the alternative***, pursuant to Rule 23(b)(3)."  Pls.

Brief at 58 (emphasis added).  In another section, plaintiffs seek Rule 23(b)(3) certification "in

addition (or in the alternative)" to Rule 23(b)(2) (*id.* at 3), and a different section purports to

"also seek certification" under Rule 23(b)(3) (*id.* at 44).  With respect to the proposed FDCPA

class, plaintiffs seek certification only under Rule 23(b)(3).  *Id.* at 2.

## III.    APPLICABLE STANDARD

### A.    Plaintiffs Must Affirmatively Demonstrate Each Of The Requirements For Class Certification Under Rule 23

The U.S. Court of Appeals for the Third Circuit has explained that "not every group of

plaintiffs should be granted class action status, because 'the class action is an exception to the

usual rule that litigation is conducted by and on behalf of the individual named parties only.'"  *In*

*re Modafinil Antitrust Litig.*, --- F.3d ---, 2016 WL 4757793, at *1 (3d Cir. Sept. 13, 2016)

(quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011)).  Plaintiffs bear the burden to

demonstrate that their putative class claims satisfy all of the prerequisites of Rule 23(a) and at

least one of the subsections of Rule 23(b).  *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591,

613-14 (1997).  To do so, plaintiffs must present facts sufficient to meet those requirements by a

preponderance of the evidence.  *See In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d

Cir. 2015); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 320 (3d Cir. 2009).

"A party seeking class certification must affirmatively demonstrate his compliance with

14

the Rule . . . he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Dukes*, 564 U.S. at 350.  The Court must apply a rigorous analysis to determine that plaintiffs have met this burden.  *See id.*  In doing so, the Court "must consider carefully all relevant evidence and make a definitive determination that the requirements of Rule 23 have been met before certifying a class."  *Lewis v. Ford Motor Co.*, 263 F.R.D. 252, 256 (W.D. Pa. 2009) (internal quotations omitted); *Harnish v. Widener Univ. Sch. of Law*, --- F.3d ----, 2016 WL 4363133, at *3 (3d Cir. Aug. 16, 2016).  And, "the court cannot be bashful;" it "must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits."  *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 591 (3d Cir. 2012) (internal quotations omitted).  Thus, the Court must look beyond the pleadings to determine whether plaintiffs' claims – and the evidence necessary to establish those claims – satisfy the strict standards of Rule 23.  *See Dukes*, 564 U.S. at 350-51.

Plaintiffs' repeated observation that claims arising from "consumer or securities fraud or violations of the antitrust laws" are well-suited for class treatment (Pls. Brief at 25-26) does not alleviate their burden.  Indeed, the Third Circuit has cautioned that "it does not follow that a court should relax its certification analysis, or presume a requirement for certification is met, merely because a plaintiff's claims fall within one of those substantive categories."  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 322.  As is evident in this case, many consumer claims are *not* suited for class treatment, particularly where, as here, ascertainable loss, causation, and reliance are elements of those claims.  *See Harnish*, 2016 WL 4363133, at *7.

### B.       The Elements of Plaintiffs' Putative Class Claims

To evaluate plaintiffs' Motion, the Court must examine plaintiffs' putative class claims, the elements of those claims, and the evidence necessary to prove each of those elements.  *See Marcus*, 687 F.3d at 600 ("[A] court at the certification stage must examine each element of a

legal claim 'through the prism' of Rule 23(b)(3).").

To succeed on a claim under the UTPCPL, Abraham and the Caves must establish that there is evidence to satisfy these elements: (1) a deceptive act; (2) that plaintiffs "suffered an ascertainable loss of money or property;" (3) causation - *i.e.*, "the loss occurred as a result of the use or employment . . . of a method, act, or practice declared unlawful by the UTPCPL" and (4) "that the plaintiffs justifiably relied on the deceptive conduct." *Abraham v. Ocwen Loan Servicing, LLC*, No. 14-4977, 2016 WL 2866537, at *10 n.3 (E.D. Pa. May 17, 2016).

To succeed on a NJCFA claim, the Kaminskis must demonstrate the existence of: "(1) an unlawful practice, (2) an ascertainable loss, and (3) a causal relationship between the unlawful conduct and the ascertainable loss." *Harnish*, 2016 WL 4363133, at *4 (internal quotations omitted). Where a plaintiff asserts omission-based claims, the "plaintiff must [also] show that defendant (1) knowingly concealed (2) a material fact (3) with the intention that plaintiff rely upon the concealment." *Abraham*, 2016 WL 2866537, at *11 (internal quotations omitted).

Finally, the Caves assert putative class claims under the FDCPA. To succeed on an FDCPA claim, "a plaintiff must prove that (1) she is a consumer, (2) the defendant is a 'debt collector,' (3) the defendant's challenged practice involves an attempt to collect a 'debt' as the Act defines it, and (4) the defendant has violated a provision of the FDCPA in attempting to collect the debt." *Jensen v. Pressler & Pressler*, 791 F.3d 413, 417 (3d Cir. 2015) (internal quotations omitted). The FDCPA provides that an entity that attempts to collect "a debt which was not in default at the time it was obtained by such person" is *not* a "debt collector" subject to the FDCPA. *See* 15 U.S.C § 1692a(6)(F); *McAndrew v. Deutsche Bank Nat'l Trust Co.*, 977 F. Supp. 2d 440, 448 (M.D. Pa. 2013) ("A loan servicer … cannot be a 'debt collector' under the FDCPA unless the debt was in default when it was obtained by the servicer.").

## IV.    PLAINTIFFS' FLAWED THEORY OF LOSS AND DAMAGES

### A.    Plaintiffs' Proposed Method For Determining The Fact Of Ascertainable Loss And The Measure Of Damages

As a predicate to Ocwen's analysis of plaintiffs' failure to establish the prerequisites of Rule 23, it is important to understand that plaintiffs' entire proffered analysis is based on a fundamentally flawed theory of causation and ascertainable - indeed hypothetical - loss. Plaintiffs propose a theory of ascertainable loss and actual harm allegedly suffered by plaintiffs and putative class members that addresses both the fact of harm and a method of calculating damages. The Third Circuit has recognized the importance of the distinction between the "fact of damage" - *i.e.*, the establishment of ascertainable loss and causation - and the "measure/amount of damages" at the class certification stage. *Harnish*, 2016 WL 4363133, at *4. Where ascertainable loss and causation are elements of liability under a plaintiff's claim, the Court must "examine the plaintiffs' theory of damages and the proof supporting it." *Id.*

 Pls. Brief at 51. In support, plaintiffs rely on the opinion of Dr. Brian C. Becker as set forth in Dr. Becker's Class Certification Report (the "Becker Report"). *See* Pls. Brief at 50-52; Becker Report, dated Dec. 21, 2015, at 25-26; 30-31 (Ex. 1 to Lechtzin Decl.). *See* Becker Report at 22; Pls. Brief at 51.

17

███████████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████ Becker Report at 22. █████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████. *See id.* at 24-25.  All that Dr. Becker's hypothetical

construct proves is that there is no practical means to prove causation and damages other than by

individual analysis of each borrower's circumstances, even if the Court were to accept Dr.

Becker's plainly-flawed methodology.

██████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████ *Id.* at 21.

██████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

18

██████████████████████████████[64]   *Id.* at 21-22.  This Court has already considered and rejected this assumption as "implausible."  *Abraham*, 2016 WL 2866537, at *8-9.  The Court found that "[i]t is implausible to expect that [p]laintiffs retained the right to enforce the original amortization period when they accepted the modification that reduced their current payments" because that expectation "would destroy the mutual benefits created by the modification, namely reduced monthly payments over the loan term coupled with the balloon payment, in exchange for Ocwen's forbearance on collecting the loan as originally agreed."  *Id.* at *9.  In light of the Court's rejection of the assumptions underlying plaintiffs' theory of harm, the Court should likewise reject that theory here and disregard the Becker Report's opinions regarding the causation and existence of loss.  *See Cave v. Saxon Mortg. Servs., Inc.*, Nos. 11-4586, 12-5366, 2015 WL 6153754, at *9 (E.D. Pa. Oct. 20, 2015) (finding portions of expert report "unreliable and inadmissible under *Daubert*" where opinions "are contrary to [the Court's] prior rulings").

Putting aside the unreasonableness of the underlying assumption, plaintiffs' theory proposes the following process for determining whether and in what amount, if any, each plaintiff and putative class member suffered actual ascertainable loss of money or property. Plaintiffs' proposed methodology, if credited and followed, would require multiple individualized steps for each of the tens of thousands of loans potentially in the putative classes.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[64] ██████████████████████████████████████████████████████████████  *See* Deposition of Brian C. Becker, dated July 20, 2016 ("Becker Dep."), at 125-28 (Ex. EE to the Forbes Decl.).

██████████████████████████████████████████████████████

████████████████████████████████ *See* Becker Dep. at 135-37, 159-64, 165-67.

████████████████████████████████████████████

████████████████████ *See* Becker Dep. at 131-32. ████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████ *See* Becker

Report at 24; *see* Becker Dep. at 131-32 (██████████████████████████████

█████████████████████████████████████████████).

█████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████. *See* Becker Report at 24-26, 29. ████████████████████████

█████████████████████████████████████████████

████████████████████████████ *See* Becker Dep. at 285-86; Becker Report at 29-30.

████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████. *See* Becker Report at 29-33.

████████████████████████████████████████ *See* Becker Dep. at 285-86. █

████████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████ Becker Report at 30-32; Reply Class

Certification Report of Brian C. Becker, dated Feb. 12, 2016, at 9 n.13 (the "Becker Reply Report") (Ex. 2 to the Lechtzin Decl.). ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

### B.   Plaintiffs' Theory Of Harm Is Incomplete And Incorrect

Plaintiffs' method for determining ascertainable loss and calculating the value of that loss suffers from a number of fundamental flaws that impact both the weight and credibility of plaintiffs' theory and the Becker Report's conclusions.

First, plaintiffs' "but-for" comparison is factually misplaced. ████████████

████████████████████████████████████████

████████████████████████████████████████████

████ *See* Becker Report at 22-30; Becker Dep. at 120. ████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████.[65] ████████████████████████████

████████████████████████████████████

████████████████████████████ *See* Floyd Report at 16-25.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████ *See* Becker Dep. at 225-

---

[65]     *See* Abraham Dep. at 350-51 (if balloon amount had been disclosed, she likely would not have entered into the modification); L. Kaminski Dep. at 117-18, 148-49 ("I wouldn't have signed it."); Deposition of Mark Kaminski, dated September 10, 2015, ("M. Kaminski Dep.") at 92-93 (same) (Ex. FF to Forbes Decl.); L. Cave Dep. at 475 ("I wouldn't have entered into the modification if I knew that the balloon was as big as it was."); Deposition of Scott Cave, dated June 24, 2014 and July 24, 2014 ("S. Cave Dep."), at 70 ("I would have walked away."), 198, 218, 586-87 (Ex. GG to Forbes Decl.).

21

26. ███████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████ *See id.* at 280.

████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████ *See id.* at 202-03 (████

███████████████████████████████████████

███████████████████████ ), 207-08. █████████████████

█████████████████████████████████████

███████████████████████████████████████████

████████████████████ *Id.* at 209-10 (███████████████████

███████████████████████████████████████

████████████████████████████████████ ).

███████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

██████████████████████████████████ .

███████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████ *See* Floyd Report at 16-25.



███████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

███████████████████████████████████.[66] *See* Floyd Report at

17-18. █████████████████████████████████ *See*

Becker Dep. at 82 (████████████████████████████

██████████████████████████████████████████).

     ███████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████ *See* Floyd Report at 24-25. ████

████████████████████████████████[67] ████

███████████████████████████████████

███████████████████████. *See* Becker Dep. at 59-64, 70-72 (████████

███████████████████████████████████

███), 249-50. ███████████████████████ *Id.* at 63-65 (█

█████████████████), 249 (█████████████████████

██████████).  ███████████████████████████

---

[66]      The named plaintiffs admitted that lower monthly payment amounts and lower interest rates were important at the time they entered their loan modification agreements.  *See* Abraham Dep. at 235-238; L. Kaminski Dep. at 79-80, 87-88, 129-30 (testifying that modified monthly payments were affordable, that they were current on their payments, and that they remain in the property); M. Kaminski Dep. at 65-66, 77 (loan modification agreement "put[ ] us in a better financial position at the time"); L. Cave Dep. at 328-29, 365-66 (goal was to obtain a loan with a better interest rate and lower monthly payments).

[67]      Abraham Dep. at 211-12, 215-17, 219-20, 223-25 (did not consider other options because "you lose your home"); L. Kaminski Dep. at 90-91, 99 ("I just wanted to keep my house"), 103 ("I was always concerned about foreclosure.") L. Cave Dep. at 300-01 (she "didn't want to lose [her]house"), 333, 389, 420, 424, 451, 475-76; S. Cave Dep. at 121-22 ("I didn't want to lose my house").



████████ Floyd Report at 25.

████████████████████████████████████████████████████████. *See* Supplement to the Expert Report of Joseph J. Floyd, dated July 29, 2016, at 2-4 ("Floyd Supplement Report") (Ex. B to the Forbes Decl.). ████████

████████████████████████████ *See id.* at 2-3. ████████████████████

████████ *See id.* at 3-4. ████████████████████

████████████████████████████████████ Becker Dep. at 232 (emphasis added). ████████████████████

████████ Floyd Supplement Report at 5. ████████████████

████████████████████. *See id.* at 4-5.

## V.   ARGUMENT

Having pointed out the fatal flaws of Dr. Becker's theory of ascertainable loss and actual harm on which plaintiffs' arguments for class-certification are substantially based, Ocwen now turns to the analysis of the applicable Rule 23 requirements.

### A.   Plaintiffs' Proposed Class Definitions Are Fundamentally Flawed And Cannot Be Certified Under Rule 23

#### 1.   Plaintiffs' Pennsylvania and New Jersey Classes are Overbroad

Plaintiffs' proposed Pennsylvania and New Jersey Classes are overbroad and contain members who have not suffered an ascertainable loss and thus lack a right to recover relief from Ocwen.  As these fundamental flaws impact a number of different class certification requirements, including commonality, typicality, and adequacy under Rule 23(a) and predominance and superiority under Rule 23(b)(3), Ocwen addresses them out the outset.[68]

Plaintiffs' proposed classes are defined to include all homeowners in Pennsylvania or New Jersey who (1) have or had mortgage loans serviced by Ocwen and (2) who "entered into" a loan modification agreement with Ocwen (3) that contains a Balloon Disclosure provision (4) that omits the estimated amount of the balloon payment due at the loan maturity date.  *See* Pls. Brief at 2.  Noticeably lacking from these definitions is any reference to ascertainable loss, causation, or justifiable reliance.  These omissions are critical because ascertainable loss and causation are essential elements of the UTPCPL and NJCFA, which, with reliance for the UTPCPL, a plaintiff must establish to obtain relief.  *See* Section III.B, *supra*.  As a result, plaintiffs' proposed Pennsylvania and New Jersey Classes by definition include putative class members who have not suffered an ascertainable loss and do not have a cognizable claim for relief.  *See Bright v. Asset Acceptance, LLC*, 292 F.R.D. 190, 198 (D.N.J. 2013) (finding class

---

[68]    The Third Circuit has explained that issues of overbreadth and standing are considered "within the rubric of the relevant Rule 23 requirements."  *Byrd v. Aaron's Inc.*, 784 F.3d 154, 169 (3d Cir. 2015).

definition that lacked alleged harm overbroad as it "includes members who . . . would not have viable FDCPA claims").

The overbreadth of the classes is exemplified by the UTPCPL claim asserted by plaintiff Abraham. ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████. Pls. Brief at 51-52. ██████████████████████████

████████████████████████████████████████████████████

█████████████████████. *See* Becker Report at 25-26, 30-31.

Plaintiffs do not dispute this fact. ███████████████████████████████████████████

████████████████████████████████████████████:

████████████████████████████████████████████████████

Becker Report at 30-31 (emphasis added); *see also* Becker Dep. at 150-51 (████████████████

████████████████████████████████████████████████████████).  This is not surprising where Abraham's Loan Modification Agreement lowered her monthly payment by over $1,200.00 per month, lowered her interest rate from 6.4% to 2.0%, and forgave approximately $91,000.00 of her total debt.  *See* Section II.B.1, *supra*.  As such, although Abraham falls within the definition of the proposed Pennsylvania Class, she has not suffered any ascertainable loss and has no individual right to relief under the UTPCPL.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

 *See* Floyd Report at 24-25; Section IV.B, *supra*. ████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████ (*see* Floyd Supplement Report at 4-5).

Moreover, as both the Floyd Report and the Becker Report show, the determination of causation and ascertainable loss requires the same multi-faceted and highly individualized analysis of different loan-specific factors, as well as considerations of causation and reliance, for each putative class member.  These individualized issues highlight the overbreadth of the class definitions and also defeat predominance (among other requirements) and preclude certification of the proposed Pennsylvania and New Jersey Classes under Rule 23(b)(3) and Rule 23(b)(2). *See Harnish*, 2016 WL 4363133, at *4-5, 10 ("because the fact of damages (an 'ascertainable loss' having a 'causal relationship' with [defendant's] conduct) is a crucial issue in the case, the inability to resolve it in class-wide fashion will cause individual questions to predominate over common ones").

> ### 2.      The Caves' FDCPA claims are time-barred and the FDCPA Class lacks a representative

The Caves seek to represent the FDCPA Class.  *See* Pls. Brief at 2.  The Caves' FDCPA claim, however, is time-barred.  *See* 15 U.S.C. § 1692k(d).  The Caves FDCPA claim accrued on the date they entered their Loan Modification Agreement.  *See Glover v. F.D.I.C.*, 698 F.3d 139, 150 (3d Cir. 2012) (FDCPA claim "arose on the date that the Modification Agreement was signed and the representation about [plaintiff's] debt became objectively false").  The Caves executed and returned the Agreement on July 8, 2011.  *See* Cave Loan Modification Agreement,

at 1-4 (with fax page and banner dated "7/8/11").  As such, the Caves were required to file any balloon-disclosure-related FDCPA claims by July 8, 2012.

"The Caves' first putative class claims addressing Ocwen's balloon disclosures were asserted in the First Amended Class Action Complaint [("FAC")] filed in [the related case, *Cave v. Saxon Mortgage Servs., Inc.*, Civ. A. No. 11-04586 ("*Cave* I")] on February 14, 2013." *Abraham*, 2016 WL 2866537, at *1.  The Caves' original complaint, filed on July 20, 2011, primarily alleged that their prior servicer wrongfully denied their application for a loan modification under HAMP.  *See id.*  The original complaint contained only three allegations directly addressing Ocwen and only one specific allegation referencing the "balloon disclosure" that forms the basis of plaintiffs' current claims.  *See id.*  As this Court has found, the Caves' original complaint "did not assert any balloon-disclosure related class claims."  *Id.*  The FDCPA claim pled in the original complaint was targeted to HAMP, HAMP trial period plans, and allegations unrelated to the balloon disclosure.  *See Cave* I, Dkt. No. 1, at ¶¶ 87-130.

Accordingly, the Caves' balloon-disclosure-based FDCPA claim relates-back, at the earliest, to the February 14, 2013 filing of the *Cave* FAC.  *See Glover*, 698 F.3d at 145-48. Because the limitations period expired on July 8, 2012, more than 7 months before they filed the *Cave* FAC, the Caves' FDCPA claim is time-barred.  The Caves, therefore, cannot pursue their individual FDCPA claim or adequately represent the FDCPA Class.  *See Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 361 (3d Cir. 2013).  Absent a class representative with an actionable FDCPA claim, the proposed FDCPA Class cannot be certified.

### 3.     The Caves Lack Standing to Assert FDCPA Claims and the FDCPA Class is Overbroad

Plaintiffs' proposed FDCPA Class is overbroad as it contains putative class members that lack Article III standing.  The proposed FDCPA Class is defined to include all Pennsylvania or

New Jersey homeowners who have or had a loan serviced by Ocwen, which loan was "in default" when it was transferred to Ocwen, and to whom Ocwen "sent" a "standard form template Loan Modification Agreement" on or after July 21, 2010 that contains a Balloon Disclosure that omits the estimated amount of the balloon payment.  *See* Pls. Brief at 2.  This definition necessarily includes members who have not suffered actual harm.

A plaintiff cannot establish Article III standing merely "by alleging a bare procedural violation" absent actual injury-in-fact.  *Spokeo, Inc. v. Robins*, --- U.S. ---, 136 S. Ct. 1540, 1550 (2016); *see also Bock v. Pressler & Pressler, LLP*, --- F. App'x ---, 2016 WL 4011150, at *2 (3d Cir. 2016).  Instead, a plaintiff must allege an injury-in-fact that is "concrete and particularized."  *Spokeo*, 136 S. Ct. at 1548.  An injury is "particularized" when it "affect[s] the plaintiff in a personal and individual way," and is "concrete" where it "actually exist[s]."  *Id.*  A plaintiff does not "automatically satisf[y] the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right."  *Id.* at 1549 (internal quotation marks omitted).  The plaintiff must demonstrate a "concrete injury" in the context of the statutory violation.  *Id.*  Although the FDCPA does not require "ascertainable loss" as an element of a claim, a plaintiff must have a concrete and particularized injury to have standing.  *See Bock*, 2016 WL 4011150, at *1-2.

The Caves allege that Ocwen violated the FDCPA because the balloon disclosure confused them as to "the correct amount allegedly owed under the mortgage[s]" and made "confusing and deceptive representations about the principal and interest charges and the amounts allegedly owed under the mortgage."  SAC ¶ 106.  The Caves have not suffered any actual, concrete injury-in-fact as a result of the allegedly confusing balloon disclosure.

Loan modifications provide numerous benefits to borrowers like the Caves and putative class members.  *See* Floyd Report at 23-24; Nieves Decl. at ¶¶ 10-12.  The Caves' Loan Modification Agreement reduced their initial monthly P&I payments by over $800.00 and reduced their interest rate significantly.  *See* Section II.B.2, *supra*.  The Agreement also cured the Caves pre-modification delinquency and removed the threat of foreclosure.  *See* Pls. Brief at 8.[69] Those benefits must be considered in assessing any ascertainable loss suffered and, when applied to the Caves, confirm that they have not suffered "any ascertainable loss, actual harm, or financial damages."  Floyd Report at 25; Floyd Supplement Report at 4-5.  The Caves, therefore, lack Article III standing and cannot represent the proposed FDCPA Class.

Even assuming that the Caves had standing, plaintiffs' proposed FDCPA Class is likely to include putative class members who have suffered no actual, concrete injury-in-fact, and thus lack standing.  Indeed, plaintiffs provide no explanation suggesting how a putative class member who was "sent," but did not "enter into" or even "receive," an allegedly confusing modification agreement could have suffered an actual, concrete, and redressable injury.  "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not.  The Judiciary's role is limited to providing relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm."  *Tyson Foods, Inc. v. Bouaphakeo*, ---U.S. ---, 136 S. Ct. 1036, 1053 (2016) (Roberts, C.J., concurring) (internal quotation marks omitted).  Plaintiffs' proposed FDCPA Class is overbroad and cannot be certified.

---

[69]     *See also* Myers Dep. at 43, 46-49 (█████████████████████████); *see also* Letter dated May 19, 2011 at 1 (█████████████████████████).

**B.**      **Plaintiffs' Proposed Pennsylvania And New Jersey Classes Do Not Satisfy The Requirements Of Rule 23(b)(2)**

Rule 23(b)(2) provides for certification of a class where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).

A Rule 23(b)(2) class must be "cohesive."  *Gates v. Rohm and Haas Co.*, 655 F.3d 255, 263-64 (3d Cir. 2011).  Rule 23(b)(2), moreover, applies only to putative class actions seeking "primarily injunctive or corresponding declaratory relief."  *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 142 (3d Cir. 1998) (internal quotations omitted).  It does not extend to cases "in which the appropriate final relief relates exclusively or predominately to money damages."  *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 198 (3d Cir. 2009) (internal quotations omitted).  "'The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted - the notion that the conduct is such that it can be enjoined or declared unlawful *only* as to all of the class members or as to none of them.'"  *Shelton v. Bledsoe*, 775 F.3d 554, 561 (3d Cir. 2015) (quoting *Dukes*, 564 U.S. at 360).  Accordingly, a class cannot be certified under Rule 23(b)(2) where the injunctive or declaratory relief sought is individualized in nature or in application.  *See Dukes*, 564 U.S. at 360-61; *Mladenov v. Wegmans Food Markets, Inc.*, 124 F. Supp. 3d 360, 369 (D.N.J. 2015) ("the mere existence of a claim seeking injunctive and declaratory relief does not automatically trigger 23(b)(2)").  Rule 23(b)(2) "applies only when a single injunction or declaratory judgment would provide relief to each member of the class."  *Dukes*, 564 U.S. at 360; *Gates*, 655 F.3d at 262.

In support of their request to certify the proposed Pennsylvania and the New Jersey Classes under Rule 23(b)(2), plaintiffs point to two types of injunctive relief.  *See* Pl. Brief at 42-

44.  Plaintiffs request prohibitory injunctive relief that includes: (1) a declaration that the balloon disclosure provision is unlawful; and (2) an injunction prohibiting Ocwen from offering loan modification agreements with balloon disclosure provisions that do not state the estimated amount of the balloon payment.  *See id.* at 44.  Plaintiffs also request mandatory injunctive relief that would require Ocwen to: (1) collect data, draft, and send separate disclosures to each individual putative class member providing: (a) the minimum estimated amount of the balloon payment applicable to that putative class member's loan at the time he or she obtained the loan modification agreement; (b) the manner in which the balloon payment is calculated for that putative class member's loan; (c) the sums that comprise the estimated amount of that putative class member's balloon payment;[70] and (d) the estimated amount of that putative class member's balloon payment at the time the disclosure is made; (2) offer each putative class member the option to rescind his or her loan modification agreement and return to pre-modification loan terms; and (3) provide each putative class member the option to apply for a new loan modification.  *See id.*  Plaintiffs, however, offer no substantive analysis of the Rule 23(b)(2) requirements as applied to their claims or the injunctive relief sought.

### 1.    Plaintiffs are Not Entitled to each Form of Injunctive Relief Requested in their Motion

#### a.    The UTPCPL does not provide for injunctive or declaratory relief

The UTPCPL does not provide for injunctive or declaratory relief.  Instead, "the only remedy available to private litigants under the UTPCPL are monetary damages."  *In re Soto*, 221 B.R. 343, 357 (Bankr. E.D. Pa. 1998).  The statute provides that a private plaintiff may "recover actual damages or one hundred dollars ($100), whichever is greater."  73 Pa. Stat. § 201-9.2.

---

[70]    Plaintiffs do not specify the period for which they seek this information.  That is critical as the amounts that may be included in the balloon payment are not determined until the maturity date of the loan and may change.  *See* Nieves Decl. at ¶¶ 23-29; Blanchard Dep. 117-18, 134-41, 239.

The UTPCPL also allows for treble damages and, in the Court's discretion, "such additional relief as it deems necessary or proper." *Id.* The plain statutory language does not authorize injunctive or declaratory relief, which is limited to claims by the Pennsylvania Attorney General. *See* 73 Pa. Stat. § 201-4. As such, neither plaintiffs nor the Pennsylvania Class are entitled to injunctive relief. *See*, *e.g.*, *Goleman v. York Int'l Corp.*, No. 11-1328, 2011 WL 3330423, at *10 n.6 (E.D. Pa. Aug. 3, 2011) ("[T]he UTPCPL authorizes only the Attorney General and District Attorney, not a private plaintiff, to seek . . . injunctive relief . . . ."); *Rauso v. Fein*, No. 13-cv-693, 2015 WL 2217411, at *8 (E.D. Pa. May 12, 2015).

In their Brief, plaintiffs declare that injunctive relief "is available under . . . the UTPCPL" and rely on a single District Court case in support - *Robinson v. Holiday Universal, Inc.*, No. 05-cv-5726, 2006 WL 2642323 (E.D. Pa. Sept. 11, 2006). *See* Pls. Brief at 42. The *Robinson* Court, however, merely noted that it could not find cases permitting or denying injunctive relief to private plaintiffs under the UTPCPL and, therefore, that it would not dismiss the request for injunctive relief at the motion to dismiss stage. *See id.* at *8. The Court did not hold injunctive relief available under the UTPCPL. *See id.* Federal courts in Pennsylvania have found injunctive relief unavailable to private plaintiffs under the UTPCPL, and the unavailability of such relief precludes certification of the Pennsylvania Class under Rule 23(b)(2).

   b. <u>Plaintiffs lack standing to obtain their requested prohibitory injunctive relief</u>

Plaintiffs seek to enjoin Ocwen "from offering loan modifications with . . . balloon disclosure provisions" that do not disclose the estimated amount of the balloon payment. *See* Pls. Brief at 44. Plaintiffs lack standing to seek that relief. *See McNair v. Synapse Grp. Inc.*, 672 F.3d 213, 222-23 (3d Cir. 2012). To have Article III standing to seek injunctive relief, plaintiffs must establish an immediate threat of actual future injury. *See ZF Meritor, LLC v. Eaton Corp.*,

696 F.3d 254, 301 (3d Cir. 2012).  The threatened injury must be more than "possible future injury;" it "must be certainly impending and proceed with a high degree of immediacy." *McCray v. Fid. Nat'l Title Ins. Co.*, 682 F.3d 229, 243 (3d Cir. 2012) (internal quotation marks omitted).  Plaintiffs cannot satisfy their burden.

First, as plaintiffs acknowledge, Ocwen's current practice is to include the estimated amount of the balloon payment in its in-house loan modification agreements that contain a balloon feature.  *See* Pls. Brief at 6, 7, 39, 46.  Ocwen implemented its current practice in late 2013 and early 2014 by amending its various template modification agreements.[71]  Ocwen began including an estimated balloon payment amount in certain of its template disclosures as early as December 2012 and January 2013, with the vast majority of other templates updated or discontinued by January 2014.[72]  Plaintiffs have not offered any evidence, or even any argument, that Ocwen is likely to revert to using balloon disclosure templates that omit the estimated balloon payment amount.  *See McCray*, 682 F.3d at 243-44.

Second, the named plaintiffs have not argued, testified, or suggested that they are likely to apply for and enter new loan modification agreements from Ocwen that contain balloon payment features.  Even if they did, plaintiffs have not shown that Ocwen is likely to provide them with a balloon disclosure that does not contain the estimated balloon payment amount. Any contrary argument would be speculative.  *See McNair*, 672 F.3d at 225 ("wholly conjectural future injury [that plaintiffs] rely on does not, and cannot, satisfy the constitutional requirement that a plaintiff seeking injunctive relief must demonstrate a likelihood of future harm"). Plaintiffs lack standing to seek the prohibitory injunctive relief requested in their Motion, and, thus, cannot represent putative classes seeking such relief under Rule 23(b)(2).

---

[71]     *See* Nieves Dep. at 40-42, 63-64, 70-72, 115-16; *see also* Ocwen's Resps. to M. Kaminski's Second Set of Interrogatories, at Resp. No. 3.

[72]     *See* Ocwen's Resps. to M. Kaminski's Second Interrogatories at Resp. No. 3.

c.   <u>Plaintiffs have not demonstrated an entitlement to the</u>
<u>extraordinary remedy of a mandatory injunction</u>

Plaintiffs seek a mandatory injunction that would require Ocwen to prepare and send

loan-specific disclosures to each putative class member and to offer each member the options to

rescind his or her loan modification agreement and apply for a new loan modification.  A

mandatory injunction, however, "is an extraordinary remedy that is only granted sparingly by the

Courts."  *Trinity Indus., Inc. v. Chi. Bridge & Iron Co.*, 735 F.3d 131, 139 (3d Cir. 2013).  A

plaintiff seeking such relief bears a "particularly heavy" burden to show a right to an injunction

that is "indisputably clear."  *Id.* (internal quotations omitted); *Snyder v. Millersville Univ.*, No.

07-1660, 2008 WL 5093140, at *11 (E.D. Pa. Dec. 3, 2008).

Plaintiffs offer no explanation, legal authority, or evidence to support entitlement to the

mandatory injunctive relief they seek.  That is because they cannot.  Plaintiffs are not entitled to

*any* injunctive or declaratory relief under the UTPCPL, and they do not show compelling

circumstances warranting mandatory injunctive relief under the NJCFA.  As an initial matter,

plaintiffs have an adequate remedy at law in monetary damages.  The primary relief available

under the NJCFA and the UTPCPL is actual damages, and both putative classes seek actual

damages, statutory damages, and treble damages, which requests are discussed extensively in

their Brief.  *See* Pls. Brief at 5, 40, 41, 44-45, 47-52, 58.

Plaintiffs also cannot show that they will suffer irreparable harm absent the injunctive

relief.  First, the named plaintiffs have already been provided with the estimated amounts of the

balloon payments due at the maturity of their loans as well as the applicable amortization

periods.  *See* Pls. Brief at 9-10, 12-13, 16-17.  The members of the putative classes can also

request the information directly from Ocwen, if they do not have it already.[73]  The information is

---

[73]        Nieves Dep. at 82-83, 87, 126; Myers Dep. at 72, 80-81.

available and Ocwen employees are trained to provide the information upon request.[74]
Similarly, beginning at the latest in March 2011, Ocwen's online account website identified
loans as "balloon" loans and disclosed the applicable amortization periods.[75] ████████████
█████████████████████████████████████████████████████████████████████████
████████████████████████████████████.[76]   Ocwen employees are
also trained on how to request and provide borrowers with amortization schedules for their loan
payments.[77]

      Plaintiffs also do not explain how offering the "right of rescission" will prevent
irreparable harm or benefit putative class members.  Rescission of putative class members' loan
modification agreements would return each loan to its pre-modification terms.  *See Pinter v.
Dahl*, 486 U.S. 622, 641 n.18 (1988) (noting that common-law rescission "provided for
restoration of the status quo" before entering the transaction at issue); Black's Law Dict. 1308
(7th ed. 1999) (defining "rescission" as a remedy "that restores the parties to their precontractual
positions").  That would include, for both themselves and for most, if not all, putative class
members, a return to their unaffordable higher monthly payments, higher interest rates, and, in
some cases, like Abraham, the addition of previously-forgiven amounts of principal back into
their unpaid principal balances.

      Additionally, putative class members who were in default when they obtained their loan
modifications - like the named plaintiffs - would be returned to their pre-modification default
status or pushed further into default.  And, each putative class member's pre-modification
delinquency would now include several years of partial or no payments, late fees, and other

---

[74]     Nieves Dep. at 82-83, 87, 126; Myers Dep. at 72, 80-81.
[75]     *See* Nieves Dep. at 73-75, 127-30.
[76]     *See* Floyd Report at 23-24.
[77]     *See* Nieves Dep. at 81-83.

charges resulting from not having made the higher pre-modification payments required under their pre-modification loan terms.  *See* Nieves Decl. at ¶¶ 48-50.  It is unsurprising that none of the plaintiffs testified that they wanted to return to their pre-modification loan terms.[78]  The "right of rescission" is illusory and more likely to *cause* irreparable harm than to prevent it.

Plaintiffs' request that Ocwen notify putative class members that "they may apply for new loan modifications" is similarly hollow.  The putative class members, like all borrowers with loans serviced by Ocwen, may apply for a loan modification at any time.  *See id.* at ¶¶ 52-54.[79]  Although putative class members may apply for loan modification assistance at any time, the ability to apply does not guarantee eligibility for a loan modification with more favorable terms or for a new loan modification at all.  *See id.* at ¶¶ 55-57.  Each of Ocwen's loan modification programs has "specific requirements for eligibility" and each modification application is subject to restrictions set by the owners of the loans.  *See id.*[80]  The ability to apply does not provide plaintiffs or putative class members with any relief, rights, or a likelihood of obtaining a new loan modification.  *See id.*  Plaintiffs have not shown extraordinary circumstances warranting mandatory injunctive relief, and, absent such relief, they cannot obtain certification of the proposed Rule 23(b)(2) classes.

### 2.      Plaintiffs' Proposed Rule 23(b)(2) Classes Lack the "Cohesiveness" Necessary for Certification under that Rule

The hallmark of Rule 23(b)(2) is that the proposed class is "cohesive."  *Gates*, 655 F.3d at 263-64.  The existence of disparate factual circumstances of class members will prevent a

---

[78]      *See*, *e.g.*, Abraham Dep. at 344-49; L. Kaminski Dep. at 153-154 (testifying "I don't know" when asked whether she wanted to rescind her loan modification agreement).

[79]      Ocwen sends out numerous letters, solicitations, and other correspondence to its borrowers offering mortgage payment assistance options.  *See* Nieves Dep. at 30.  Ocwen's website also directs its customers to contact Ocwen when customers are having financial difficulties and identifies assistance options, like modifications.  *See* Ocwen's website at https://www.ocwencustomers.com/T001/home.jsp#.

[80]      *Id.*; *see also* Nieves Dep. at 47-52 (discussing investor restrictions on loan modifications available to certain borrowers); Blanchard Dep. at 98-100.

class from being sufficiently cohesive for Rule 23(b)(2) certification.  *See id.* at 264.  The Third

Circuit has reasoned that "a (b)(2) class may require more cohesiveness than a (b)(3) class."

*Barnes*, 161 F.3d at 142-43; *Gates*, 655 F.3d at 264 n.12.  That is because Rule 23(b)(2) does not

provide the opportunity for putative class members to opt out of the class and "significant

individual issues in a (b)(2) class might present manageability issues and undermine the value of

utilizing the class action mechanism."  *Shelton*, 775 F.3d at 561.  Here, neither plaintiffs'

putative class claims nor their requested relief satisfy the cohesiveness requirement.

<ul style="list-style:none"><li>a. <u>Plaintiffs' putative class claims require individualized proof of ascertainable loss, causation, and reliance, which defeat the cohesiveness of the putative classes</u></li></ul>

Where, as here, putative class claims require individualized proof for each putative class

member to establish a right to relief, cohesiveness is lacking.  *See Gates*, 655 F.3d at 264.  The

putative class claims of the Pennsylvania Class (assuming injunctive relief were available to it)

and the New Jersey Class lack such cohesiveness and cannot be certified under Rule 23(b)(2).

Plaintiffs' claims and those of any individual putative class member require highly-

individualized showings of ascertainable loss, causation, and, for the Pennsylvania Class,

justifiable reliance, before any putative class member is entitled to recover relief from Ocwen.

*See* Section III.B, *supra*.  Individuals that fall within the proposed classes, as those unworkable

classes are defined, are not automatically entitled to any relief, and the mere inclusion in the

proposed class does not establish Ocwen's liability to that person or to any other putative class

member.  Instead, Ocwen's liability to each putative class member depends upon that person's

ability to prove that he or she suffered ascertainable loss, that the loss was caused by the alleged

omission of the balloon payment amount, and, for the Pennsylvania Class, that he or she relied

on the alleged omission at the time he or she entered the modification agreement.

None of these essential elements of the NJCFA or the UTPCPL can be established with class-wide evidence or on a class basis. ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████. *See* Pls. Brief at 51-52; Floyd Report at 23-25; Floyd Supplement Report at 4-5.  Cohesiveness is plainly lacking where, as here, the identification of putative class members that have an actual cause of action and are entitled to share in a class recovery depends on the individual factual circumstances of each putative class members.  *Gates v. Rohm and Haas Co.*, 265 F.R.D. 208, 231 (E.D. Pa. 2010); *Blunt v. Lower Merion Sch. Dist.*, 262 F.R.D. 481, 489-90 (E.D. Pa. 2009).

        b.     <u>The injunctive and monetary relief sought by plaintiffs are too individualized to support certification of Rule 23(b)(2) classes</u>

The proposed Pennsylvania and New Jersey Classes are also inappropriate for Rule 23(b)(2) certification because the monetary and injunctive relief sought by plaintiffs cannot be applied on a class-wide basis and are inherently individualized in application.

First, the fact that the proposed classes seek individualized awards of monetary damages for each putative class member is fatal.  The Supreme Court has instructed that "Rule 23(b)(2) . . . 'does not authorize class certification when each class member would be entitled to an individualized award of monetary damages."  *Dukes*, 564 U.S. at 360-61; *Gates*, 655 F.3d at 263. Even if the putative classes were able to establish liability, the putative class members would still be entitled to different amounts of monetary damages based upon their specific circumstances and the unique terms of their loan modification agreements.  *See Yarger v. ING Bank, FSB*, 285 F.R.D. 308, 320 (D. Del. 2012).  Indeed, the calculation of damages based on the "payment of a

greater amount of interest" necessitates an individual, loan-by-loan comparison of data unique to each putative class member. *See* Section IV, *supra*. The individualized monetary damage awards preclude certification of plaintiffs' proposed Rule 23(b)(2) classes.

Second, plaintiffs' injunctive relief is far too individualized to satisfy Rule 23(b)(2)'s standards. Rule 23(b)(2) certification is only permitted where "a single injunction or declaratory judgment would provide relief to each member of the class" and that relief applies "as to all of the class members or as to none of them." *Dukes*, 564 U.S. at 360 (internal quotations omitted). A proposed class in which "each individual class member would be entitled to a *different* injunction or declaratory judgment" that is tailored to each member fails to satisfy Rule 23(b)(2). *Id.*; *Yarger*, 285 F.R.D. at 321.

Plaintiffs do not seek a single injunction that is applicable to all putative class members; they seek a common generalized form of injunction, but one that must be applied separately to each putative class member. Indeed, plaintiffs seek to compel Ocwen to provide each putative class member with a disclosure that identifies a number of loan-specific data points regarding that member's loan, including the estimated amount of the putative class member's balloon payment for different periods of time, the manner of calculation of the balloon payment, and the make up of the balloon payment. *See* Pls. Brief at 44. None of this is uniform.

Ocwen would first need to identify every putative class member by name, address, and loan. Ocwen would then need to collect the relevant data for each putative class member's loan, which would require it to conduct separate searches through multiple databases that contain current and historical information for each loan. *See* Nieves Decl. at ¶ 40. The information requested is not contained in one place, and Ocwen's systems cannot call up this specific information for multiple putative class members (or even a single putative class member)

40

without a manual search of multiple Ocwen systems and individual borrower records.  *See id.* at

¶¶ 39-42.  Following a manual search, review, and collection of data, Ocwen would then need to

record that information and enter it into a template disclosure form.  *See id.* at ¶ 43.  Ocwen

would have to conduct the same inquiry for every putative class members (*id.* at ¶ 44) - a number

which plaintiffs' allege to potentially exceed 19,000 individuals.  *See* Pls. Brief at 4, 32.  Such

highly individualized injunctive relief is not suitable for certification under Rule 23(b)(2).  *See*

*Dukes*, 564 U.S. at 360-61.

 Plaintiffs' rescission-based request would be similarly individualized in its execution.

Plaintiffs offer no explanation as to how Ocwen would implement the right of rescission on a

class-wide basis.  That is because they cannot.  Rescission is an inherently individualized form of

relief, the implementation and consequences of which would be fact-specific and unique for each

putative class member.  That is why claims seeking rescission are inappropriate for class

treatment.  *See Andrews v. Chevy Chase Bank*, 545 F.3d 570, 573-575 (7th Cir. 2008); *McKenna*

*v. First Horizon Home Loan Corp.*, 475 F.3d 418 (1st Cir. 2007).  The same is true of claims

seeking a "right to rescind" for putative class members.  *See McKenna*, 475 F.3d at 427 (a

declaration of a right to seek rescission "work[s] against [the] judicial economy and disserves

efficiency concerns" at the heart of the class action mechanism by requiring post-relief

implementation on an individual basis).  The notification of an ability to apply for a new loan

modification is equally flawed.  The actual execution of that "right" involves an application

process - *i.e.*, submission of the application, submission of financial information, eligibility

review, application related communications, and post-denial dispute resolution - that is unique

for each putative class member.  And, an injunction requiring Ocwen to provide a "right to

apply" similarly disserves the judicial economy concerns underlying Rule 23.  *See id.*

Finally, the fact that plaintiffs' proposed injunctive relief will not benefit each member of the putative classes is confirmation of the lack of cohesiveness of those classes. *See McNair v. Synapse Grp., Inc.*, No. 06-5072 (JLL), 2010 WL 4777483, at *7 (D.N.J. Nov. 15, 2010) (denying certification of NJCFA claim where "disparate factual circumstances demonstrate[d]" a lack of cohesiveness, in part, because the relief sought would not benefit the entire class). That is because "Rule 23(b)(2) certification is inappropriate where many putative class members have nothing to gain from an injunction, and the declaratory relief they seek serves only to facilitate the award of damages." *Glover v. Udren*, No. 08-990, 2013 WL 6237990, at *7 (W.D. Pa. Dec. 3, 2013) (internal quotation marks omitted); *Kostur v. Goodman Global, Inc.*, No. 14-1147, 2016 WL 4430609, at *9 (E.D. Pa. Aug. 22, 2016) (rejecting Rule 23(b)(2) class because injunctive relief requested was "a disguised request for individualized monetary damages").

Plaintiffs' request for a declaration that "the balloon disclosure provisions" at issue are "unlawful" is effectively a declaration that they have satisfied one of the elements to their statutory claims for damages. The declaration has no other impact on plaintiffs' or putative class members' claims. Similarly, a prohibition on Ocwen "from offering loan modification agreements with [allegedly unlawful] balloon disclosure provisions" has little value as Ocwen has already changed its balloon disclosure provisions, plaintiffs lack standing to assert claims for such relief, and the injunction does nothing to redress claims for alleged conduct that occurred *in the past*. *See Mladenov*, 124 F. Supp. 3d at 379 (rejecting injunctive relief claim under CFA where allegations related to past conduct). Plaintiffs' mandatory disclosures fare no better, as they cannot show that the requested disclosures are likely to provide any actual benefit or relief. *See* Section V.B.1.c, *supra.*; *In re Ford Motor Co. E-350 Van Prods. Liab. Litig.*, No. 03-4558, 2012 WL 379944, at *39 (D.N.J. Feb. 6, 2012).

42

Moreover, certain putative class members may no longer have loans serviced by Ocwen.



*See* Nieves Dep. at 152-159.

. *See* Ocwen

Chart (Ex. JJ to Forbes Decl.); *see also* Nieves Dep. at 152-53.  While each of the borrowers

would be included in the putative classes, the Chart identifies:

- █████ Pennsylvania loans and ████ New Jersey loans that are active and no longer have a balloon payment feature;

- ████ Pennsylvania loans and ██ New Jersey loans that were terminated due to foreclosure;

- ████ Pennsylvania loans and ██ New Jersey loans that were terminated due to sale of the property (including refinanced and paid off loans);

- ████ Pennsylvania loans and ██ New Jersey loans that were terminated due to short sales; and

- ███ Pennsylvania loans and █ New Jersey loans that were terminated due to deeds-in-lieu of foreclosure.

*See* Ocwen Chart at 1.  For the putative class members associated with these █████ Pennsylvania

and ████ New Jersey loans, Ocwen would be unable to offer most of the requested injunctive

relief, such as the right of rescission, the option to apply for a new loan modification, or the

current estimated balloon payment amount, and the remaining relief, like the estimated balloon

payment amount at the time of modification, would provide them no meaningful relief.

### 3.      Plaintiffs' Requests for Monetary Relief Predominate over Injunctive Relief; Certification of a Rule 23(b)(2) Class is Impermissible

In this case, monetary damages are the predominant form of relief sought and are not incidental to the injunctive relief.  Plaintiffs' claims are therefore unsuited for certification under Rule 23(b)(2).  That is because Rule 23(b)(2) classes are limited to putative class actions seeking "primarily injunctive or corresponding declaratory relief."  *Barnes*, 161 F.3d at 142 (internal quotations omitted).  Monetary damages predominate "unless [that relief] is incidental to requested injunctive or declaratory relief."  *Barabin v. Aramark Corp.*, 210 F.R.D. 152, 161 (E.D. Pa. 2002) (citing *Allison v. Citgo Petroleum Corp.*, 151 F. 3d 402, 415 (5th Cir. 1998)), *affirmed*, No. 02-8057, 2013 WL 355417 (3d Cir. Jan. 24, 2003).  Incidental damages are "those that flow directly from liability to the class as a whole on the claims forming the basis of the injunctive or declaratory relief."  *Id.*  These include damages "to which class members would be automatically entitled," that "can be computed by objective standards and not standards reliant upon . . . each class member's circumstances," and that do not "require additional hearings to determine."  *Id.*

Plaintiffs seek actual damages, statutory damages, and treble damages that will differ for each putative class member.  *See* Pls. Brief at 50-52.  That monetary relief is separate from and cannot be said to be "incidental to" the requested injunctive relief.  The determination of whether a putative class member has suffered an ascertainable loss and the calculation of the amount of damages are inherently individualized analyses that can only be conducted on a loan-by-loan basis.  *See* Section V.C.2, *infra.*; Section V.A, *supra*.  Plaintiffs do not contend that damages can be computed or awarded "in an amount which naturally flows from an entitlement to a declaration or injunction against further harm."  *Barabin*, 210 F.R.D. at 161.  Instead, "the damages will not flow to the class as a whole, but rather will go to individual class members"

44

based on a loan-specific comparison of each putative class member's actual loan modification terms with the terms of a "but for" modification. *See id.* That amount will differ for each putative class member, and the requested injunctive relief has no bearing on or relation to the amount of damages, if any, that a putative class member may recover.

Plaintiffs' Brief highlights the predominance of monetary damages as it extensively addresses the monetary relief sought, with little mention and no substantive discussion of injunctive relief. *See* Pls. Brief at 3-5, 39-41, 44-55, 57-58. Indeed, plaintiffs refer to the specifically-requested injunctive relief on a single page and offer nothing more than a list. *See id.* at 44. Similarly, while plaintiffs expend approximately 11 pages on their Rule 23(b)(3) damages classes, they devote less than 3 pages to the Rule 23(b)(2) classes. *See id.* at 42-55.

Moreover, the primary relief available under the UTPCPL and NJCFA statutory schemes is monetary in nature. The UTPCPL does not provide for injunctive or declaratory relief and, thus, the Pennsylvania Class is limited to seeking monetary relief. *See* Section V.B.1.a, *supra*. With respect to the New Jersey Class, the NJCFA provides for a private plaintiff to recover treble actual damages and "other appropriate legal or equitable relief." N.J.S.A. § 56:8-19. The plain language of the statute identifies "threefold the damages sustained" as available relief, whereas it otherwise refers only to "other appropriate . . . equitable relief." *Id.* Monetary damages remain the predominate remedy available to private plaintiffs, and confirm that the "other" equitable relief available is inherently secondary. *See id.*

Finally, the fact that many members of the putative class would receive no benefit from the injunctive relief further demonstrates the predominance of monetary relief. *See* Section

V.B.2.b, *supra*.  Plaintiffs' requests for monetary damages are clearly not incidental to the

injunctive relief, which precludes certification under Rule 23(b)(2).[81]

### C.  Plaintiffs' Claims Do Not Satisfy The Requirements Of Rule 23(b)(3) And Cannot Be Certified

For many of the same reasons set forth above, plaintiffs have not satisfied their burden

under Rule 23(b)(3) to establish ascertainability, predominance, or superiority as to their

proposed classes.

### 1.  Plaintiffs Have Failed to Establish that their Classes are Ascertainable and thus Appropriate for Certification under Rule 23(b)(3)

The Third Circuit has recognized ascertainability as an essential prerequisite to

certification under Rule 23(b)(3).  *See Carrera v. Bayer Corp.*, 727 F.3d 300, 306, 307 (3d Cir.

2013); *Marcus*, 687 F.3d at 592.  A plaintiff seeking certification must show that (1) the class is

defined with reference to objective criteria; and (2) "the purported method for ascertaining class

members is reliable and administratively feasible."  *Carrera*, 727 F.3d at 307-08.  An

administratively feasible mechanism is one that is manageable and "does not require much, if

any, individual factual inquiry."  *Id.* at 308.

A plaintiff cannot simply "propose a method of ascertaining a class."  *Id.*  Instead, a

plaintiff must provide "evidentiary support that the method will be successful."  *Id.*  A plaintiff's

proposed method must provide the defendant with the opportunity and ability "to challenge the

evidence used to prove class membership."  *Id.* at 308.  If a plaintiff cannot prove that class

---

[81]     Plaintiffs' request to certify a 23(b)(2) and/or a (b)(3) raises a Seventh Amendment issue as to putative class members right, if any, to a jury trial on their damages claims.  That is because a Rule 23(b)(2) class is a mandatory class that does not permit putative class members to opt-out.  *See* Fed. R. Civ. P. 23(c)(2)(A).  As such, plaintiffs' request for a Rule 23(b)(3) class only as an alternative to the (b)(2) class raises the concern that a judgment against the Rule 23(b)(2) class would preclude putative class members' claims for damages without providing them the opportunity to opt out or to exercise their rights to a jury trial.  *See In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 166-67 (E.D. Pa. 2015) (expressing "trouble[]" with "[t]he perils of claim preclusion when certifying a Rule 23(b)(2) class alongside Rule 23(b)(3) classes"); *see also Dukes*, 564 U.S. at 363-64.

members are identifiable without resort to individualized inquiries and mini-trials, the plaintiff

has failed to show compliance with Rule 23.  *Id.* at 306-07; *Marcus*, 687 F.3d at 593.

> a.  <u>Plaintiffs do not present any evidence regarding the ascertainability of the FDCPA Class</u>

Plaintiffs fail to offer any evidence regarding whether the members of the proposed

FDCPA class can be identified, let alone identified by way of a reliable and administrative

feasible mechanism.  Plaintiffs' failure is highlighted by two unique aspects of the FDCPA Class

definition - that putative class member's loans were "in default" at the time they were transferred

to Ocwen and that putative class members were "sent" loan modification agreements containing

the allegedly offending balloon disclosure.  *See* Pls. Brief at 2.

First, plaintiffs have offered no evidence and no explanation as to how to determine

whether individual Pennsylvania and New Jersey homeowners were "in default" at the time their

loans transferred to Ocwen.  This factual issue is significant because the FDCPA applies only to

loans that were in default when Ocwen began servicing them.  *See* 15 U.S.C § 1692a(6)(F).  In

fact, neither the Kaminskis nor Abraham is a member of the FDCPA class as neither of their

loans was not in default when transferred to Ocwen.  Plaintiffs rely on a single declarative

statement in their Brief that individual borrower's "[p]ayment histories and other data in

RealServicing[®] can also be used to ascertain borrowers who are members of the FDCPA Class

by identifying whether they were in default when servicing of their loans was transferred to

[Ocwen]."  Pls. Brief at 31.  Plaintiffs, however, do not cite to or reference the existence of

specific evidence that supports that conclusion, nor do they specify what information is

contained in "payment histories" or what "data" is in RealServicing® to make that

determination.  Plaintiffs do not propose any means to obtain this information on a systematic,

class-wide basis.

Second, plaintiffs' Brief also lacks any discussion of how to identify borrowers who were "sent" loan modification agreements that contained the balloon disclosure at issue. Plaintiffs, in fact, do not mention how they intend to ascertain this element of the class definition, let alone present specific evidence of an administrative feasible and reliable process to do so. *See* Pls. Brief at 26-32. Plaintiffs cite only to evidence addressing potential means for identifying Pennsylvania and New Jersey borrowers who "entered into" in-house loan modification agreements. *See id.* at 28-31. None of that evidence touches on identification of borrowers who were "sent," but did not enter into, balloon loan modification agreements. That evidence has no bearing on the ascertainability of a class of borrowers who were merely "sent" loan modification agreements. *See Parsons v. Philadelphia Parking Auth.*, No. 13-0955, 2016 WL 538215, at *4 (E.D. Pa. Feb. 11, 2016) (rejecting certification where "Plaintiff has failed to identify any mechanism by which the putative class may be ascertained and she has not provided any evidence to show that any method could be successful").

Notwithstanding the lack of evidence of ascertainability, plaintiffs cannot satisfy their burden. Ocwen does not record or track borrowers to whom it sends in-house loan modification agreements in the same manner that it tracks borrowers who entered into agreements. *See* Nieves Dep. at 33 (████████████████), 137-138. Instead, the only manner in which Ocwen tracks the *sending* of in-house loan modification agreements is at a loan-specific level - such that a determination of whether borrowers were "sent" a particular agreement would require, at a minimum, a review of the documents imaged in each putative class member's loan servicing file, where written communications with borrowers are stored, and the narrative comments contained in a borrower's comment log. *See* Nieves Decl. at ¶¶ 60-63. This individualized analysis cannot be performed on a class-wide basis and is not an "administratively feasible mechanism" for

identifying class members.[82]  *See Coleman v. Comm. Land Title Ins. Co.*, Nos. 09-679, 09-841,

2016 WL 4705454, at *13-14 (E.D. Pa. Aug. 17, 2016) (finding that "file-by-file review here

amounts to a 'mini-trial' and 'individualized fact-finding' that undermines ascertainability and

makes class treatment inappropriate").  For these reasons, plaintiffs have failed to present

sufficient evidence to demonstrate that the proposed FDCPA Class is ascertainable.

        **b.**    <u>The alleged ascertainability of the Pennsylvania and New Jersey<br>Classes rests solely on inadmissible "expert" testimony</u>



. *See* Pls. Brief at 26-32.

*Id.* at 28 (quoting the Becker Report at 13).

For these reasons, set forth in more detail in Ocwen's Motion to Strike,

plaintiffs' ascertainability argument is based on inadmissible and blatantly improper expert

"opinion" that the Court should disregard.  Without more, plaintiffs have not satisfied their

burden to prove that the members of the proposed classes are ascertainable.  *See In re Blood*

*Reagents Antitrust Litig.*, 783 F.3d at 187.

---

[82]    The FDCPA class definition would require review of the file and loan account information for ***every*** Pennsylvania and New Jersey borrower whose loan was transferred to Ocwen in default before or during the putative class period and who had an active loan during the class period.

## 2.      Plaintiffs have Failed to Establish Predominance; Individual Inquiries are Necessary to Resolve Each Putative Class Member's Claim

A plaintiff seeking certification of a class under Rule 23(b)(3) must demonstrate that "questions of law or fact common to the class predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). An individual issue is defined as "'one where members of a proposed class will need to present evidence that varies from member to member.'" *Harnish*, 2016 WL 4363133, at *3 (quoting *Tyson Foods*, 136 S. Ct. at 1045). A common issue, on the other hand, "'is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Id.* The Third Circuit has further instructed that "[i]f class-wide evidence is lacking, the court cannot be adequately assured that individualized evidence will not later overwhelm the case and render it unsuitable for class-wide adjudication." *Id.* Before certifying a class, the Court must find that plaintiffs' "proposed class-wide theories *and* evidence would be sufficient to address the predominate issues in the case." *Id.* at *4.

In order to establish liability and an entitlement to relief under the UTPCPL and NJCFA, each named plaintiff and each member of the proposed Pennsylvania and New Jersey Classes must prove that he or she suffered ascertainable loss and that the loss suffered, if any, was caused by the omission of an estimated amount of the balloon payment. *See* Section III.B, *supra.* The Caves, Abraham, and the putative members of the Pennsylvania Class must also establish that he, she or they justifiably relied on that omission when accepting Ocwen's loan modification offer. *See id.* Similarly, the Caves and the FDCPA Class must demonstrate actual, concrete injury-in-fact to have standing to bring their claims and share in any class wide recovery. *See* Section V.A.3, *supra.* There is no class-wide evidence that will serve to establish these elements

for all putative class members' claims.  Nor can any of these issues be proven without engaging in individualized inquiries utilizing evidence and facts unique for each putative class member.

Plaintiffs attempt to sidestep the individual issues inherent in their claims by repeatedly pointing to the relative uniformity of Ocwen's pre-2014 balloon disclosure templates and contending that whether the subject omissions from the disclosures is "unfair, deceptive, and misleading" can be determined on a class basis.  *See*, *e.g.*, Pls. Brief at 46.  That is not enough.

> a.      The issue of whether putative class members suffered
>         "ascertainable loss" or "actual harm" is an individual question

The question of whether the named plaintiffs and the members of the putative Pennsylvania and New Jersey Classes suffered "ascertainable loss" is an individual issue that must be established before any one putative class member is entitled to relief against Ocwen. *See Harnish*, 2016 WL 4363133, at *4.  The same is true of actual harm, or injury-in-fact, for the Caves' FDCPA claim.  *See* Section V.A.3, *supra*.

Plaintiffs seek to avoid this inherently-individualized element through linguistic sleight of hand, claiming simply that *calculation* of damages on an individualized basis does not preclude certification.  *See* Pls. Brief at 50-52.  Plaintiffs' argument misses the point.  Regardless of the method for *calculating* of the amount of damages for putative class members, plaintiffs must still demonstrate that causation and the *existence of ascertainable loss*, or "*fact of damage*," can be proven with "generalized, class-wide proof."  *Harnish*, 2016 WL at *3-4.  This is a critical distinction.  *See id.* (rejecting attempt to "gloss over the fact that when courts speak of 'damages,' they are often referring to two distinct concepts").  Specifically, the Third Circuit described the distinction between the "existence" and the "measure" of damages in a NJCFA action as follows:

> The fact of damage, often synonymous with "injury" or "impact," is frequently an element of liability requiring plaintiffs to prove that they have suffered <u>some</u> harm traceable to the defendant's conduct—in other words, the "ascertainable loss" and "causal relationship" requirements under the NJCFA . . . .  Only if the fact of damage is established does a court reach the question of remedy and the exact calculation of each plaintiff's damages.

*Harnish*, 2016 WL 4363133, at *4 (internal quotation marks omitted).  The Third Circuit went on to instruct that "***while obstacles to calculating damages may not preclude class certification, the putative class must first demonstrate economic loss—that is, the fact of damage—on a common basis*.***" *Id.* (emphasis added); *see also Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 187-190 (3d Cir. 2001) (predominance lacking "because economic loss cannot be presumed, ascertaining which class members have sustained injury means individual issues predominate over common ones"); *Glover*, 2013 WL 6237990, at *21.

Here, individualized inquiries into variable and member-specific evidence are unavoidable in determining the "fact of damage" for each putative class member.  This defeats certification of plaintiffs' proposed classes whether the "fact of damage" is analyzed under plaintiffs' damages theory or Ocwen's countervailing methodology.  ███████████

████████████████████████████████████████████████

██████████████.  *See* Section V.A.1, *supra*; Becker Report at 25, 30-31; Pls. Brief at 11.  ██

██████████████████████████████████████████

████████████████████████████████.  *See* Pls. Brief at 50-52;

Section IV.A, *supra*.  █████████████████████████████

███████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████



. *See* Becker Report at 22-33; Section IV.A, *supra*.

. *See* Becker Dep. at 285-286.

Plaintiffs have not proven that the fact and existence of ascertainable loss and actual harm can be determined on a class-wide basis via common evidence. "Regardless of similarity in the nature of alleged harm, each [putative class member] will inevitably need to provide proof that his or her damages resulted from his or her own transaction, a conclusion that demonstrates the predominance of individual, not common, issues." *Lester v. Percudani*, 217 F.R.D. 345, 352 (M.D. Pa. 2013). And, "[t]he impossibility of class-wide proof of damages precludes certification" of plaintiffs' proposed classes. *Id.*; *see also Harnish*, 2016 WL 4363133, at *4-5, 10 ("because the fact of damages . . . is a crucial issue in the case, the inability to resolve it in class-wide fashion will cause individual questions to predominate over common ones").

> b.  Proof of "causation" requires individualized evidence for each putative class member

To succeed on their UTPCPL and NJCFA claims, each member of the Pennsylvania and New Jersey Classes must prove the existence of a causal nexus between the alleged omission of the balloon payment amount and their ascertainable loss. *See* Section III.B, *supra*. Thus, irrespective of the relative similarity of Ocwen's balloon disclosures, plaintiffs must still show that their ascertainable loss, if any, was actually *caused* by the absence of the estimated balloon amount before they can recover damages. Plaintiffs cannot make this showing without delving

into the individual facts and circumstances of each putative class member.  Indeed, plaintiffs'

theory fails under minimal scrutiny, because it relies upon multiple unfounded assumptions that

cannot be unilaterally applied to each putative class member.

First, plaintiffs incorrectly assume that every putative class member did not know the

estimated balloon amount or the applicable amortization period when they entered into their

modification agreements.  ██████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████  *See* Ex. 9 to Lechtzin Decl. at

Ocwen010223; Pls. Brief at 7.  ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████  Ex. 9 to Lechtzin Decl. at Ocwen010223.  ██████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

*See* Nieves Dep. at 82-83, 87, 126, 198; Myers Dep. at 72, 80-81; Blanchard Dep. at 120.

Contrary to plaintiffs' assumption, the facts show that putative class members could have

requested and obtained the estimated balloon payment amount before choosing to enter the

modification.  Under these circumstances, the absence of the information in the "Balloon

Disclosure" would not be material, nor would that omission have *caused* any ascertainable loss.

*See, e.g.*, *Lester*, 217 F.R.D. at 353 (finding predominance lacking whether plaintiffs could not

show causation on a classwide basis).  ██████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

███████████  *See* Floyd Report at 23-24.[83]  Simply put, the causation analysis requires an

evaluation of each putative class member's personal knowledge and understanding regarding the

balloon payment amount when he or she entered into the agreement.  This is an inherently

individualized question that depends on class-member specific evidence.

Second, plaintiffs incorrectly assume that if Ocwen had disclosed the estimated balloon

payment amount and amortization period, each putative class member would have rejected the

modification.  The preferences and priorities of each putative class member are individualized

issues that overwhelm any common questions.  Although the named plaintiffs claim that, despite

the numerous benefits provided, they would not have accepted their loan modification

agreements had they known the amount of the balloon payment, plaintiffs cannot show that each

putative class member would have made the same determination.

Indeed, each putative class member would have balanced the benefits of their modified

loan terms, their financial circumstances, and other relevant factors against the future balloon

payment due.  For many putative class members facing foreclosure and loss of their homes, the

loan modification provided much needed relief and the opportunity to stay in their homes -

benefits that are not easily refused.  ████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

███████████████████  Becker Dep. at 235-36.  ████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

---

[83]     *See also* Floyd Report at Ex. B (████████████████████████████
████████████████████████████████████████████ ).

██████████████████████████████████ *See* Section II.B.3.  As the Third

Circuit has noted, "individualized issues … swamp the inquiry" where the Court must inquire

into how each putative class members would weigh certain allegedly withheld information

against the "benefits … offer[ed]" by the product initially purchased without that information.

*See Marcus*, 687 F.3d at 607 ("[i]f a consumer did know about the 'defects' but, despite that

knowledge, still decided to purchase or lease a BMW at the same price anyway . . . then the

consumer would not have received something less").

██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████ *See*

Section IV, *supra*.  ██████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████ *See* Section

II.B, *supra*.  Plaintiffs cannot rely upon assumptions and ignore the available evidence to show

that causation—a required element of each of their claims—is provable on classwide basis.  *See*,

*e.g.*, *Dukes*, 564 U.S. at 350.  Yet, this is exactly what plaintiffs do.  Causation cannot be

established without addressing unique, class-member-by-class-member evidence, and, therefore,

their claims are inappropriate for class treatment.  *See Harnish*, 2016 WL 4363133, at *4.

      c.    The Pennsylvania Class cannot establish justifiable reliance
               without delving into individualized inquiries and evidence

Plaintiffs acknowledge, as they must, that justifiable reliance is a necessary element of

their UTPCPL claims.  *See* Pls. Brief at 49; *Hunt v. U.S. Tobacco Co.*, 538 F.3d 217, 227 (3d

Cir. 2008).  To establish reliance, plaintiffs must show that knowledge of the omitted

information "would have changed [their] conduct" or induced them to "engage in any other

detrimental activity."  *Hunt*, 538 F.3d at 227; *Slapikas v. First Am. Title Ins. Co.*, 298 F.R.D.

285, 292, 294 (W.D. Pa. 2014).  The Third Circuit recently reaffirmed that this element defeats

class certification, explaining that "reliance is nearly always an individualized question,

requiring case-by-case determinations of what effect, if any, the misrepresentation had on

plaintiffs' decision-making."  *Harnish*, 2016 WL 4363133, at *7.

Plaintiffs offer no explanation as to how they can prove, or how the Court can find,

justifiable reliance for each member of the class using common evidence.  Instead, they argue

that they need not establish reliance at all because it can be "infer[red] … where the modification

agreement[s] failed to disclose the amount of a balloon payment due at the loan's maturity date."

Pls. Brief at 49.  Plaintiffs seek to have the Court read the reliance requirement out of the

UTPCPL.  Courts in Pennsylvania, however, have soundly rejected any such presumption of

reliance under the UTPCPL because a plaintiff "must prove justifiable reliance affirmatively."

*Hunt*, 538 F.3d at 227; *see also Debbs v. Chrysler Corp.*, 810 A.2d 137, 158 (2002) (rejecting

presumption of reliance and denying class certification because individual inquiries would

dominate).  The cases cited by plaintiffs do not support a different conclusion.  Indeed, this

Court's earlier finding that the Caves had pled sufficient allegations to infer justifiable reliance to

defeat Ocwen's motion to dismiss does not relieve plaintiffs of the burden of *proving* reliance at

trial or set up a conclusive inference for class certification purposes.[84]

Additionally, even if a presumption of reliance were permissible under the UTPCPL,

such a presumption would not apply to the claims at issue here.  The absence of the estimated

---

[84]      Plaintiffs' reliance on *Grimes v. Enter. Leasing Co of Phila., LLC*, 66 A.3d 330 (Pa. Super.
2013), as dispensing with justifiable reliance is misplaced as *Grimes* has been rejected as inconsistent
with Pennsylvania Supreme Court precedent.  *See Slapikas*, 298 F.R.D. at 296.

balloon payment amount from any particular loan modification agreement may or may not have

been material to each putative class member's decision to accept the modification.  That is

because "consumers could have a wide range of reactions to the undisclosed information" and

"[r]easonable consumers could come to different conclusions about the materiality of the

withheld information."  *Debbs*, 810 A.2d at 158 (justifiable reliance precluded class certification

under UTPCPL); *see also Hunt*, 538 F.3d at 228 (unlike the securities fraud context,

misrepresentations to individual consumers require individualized analysis of whether the

misrepresentation was material).

Because justifiable reliance cannot be presumed for the members of the Pennsylvania

Class, the determination of reliance requires individual borrower-by-borrower inquiries and

evaluation of unique evidence for each class member.  *See Cohen v. Chicago Title Ins. Co.*, No.

06-873, 2013 WL 842706, at *5 (E.D. Pa. Mar. 7, 2013) ("Justifiable reliance requires an

individual inquiry into each of the class member's transactions with [defendant].").  Plaintiffs

and putative class members cannot prove they relied on the omission of the estimated balloon

payment amount on a class-wide basis.  Accordingly, individualized inquiries of reliance (along

with individualized inquiries of ascertainable loss and causation) will predominate over common

issues.  *See Slapikas*, 298 F.R.D. at 299 (reliance element required decertification because "[t]he

lack of a single stroke resolution underlines the predominance of individual issues"); *Cohen*,

2013 WL 842706, at *4-5.

### 3.        Plaintiffs have Failed to Establish Superiority

To satisfy Rule 23(b)(3), plaintiffs must also establish that the class action mechanism is

the superior method for adjudicating the proposed class claims.  *See* Fed. R. Civ. P. 23(b)(3).

The key consideration in assessing superiority is the likely difficulties in managing a class action

("manageability").  *See id.*  Manageability is critical because at its base is the question of how

58

practically the proposed putative class claims can be tried on a class basis.  The class action

mechanism is appropriate only where the issues, including liability and the existence of actual

harm, can be established with common evidence applicable to each class member.  *See Newton*,

259 F.3d at 186.  Where resolution of each putative class member's claim presents a "multitude

of individualized issues" that "would entail complicated mini-litigations within the class action

itself," however, the class lacks manageability and a class action is not the superior method of

adjudication.  *See Danvers Motor Co., Inc. v. Ford Motor Co.*, 543 F.3d 141, 149 (3d Cir. 2008).

Plaintiffs have not met their burden.  The resolution of plaintiffs' claims will necessarily

require the Court to conduct individualized inquires and consider loan-specific evidence to assess

whether each putative class member can establish ascertainable loss, actual harm, causation, and

reliance.  *See* Section V.C.2, *supra.*  Plaintiffs cannot avoid these fundamental questions of

liability, which "present insurmountable manageability problems" and defeat superiority.

*Newton*, 259 F.3d at 191-92 (no superiority where resolution of each putative class member's

claim required the "need for individualized inquiry into actual injury").

There is simply no way for the Court to resolve each plaintiff's and putative class

member's claim without conducting a "mini-trial" for each putative class member to examine the

individual facts of that class member's loan modification transaction to determine, at a

minimum:

> (1) whether the modification at issue caused him or her ascertainable loss or
> actual harm when measured against the benefits provided by the modification;
>
> (2) whether he or she had knowledge of the estimated amount of the balloon
> payment or the amortization period before entering into the modification;
>
> (3) whether he or she would have rejected the loan modification agreement if he
> or she had known the estimated balloon amount or the amortization period;
>
> (4) whether he or she would have considered the amount of the balloon payment
> material in light of the benefits provided by the modification;

(5) whether he or she relied on the omission of the balloon amount when accepting the loan modification agreement;

(6)  whether he or she was able and willing to undertake the hypothetical "but-for" loan modification with a higher monthly payment; and

(7)  whether Ocwen would have determined that he or she was qualified to make the higher monthly payment.

In light of this multitude of variables to be determined for any putative class member and which involve matters of credibility that can only be determined by the finder of fact, plaintiffs' proposed classes cannot be tried in a manageable and efficient manner.

Plaintiffs' claims fit squarely within the Third Circuit's admonition that where "actual injury cannot be presumed … [and] establishing proof of the plaintiffs' injuries and litigating the defenses available to defendants would present insurmountable manageability problems," superiority is lacking.  *Newton*, 259 F.3d at 191-92; *Glover*, 2013 WL 6237990, at *22 (no superiority where "claims presented by [p]laintiff[s] all require in depth individual investigations of each of the class member's loan transaction history and the documents appurtenant thereto").

### D.   Plaintiffs Have Failed To Affirmatively Demonstrate That Their Claims Satisfy Each Of The Requirements Of Rule 23(a)

In addition to their failure to affirmatively demonstrate that their putative class claims are suitable for class treatment under Rules 23(b)(2) and (b)(3), plaintiffs also have failed to satisfy their burden to prove compliance with Rule 23(a).

#### 1.   Plaintiffs have Failed to Present Evidence to Prove that the FDCPA Class Satisfies the Numerosity Requirement

Plaintiffs have presented no evidence that the proposed FDCPA class is sufficiently numerous to satisfy Rule 23(a)'s numerosity prerequisite.  Plaintiffs bear the burden to "affirmatively demonstrate . . . that there are *in fact* sufficiently numerous parties." *Dukes*, 564 U.S. at 350; *Marcus*, 687 F.3d at 591 ("we have repeatedly emphasized that actual, not

presumed, conformance with Rule 23 requirements is essential" (internal quotation marks and corrections omitted)).  To satisfy this burden, a plaintiff cannot rely on "[m]ere speculation as to the number of class members."  *Hayes*, 725 F.3d at 357; *In re Paulsboro Derailment Cases*, 2014 WL 4162790, at *9 (D.N.J. Aug. 20, 2014).  Instead, a plaintiff must present either direct evidence of the number of putative class members or circumstantial evidence of the products, problems, parties, and geographic areas at issue in the litigation and specific to the proposed class.  *See Hayes*, 725 F.3d at 357.  "[W]here a putative class is some subset of a larger pool, the trial court may not infer numerosity from the number in the larger pool alone."  *Id.* at 358; *see also Marcus*, 687 F.3d at 595

Plaintiffs have failed to identify any evidence that anyone other than the Caves fall within the proposed FDCPA Class.  While the proposed FDCPA Class shares some characteristics with the Pennsylvania and New Jersey Classes, it differs in important ways.  First, the FDCPA Class is limited only to borrowers whose loans were transferred to Ocwen at a time when the loans were "in default."  Pls. Brief at 2.  Second, as defined, the FDCPA Class is subject to a shorter limitations period.  *See id.*  Third, the FDCPA Class is defined more broadly than the Pennsylvania and New Jersey Classes to include all borrowers who were "sent," as opposed to who "entered into," a standard form template modification agreement.  *See id.*

Yet, neither plaintiffs' Brief nor the evidence in support suggests the number of borrowers who would fall within the FDCPA Class.  Plaintiffs offer no evidence to infer the number of Pennsylvania and New Jersey borrowers whose loan were transferred to Ocwen in default and who were "sent" the allegedly deceptive agreements during the proposed class period.  *See*, *e.g.*, Pls. Brief at 23-33.  Plaintiffs instead ask the Court to speculate regarding the number of FDCPA Class members, which it cannot do.  *See Hayes*, 725 F.3d at 357-58.  The

61

only conclusion that can be drawn from plaintiffs' "evidence" is that the size of the FDCPA

Class could fall in a range anywhere from 19,611 putative class members (based on evidence

submitted regarding the putative Pennsylvania and New Jersey Classes) to zero.  *See id.* at 358.

"Within that range, [the Court] can only speculate as to the number of class members."  *Id.*

Plaintiffs have failed to demonstrate that the FDCPA Class is sufficiently numerous to qualify

for class action treatment.  *See id.*

### 2. Plaintiffs have Failed to Establish Commonality

Plaintiffs have also failed to affirmatively demonstrate commonality as to any of their

proposed classes.  That is because the answers to the common questions suggested by plaintiffs

do not advance the resolution of plaintiffs' claims on a class basis.

To establish commonality, plaintiffs must demonstrate the existence of "questions of law

or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  The Supreme Court has instructed that

commonality requires the presence of at least one question the answer to which "will resolve an

issue that is central to the validity of each one of the claims in one stroke."  *Dukes*, 564 U.S. at

350; *see also In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 596-97 (3d Cir. 2009).

They key component of commonality "is not the raising of common questions – even in droves –

but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the

resolution of the litigation."  *Dukes*, 564 U.S. at 350 (internal quotations omitted).  Thus,

commonality is present only where a plaintiff has shown "with significant proof" that the

common questions will actually drive the resolution of the putative class claims.  *Id.* at 350-53.

The purported common questions identified by plaintiffs do not satisfy this standard;

those questions are either not common to the class when the evidence required at trial is

considered or do not "drive the resolution of the litigation."  The first category of plaintiffs'

allegedly common questions relate to either the purported "uniform terms of the Balloon

Disclosure" or Ocwen's purported "course of conduct" towards the entire class.  *See* Pls. Brief at 40-41).  As to the "course of conduct," plaintiffs rely on mere allegations and assumptions. Indeed, each putative class member's knowledge regarding the balloon payment amount and amortization period motivation in entering into a modification agreement, and reliance on the alleged omission in doing so will necessarily vary on a class-member-by-class-member basis.  In other words, the resolution of plaintiffs' putative class claims depend on the specific conduct, knowledge, and reactions unique to each named plaintiff and putative class member.  *See Dukes*, 564 U.S. at 350 ("[d]issimilarities within the proposed class are what have the potential to impede the generation of common answers" (internal quotations omitted)); *Danvers Motor Co.*, 543 F.3d at 148 (rejecting theory that common course of conduct by defendant was sufficient where there were "many non-common issues" regarding "each proposed class member's treatment").

The second category of purportedly common questions relate to whether each putative class member suffered actual damages or an ascertainable loss.  *See* Pls. Brief at 40-41.  These are not "common questions;" the evidence required to establish the existence of loss or actual damages is unique to each putative class member and the ultimate answer to the damages question will be individualized for each member.  Thus, the answer to the question - whether putative class members suffered actual damages or an ascertainable loss? - cannot be resolved with common evidence or in a manner that will "generate common *answers*" applicable to the claims of the entire class as a whole.  *See Dukes*, 564 U.S. at 350.  This conclusion holds true whether the Court accepts plaintiffs' theory of damages or Ocwen's theory of damages.  ███

████████████████████████████████████████████████████████████

███████.  *See* Section IV.A, *supra*; Becker Report at 25, 30-31.  ████████████



*See* Section IV.A, *supra*.

The remaining questions identified by plaintiffs are equally deficient as they are not "central to the validity of each one of the claims." *Dukes*, 564 U.S. at 350. Even if the questions of whether the Court can award statutory damages or injunctive relief under plaintiffs' claims are common (*see* Pls. Brief at 40-41), the answers to those questions do nothing to advance resolution of the litigation. *See Diabate v. MV Transp., Inc.*, No. CIV.A. 14-857, 2015 WL 4496616, at *13 (E.D. Pa. July 20, 2015).

> **3.** **Plaintiffs' Claims are not Typical and Plaintiffs are not Adequate Class Representatives**

The final two requirements of Rule 23(a) are typicality and adequacy of representation. *See* Fed. R. Civ. P. 23(a). The question of whether plaintiffs' claims are typical of the claims of the putative class and whether the plaintiffs are adequate representatives of the class are similar in that they test the interests and incentives of the named plaintiffs to represent the interests of the class. *See Mwantembe v. TD Bank, N.A.*, 268 F.R.D. 548, 559 (E.D. Pa. 2010).

The typicality prerequisite requires that "the claims or defenses of the representative parties" are "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality tests whether the legal positions and factual circumstances of the named plaintiffs are typical of those of the putative class; where the named plaintiffs' positions and circumstances are markedly different from the putative class, typicality is lacking. *See Marcus*, 687 F.3d at 598. In evaluating typicality, Courts examine three distinct concerns:

> (1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class.

*Id.* (internal quotations omitted); *Beck v. Maximus, Inc.*, 457 F.3d 291, 300-01 (3d Cir. 2006).

The adequacy of representation requirement mandates that the named plaintiffs must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy tests whether the named plaintiffs' interests conflict with the interests of putative class members. *Danvers Motor Co.*, 543 F.3d at 149-50; *Mwantembe*, 268 F.R.D. at 559. Here, the named plaintiffs are atypical and not adequate representatives because their factual circumstances are disparate and varied, their claims are subject to unique defenses, and their interests likely conflict with the interests of many putative class members.

First, the factual circumstances between the named plaintiffs themselves and between the named plaintiffs and the putative class vary significantly in ways that are material to the determination of liability and entitlement to share in any class recovery. While plaintiffs assert that the named plaintiffs and the class members were "harmed by the same unlawful conduct by Ocwen," that assertion is incorrect because not all putative class members, or even all of the named plaintiffs, have actually suffered actual harm. *See* Section V.A (discussing plaintiffs' concession that Abraham lacks ascertainable harm). Abraham's Loan Modification Agreement also provided her with a benefit not provided to the other named plaintiffs - the forgiveness of a significant portion of her principal balance - which further evidences her lack of actual harm. Similarly, the named plaintiffs have presented no evidence to show that all, or even some, of the putative class members lacked information or knowledge about the estimated amount of the balloon payment when they entered their loan modification agreements. Plaintiffs simply

assume the fact.  While sharing some similarities, the named plaintiffs' factual circumstances are "markedly different" from the putative class members and they are neither typical nor adequate representatives.  *See Mueller v. CBS, Inc.*, 200 F.R.D. 227, 237 (W.D. Pa. 2001).

Second, the named plaintiffs' claims are subject to the unique defense that they have not suffered actual harm or an ascertainable loss sufficient to satisfy required elements of their claims or establish Article III standing.  Abraham has not suffered ascertainable loss and her lack of actual loss is a unique defense that will defeat her individual UTPCPL claim.  *Donaldson v. Exelon Corp.*, No. CIV.A. 05-1542, 2006 WL 2668573, at *4 (E.D. Pa. Sept. 14, 2006).  ██████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████  *See* Section IV.B, *supra*; Floyd Report at 25; Floyd Supplemental Report at 4-5.  These defenses are important because where named plaintiffs "could have suffered no injury as a result of the alleged [wrongful] practices" they are "not eligible to represent a class of persons who did allegedly suffer injury."  *E. Tex. Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403-04 (1977).

Third, the different factual circumstances of the named plaintiffs' situations further highlight the divergence of interests.  ██████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████  As such, their interests and incentives regarding the most appropriate relief are likely to be individualized and unique among them and to vary among putative class members. The putative classes also includes numerous members whose loans are no longer serviced by Ocwen or whose loans no longer have balloon payment features and, thus, will gain little, if any,

benefit from injunctive relief.  As borrowers with loans still serviced by Ocwen and still having active balloon features, the named plaintiffs have inherently different interests and incentives.

These potential conflicts are highlighted in plaintiffs' requested remedy of rescission of certain loan modification agreements with balloon features.  The loan modifications provided to plaintiffs and putative class members provided numerous benefits to their recipients.  *See* Sections II.A, IV.B, *supra*.  It stands to reason that there are likely numerous members of the putative classes who would *not* want to rescind their modifications and lose those benefits.  A putative class member who received a significant forgiveness of principal, like the approximately $91,000 reduction of debt provided to Abraham, would likely be unwilling to take on the obligation to pay those previously-forgiven amounts.  Other putative class members may be unable to afford their higher pre-modification monthly payments.  And, putative class members who are current on their modified loans, like the Kaminskis, would be unlikely to abandon their current payment status and return to a delinquent status.  Accordingly, even if styled as an "option to rescind," the inherent conflict between the named plaintiffs and putative class members is an obstacle that plaintiffs' cannot clear.  *See Danvers Motor Co.*, 543 F.3d at 149-50.

## VI. <u>CONCLUSION</u>

For the foregoing reasons, Defendant Ocwen Loan Servicing, LLC respectfully requests that the Court deny Plaintiffs' Motion for Class Certification.

Respectfully submitted,

OCWEN LOAN SERVICING, LLC,

By its attorneys,


/s/ Brian M. Forbes

R. Bruce Allensworth (admitted *pro hac vice*)
Brian M. Forbes (admitted *pro hac vice*)
Robert W. Sparkes, III (admitted *pro hac vice*)
K&L GATES LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
(617) 261-3100 (telephone)
(617) 261-3175 (facsimile)


David R. Fine
K&L GATES LLP
17 North Second Street, 18th Floor
Harrisburg, PA 17101
(717) 231-4500 (telephone)
(717) 231-4501 (facsimile)

Dated: October 6, 2016

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this 6th day of October, 2016, a true and correct copy of the foregoing document was filed with the Clerk of the Court and served on all counsel of record, including counsel for Plaintiffs (identified below), through the Court's CM/ECF filing system and the Notice of Electronic Filing generated thereby.

Todd S. Collins
Eric Lechtzin
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA  19103
Tel: 215-875-3000
Fax: 215-875-4613
e-mail: tcollins@bm.net
e-mail: elechtzin@bm.net

Ann Miller
LAW OFFICE OF ANN MILLER
1657 The Fairway #132
Jenkintown, PA  19046
e-mail: am@attorneyannmiller.com

*Attorneys for Plaintiffs*

/s/ Brian M. Forbes
Brian M. Forbes