IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LISA A. ABRAHAM, LISA CAVE, SCOTT CAVE, LEE ANN KAMINSKI, and MARK E. KAMINSKI, on behalf of themselves and all others similarly situated, | : : : : : | CIVIL ACTION |
| Plaintiffs, | : : | |
| v. | : : | No. 14-4977 |
| OCWEN LOAN SERVICING, LLC, | : : | |
| Defendant. | : | |

**MEMORANDUM**

**PADOVA, J.**                                                                     **June 26, 2017**

TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................................... 3

II.   BACKGROUND ................................................................................................................ 3

III.   THE CLASS CERTIFICATION RECORD ....................................................................... 5

   A.   Background Regarding Ocwen's In-House Balloon Loan Modifications and its Documentation Systems ..................................................................................................... 5

   B.   The Class Representatives ................................................................................................. 7

      1.   Plaintiffs Lisa and Scott Cave ........................................................................................ 7

      2.   Plaintiff Lisa A. Abraham ............................................................................................ 10

      3.   Plaintiffs Lee Ann and Mark E. Kaminski (the "Kaminskis") ..................................... 14

   C.   Expert Evidence .............................................................................................................. 18

      1.   Plaintiffs' Expert Dr. Brian C. Becker .......................................................................... 18

      2.   Defendant's Expert Joseph J. Floyd .............................................................................. 24

      3.   Dr. Becker's Reply to the Floyd Report ....................................................................... 30

      4.   Floyd's Supplemental Report ........................................................................................ 33

IV.     OCWEN'S MOTION TO STRIKE ................................................................. 36

V.  THE CLASS CERTIFICATION MOTION ...................................................... 40

  A.  Ocwen's Preliminary Issues on Loss and Damages ......................................... 41

     1.  Plaintiffs' Theory of Loss ........................................................................ 41

     2.  Becker's Model Cannot Be Common Evidence ......................................... 47

     3.  Becker's Theory of Harm is not Supported by the Record ............................ 51

  B.  Ocwen's Preliminary Issues on the Proposed Class Definitions ...................... 59

     1.  The Pennsylvania and New Jersey Classes are Overbroad ........................... 59

     2.  Time-barred Claims ................................................................................ 63

     3.  The FDCPA Class Definition is Both Flawed and Overbroad ...................... 65

     4.  Entitlement to Injunctive Relief .............................................................. 71

  C.  Cohesiveness of the NJCFA Class ................................................................. 80

     1.  Issues Involving Ascertainable Loss and Damages ..................................... 83

     2.  Issues Involving the Crafting of Injunctive Relief ...................................... 84

     3.  Rescission is an Inherently Individualized Form of Relief ........................... 85

     4.  Disparate Factual Circumstances ............................................................. 88

  D.  Ascertainability of a Rule 23(b)(3) Class ....................................................... 89

  E.  Rule 23(a) Requirements .............................................................................. 96

     1.  Numerosity ............................................................................................ 96

     2.  Commonality .......................................................................................... 99

     3.  Typicality ............................................................................................ 101

     4.  Adequacy ............................................................................................. 106

  F.  Rule 23(b)(3) Predominance and Superiority Requirements ......................... 107

     1.  Ascertainable loss ................................................................................ 111

     2.  Causation ............................................................................................ 113

     3.  Reliance .............................................................................................. 119

VII.  CONCLUSION ......................................................................................... 121

# I.    INTRODUCTION

Plaintiffs Lisa A. Abraham, Lisa and Scott Cave, and Lee Ann and Mark E. Kaminski filed this class action suit against Defendant Ocwen Loan Servicing, LLC ("Ocwen") alleging Ocwen violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa. Stat. § 201-3, the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 et seq., and the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. § 56.8-1, et seq. They seek to represent classes of similarly situated Pennsylvania and New Jersey homeowners who have entered into a standard form in-house loan modification agreement with Ocwen that contained a "Balloon Disclosure" provision that allegedly did not disclose the amount of the balloon payment. Presently pending are Plaintiffs' motion to certify three classes, one class for each statutory claim. Also pending is a Motion by Ocwen to strike portions of Plaintiffs' expert report. For the following reasons, the Motion to Strike is denied. Additionally, after rigorous analysis of the expert submissions, the class certification record, and the arguments of the parties, the Motion for Class Certification is also denied.

# II.    BACKGROUND

Plaintiffs allege that Ocwen violated the UTPCPL, FDCPA and NJCFA by entering into standard form-written in-house loan modification agreements with class members that contain a uniform Balloon Disclosure provision that is unfair, deceptive, and misleading because it does not disclose: (1) the amount of the balloon payment that the borrower will owe at the end of the term of the loan; (2) the method by which such a balloon payment is calculated; and (3) the amortization term of the loan and whether it had been changed by the modification. Ocwen's Balloon Disclosure states only: "The loan modification for which you have applied contains a balloon provision. This means that even if you make all payments full and on time, the loan will

not be paid in full by the final payment date."  (See Sept. 2, 2016 Declaration of Eric Lechtzin ("Lechtzin Decl.") Ex. 4 at Ocwen001040).  Plaintiffs assert that this language fails to disclose the information borrowers need to make informed financial decisions.

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs move to certify[1] a Pennsylvania Class represented by Plaintiffs Lisa Abraham, Lisa Cave and Scott Cave consisting of:

> All Pennsylvania homeowners whose mortgage loans have been serviced by Ocwen, and who have entered into a standard form template Loan Modification Agreement with Ocwen on or after February 14, 2007 that contains a "Balloon Disclosure" provision which does not disclose the amount of the balloon payment that the borrower will owe at the end of the term of the loan (the "Pennsylvania Class").

a New Jersey Class represented by Plaintiffs Lee Ann Kaminksi and Mark E. Kaminski consisting of:

> All New Jersey homeowners whose mortgage loans have been serviced by Ocwen, and who have entered into a standard form template Loan Modification Agreement with Ocwen on or after February 25, 2009 that contains a "Balloon Disclosure" provision which does not disclose the amount of the balloon payment that the borrower will owe at the end of the term of the loan (the "New Jersey Class").

and a FDCPA Class represented by Plaintiffs Lisa Cave and Scott Cave consisting of:

> All Pennsylvania and New Jersey homeowners for whom servicing of their mortgage loans was transferred to Ocwen at a time when such homeowners were in default on their loans, and to whom Ocwen sent a standard form template Loan Modification Agreement with Ocwen on or after July 21, 2010 that contains a "Balloon Disclosure" provision which does not disclose the amount of the balloon payment that the borrower will owe at the end of the term of the loan (the "FDCPA Class").

---

[1] Plaintiffs have narrowed the definitions of the Classes from the definitions set forth in the Second Amended Complaint ("SAC") (Docket Entry #50) to limit the instant Motion for Class Certification to borrowers who received in-house loan modification agreements based upon standardized form templates.

(Br. in Support of Pls.' Mot. for Class Cert. ("Pls.' Mem.") (Docket Entry #56-1) at 2.) Plaintiffs seek certification of the Pennsylvania and New Jersey Classes under Rule 23(b)(2) in order to obtain injunctive relief pursuant to the UTPCPL and NJCFA. Plaintiffs also seek certification of all three Classes under Rule 23(b)(3) for their actual and statutory damages as provided by the UTPCPL, NJCFA and FDCPA.

## III.   THE CLASS CERTIFICATION RECORD

   A.   <u>Background Regarding Ocwen's In-House Balloon Loan Modifications and its Documentation Systems</u>

The balloon modification agreements at issue in this case originate from Ocwen's "Loan Resolution Module" or "LRM" computer system. (Lechtzin Decl. Ex. 3, October 28, 2015 Deposition of Max Nieves ("Nieves Tr.") at 31-32.) Ocwen inputs borrower data for its in-house loan modifications, including income data, into the LRM. (Nieves Tr. at 32; Lechtzin Decl. Ex. 10, October 2, 2015 Deposition of Rashad Blanchard ("Blanchard Tr.") at 26.) The data in the LRM also includes information about the original loan, such as the principal amount of the loan, the interest rate, and the term of the loan. (Blanchard Tr. at 27, 69-71, 121-24.) The LRM also contains data or rules (such as restrictions on loan modifications) culled from the pooling and servicing agreements between Ocwen and the owners or investors in the loans. (Nieves Tr. at 46-50.) Ocwen uses the borrower and loan data in LRM to generate in-house loan modification agreements based upon blank modification agreement templates, which are identifiable by unique version numbers or codes. (<u>See id.</u> at 30, 38, 140-44.) Ocwen runs the loan and borrower data through a "resolution waterfall," which is an "algorithm within [the]

LRM that tells [Ocwen] what the optimal resolution is . . . versus taking it to foreclosure. . . ." (Id. at 50-52.)

In order to create a modification agreement that is sent to a borrower, Ocwen uses the LRM system which populates "merged fields" within the agreement template with data such as the borrower's name, the property address, the principal balance of the modified loan, the modified interest rate, the modification effective date, the first payment date, and the loan maturity date. (Id. at 36-37; Lechtzin Decl., Exs. 4-6, 22-25 (exemplars of templates).) Ocwen stores copies of all modification agreements that have been accepted by borrowers on Ocwen's Central Imaging System or "CIS." (Nieves Tr. at 34.)

Ocwen's main loan servicing platform is called "RealServicing." (Blanchard Tr. at 45.) Certain information in the LRM is automatically saved in RealServicing. (Nieves Tr. at 35.) RealServicing also contains a comment log and spreadsheet data that includes loan transaction or payment histories, amortization tables and loan terms (e.g., interest rate, first payment date, maturity date, and amortization term). (Blanchard Tr. at 69, 72, 106-09.) Ocwen also records the identity of the investor in every loan serviced by Ocwen (i.e., the trusts that hold the loans) in RealServicing. (Id. at 96-98.)

Prior to 2014, Ocwen's standard template Balloon Disclosure did not disclose the dollar amount of any balloon payment due at the loan's maturity date. (Nieves Tr. at 115-16, 147, 191-92.) Ocwen's training manuals from this time period stated: "The agreements will never indicate the balloon amount." (Id. at 191, 197; Lechtzin Decl. Ex. 9 (Ocwen Loss Mitigation Manual at Ocwen010223.) Similarly, scripting tools utilized by Ocwen representatives instructed them to answer the question, "What is my balloon at maturity?" by answering: "We cannot provide a balloon amount which will be due at maturity as the remaining balance

becomes the balloon amount." (Nieves Tr. at 189; Lechtzin Decl. Ex. 8 (Ocwen CCC Best Practices CCC Resolutions Manual) at Ocwen011487; id. Ex. 9 (Ocwen Customer Care Center Loss Mitigation Manual) at Ocwen010223.) However, the same manuals also instruct representatives that, if an "estimated balloon payment" is reflected in the system for the borrower, the representative should "advise [the borrower] of the same, as long as you disclose it is only an estimate [and] [t]he balloon amount depends on how the customer makes the payments." (Id.) Ocwen ceased using the balloon modification templates at issue in this case in late 2013 or early 2014. (Nieves Tr. at 40-42, 62-65.) Since that time, all Ocwen balloon disclosures state a minimum dollar amount for the balloon payment due at the maturity of the loan. (Id. at 42, 64-65, 66-72 (identifying blank balloon modification templates).)

B.     The Class Representatives

1.     Plaintiffs Lisa and Scott Cave

Lisa and Scott Cave ("the Caves"), who seek to represent both the Pennsylvania and FDCPA Classes, are owners of a home located at 491 North Mill Road, Kennett Square, Pennsylvania, which they purchased in December 2003 for $175,000. (Lechtzin Decl. Ex. 26, June 24, 2014 Deposition of Scott Cave ("S. Cave Tr.") at 49, 83.) On November 23, 2005, the Caves refinanced their home with a 30-year mortgage loan from Saxon Mortgage, Inc. in the amount of $236,300, which they were required to repay at an annual interest rate of 8.650 percent. (Lechtzin Decl. Ex. 28, November 23, 2005 Note; Ex. 29 November 23, 2005 Mortgage.) Under the terms of this loan, the Caves' monthly payment of principal and interest was $1,842.12. (Id.)

In August 2009, after falling behind on their mortgage payments, the Caves applied to Saxon for a loan modification under the Home Affordable Mortgage Program ("HAMP"). (S.

Cave Tr. at 429-31.) By letter dated April 21, 2011, Saxon advised the Caves that the servicing of their mortgage was being transferred to Ocwen, effective May 16, 2011. (Lechtzin Decl. Ex. 30.) At the time Ocwen assumed servicing of the Caves' loan in May 2011, the Caves were in default on their loan. (Joint Submission of Material Facts (Docket Entry # 78) ¶ 15.) Specifically, the Caves' loan was "due for November 2009," according to an Ocwen Rule 30(b)(6) witness. (Lechtzin Decl. at Ex. 19, December 20, 2013 Deposition of Paul Myers ("Myers Tr.") at 43; Ex. 21, Ocwen Letter of May 19, 2011.) In June 2011, Ocwen sent the Caves a HAMP solicitation letter, and on June 23, 2011, Ocwen received the Caves' HAMP document package. (Myers Tr. at 53-55.) Ocwen reviewed the Caves for a HAMP modification and sent them a written notice of denial on June 25, 2011. (Id. at 56.)

Also in June 2011, Ocwen sent the Caves an in-house loan modification agreement with the Balloon Disclosure provision at issue here. (Id. at 58.) Under the terms of the proposed Cave Modification Agreement, the principal balance increased from $236,300 to $278,203, the interest rate for the first 60 months was 2 percent, and the rate increased to 4.5 percent for the remaining term of the loan. (Id. at 72-73; Nieves Tr. at 123-24; Ex. 20, June 28, 2011 Loan Modification Agreement ("Cave Modification Agreement").) Under the proposed Cave Modification Agreement, the monthly principal and interest payment for the first 60 months is $1,000.02. (Myers Tr. at 76.) The Cave Modification Agreement includes a "Balloon Disclosure" that is substantially similar to the modification agreements entered into by all other Pennsylvania Class members, which provides:

> The loan modification for which you have applied contains a balloon provision. This means that even if you make all payments full and on time, the loan will not be paid in full by the final payment date. A single balloon payment will be due and payable in full on 12/1/35, provided that all payments are made in accordance with the loan terms, and the interest rate does not change for the entire loan term.

(Lechtzin Decl. Ex. 20.)  Ocwen's 30(b)(6) witness Paul Myers testified that all of Ocwen's loan modification agreements had disclosures similar to those made in the Cave Modification Agreement, which did not state the amount of the balloon payment.  (Myers Tr. at 100-04.)

Before the Caves accepted the Cave Modification Agreement, Lisa Cave called Ocwen to inquire about the amount of the balloon, but, she testified, "[t]hey weren't able to give me an amount."  (Lechtzin Decl.  Ex. 32 June 23, 2014 Deposition of Lisa Cave ("L. Cave Tr.") vol.  I at 302.)  The Caves  accepted Ocwen's offer by executing the Cave Modification Agreement and returning the signed agreement to Ocwen along with the requested initial payment of $1,285.39, which Ocwen accepted and retained.  (Id. at 302-03.)  Under the Cave Modification Agreement, Ocwen extended the amortization term from 360 months to 374 months, commencing on September 1, 2011, the first payment date of the modification.   (Myers Tr. at 86; Cave Modification Agreement; Nieves Tr. at 121-22.)   Ocwen admits that the Cave Modification Agreement does not disclose this change in the amortization term from 360 months to 374 months.  (Nieves Tr. at 124.)  Ocwen did not provide the Caves with an amortization schedule that would have revealed this change in the amortization term of the Caves' loan.  (Myers Tr. at 78.)  The Cave Modification Agreement provides that "[a]ll covenants, agreements, stipulations, and conditions in your Note and Mortgage will remain in full force and effect, except as herein modified. . . ."  (Cave Modification Agreement ¶ 8(b).)  Plaintiffs allege that this provision of the Cave Modification Agreement was misleading and deceptive in light of Ocwen's failure to disclose the change to the amortization period of the Caves' loan.  (Pl. Mem. at 9.)

Ocwen admits that the Cave Modification Agreement does not state the amount of the balloon payment due at the maturity of their loan.   (Myers Tr. at 75; Nieves Tr. at 124.) However, at the time the Caves accepted the Cave Modification Agreement, Ocwen knew that

the Caves would be required to make a balloon payment in the amount of $93,524.46 at the loan's maturity date if they made all of their scheduled payments in full and on time. (Myers Tr. at 75, 80-81.) Ocwen admits that the Cave Modification Agreement does not include instructions as to how the Caves could have calculated the amount of the balloon they will owe at their loan's maturity date. (Nieves Tr. at 127.) However, Ocwen 30(b)(6) witness Myers explained in general terms the steps that one would need to perform to calculate the amount of the balloon, stating:

> You determine the amortization portion. I believe in this case we can certainly look at the comments. I can tell you what it was amortized over. It was amortized over 374 months. You take the principal balance, the 278,000 number, you amortize that. You initially do the amortization schedule over 374 months. You take a look after month 60, what's the principal balance. Then turn around and do a second one starting payment 61 through 374 and that would give you the amortization over the balance.

(Myers Tr. at 86.) Ocwen 30(b)(6) witness Nieves provided a similar explanation about how to calculate the amount of the balloon. (Nieves Tr. at 124-127.)

Scott Cave testified that "if I would have been told up front that it [the balloon] was $90,000 I would have walked away." (S. Cave Tr. at 70, 218-19.) Lisa Cave testified that because the balloon amount was not disclosed, "I wasn't given the opportunity to plan properly financially. According to the information I have now, if I were to have paid the entire mortgage and then had to pay the balloon payment, I would have had to take out another loan somewhere in my 60s." (L. Cave Tr. vol. II at 323.)

2.    Plaintiff Lisa A. Abraham

Lisa Abraham, who seeks to represent the Pennsylvania and the FDCPA Classes, is the owner of a home located at 31 Clay Valley Road, Fleetwood, Pennsylvania, which has been her primary residence since 1992. (Lechtzin Decl. Ex. 14, June 18, 2007 Abraham Note; Lechtzin

Decl. Ex. 34, August 28, 2015 Deposition of Lisa A. Abraham ("Abraham Tr.") at 43, 59-60.)

On June 18, 2007, Abraham refinanced her home with a 30-year Fixed Rate Stepped Payment Note in the amount of $263,500, with a maturity date of July 1, 2037. (Abraham Tr. at 148-54; Ex. 14.) Under the terms of the loan, Abraham was to pay interest only at a rate of 8.590 percent for the first 120 months. (Blanchard Tr. at 182-84.) The initial monthly payment under this loan was $1,949.76, however after the first 120 months, the monthly payment would increase to $2,196.79. (Abraham Tr. at 154-55; Ex. 14.) There was no balloon payment provision under this loan. (Blanchard Tr. at 210.)

In August 2010, Ms. Abraham was going through a divorce and fell behind on her loan payments. (Abraham Tr. at 170-73.) In order to bring her loan current and resolve pending litigation, she entered into a Settlement and Release Agreement with Ocwen, which modified the terms of her loan. (Id. at 180-88; Lechtzin Decl. Ex. 18, June 2, 2010 Ocwen/Abraham Settlement and Release Agreement ("Release").) Under the terms of this agreement, Ocwen increased the principal amount of her loan to $322,838.81, the interest rate was fixed at 6.4 percent, and her new monthly principal and interest payment increased to $1,867.13. (Release ¶¶ 1b-d.) Unlike the modification agreements at issue in this case, Abraham's Release expressly stated the amortization term applicable to her modified loan: "this balloon modification is amortized as if the repayment period was 480 months. . . ." (Id. ¶ 1e; Abraham Tr. at 205.)

In February 2011, Ms. Abraham suffered a stroke and again fell behind on her monthly loan payments.[2] (Abraham Tr. at 210-12.) By letter dated November 23, 2012, Ocwen offered Abraham a new Loan Modification Agreement that: (1) reduced the principal balance of her

---

[2] We note that, while there is evidence that Abraham twice fell behind on her payments, no evidence has been presented that any loan executed by Abraham was "in default" at the time Ocwen acquired it.

loan to $236,040.80; (2) forgave approximately $91,000.00 of her total outstanding debt; (3) reduced her monthly principal and interest from $1,867.13 to $714.79; (4) lowered her total monthly payment, including escrow items, from $2,535.16 to $1,319.75; and (5) lowered the interest rate from 6.4% to 2.0%. (Lechtzin Decl. Ex. 15, November 23, 2012 Proposed Modification Agreement ("Proposed Modification Agreement"); Blanchard Tr. at 184-85, 196-99.) The Agreement changed the amortization period of the loan to 480 months from 360 months. (Blanchard Tr. 229-31.)

The Proposed Modification Agreement is based upon a standard template document, which can be identified by its version number, and which Ocwen has used to modify mortgages on properties located in Pennsylvania. (Nieves Tr. at 60-61.) The "Balloon Disclosure" provision in the Abraham Modification Agreement provides:

> The loan modification for which you have applied contains a balloon provision. This means that even if you make all payments full and on time, the loan will not be paid in full by the final payment date. A single balloon payment will be due and payable in full on 7/1/37, provided that all payments are made in accordance with the loan terms, and the interest rate does not change for the entire loan term.

(Proposed Modification Agreement.) Ms. Abraham accepted Ocwen's offer by executing the Proposed Modification Agreement and returning it to Ocwen. (Blanchard Tr. at 186-87; Lechtzin Decl. Ex. 16, executed Abraham Modification Agreement.) At the time Abraham signed the Modification Agreement, she did not know the amount of the balloon payment she would owe at the loan's maturity. (Abraham Tr. at 248-49.)

Ocwen admits that the Abraham Modification Agreement does not state the amount of the balloon payment due at the maturity of her loan. (Blanchard Tr. at 210-11; Lechtzin Decl. Ex. 17, Ocwen Response to Request for Admission ("Ocwen Abraham Admission") No. 12.) Ocwen also admits that it had determined that the estimated balloon payment amount was

projected to be $114,236.82 at the time of the loan's maturity date, provided Abraham made all scheduled monthly payments due under the Abraham Modification Agreement. (Blanchard Tr. at 212; Ocwen Abraham Admission No. 14.) According to Ocwen's records of a phone call with Ms. Abraham on February 11, 2014, an Ocwen representative informed her orally that her balloon amount is at least $114,236.82. (Blanchard Tr. at 190-92, 212.) Abraham recalls that when she asked the representative about the amount of the balloon, he said: "I'm not real sure. This is not set in stone." (Abraham Tr. at 248-49, 298-99.)

Ocwen admits that that the Abraham Modification Agreement did not include an amortization schedule. (Ocwen Abraham Admission No. 7.) Ocwen further admits that "neither the 'Balloon Disclosure' term set forth at Paragraph 5 on Page 2 of the Abraham Modification Agreement, nor the Balloon Disclosure set forth at Page 4 of the Abraham Modification Agreement, states the method by which the balloon payment that would be due at the loan's maturity date of July 1, 2037 will be calculated." (Ocwen Abraham Admission No. 13; Nieves Tr. at 88.) Moreover, "Ocwen admits that neither the Abraham Modification Agreement . . . nor the cover letter, dated November 23, 2012, enclosing the Abraham Modification Agreement, provided express instructions as to how Abraham could calculate the amount of the estimated minimum balloon payment due and payable on July 1, 2037." (Ocwen Abraham Admission No. 16.)

Abraham admits that the loan modification lowered her monthly payments and made her life "more comfortable," but believes she would not have lost her home if she did not enter into this agreement "[b]ecause I had been paying my loan prior to the 2012 modification." (Abraham Tr. at 322.) She testified that if the amount of the balloon payment had been disclosed in the modification agreement, she would not have agreed to it, because she will be age 77 when the

balloon comes due and she would need to take out a new mortgage to pay that amount. (Id. at 350-51 ("That wouldn't work. It's not going to work. No one is going to give a 77-year-old woman, with rheumatoid arthritis, on disability, even a $100,000 mortgage at that age. It's impossibility.").) After Ms. Abraham filed the instant lawsuit, Ocwen stopped sending her monthly mortgage statements and it no longer allows her to view her loan information on its website. (Blanchard Tr. at 176-77; Abraham Tr. at 301.)

### 3. Plaintiffs Lee Ann and Mark E. Kaminski (the "Kaminskis")

The Kaminskis, who seek to represent the New Jersey Class, are owners of a home located at 10 E. Maple Tree Drive, Westampton, New Jersey, which has been their family's primary residence since May 2000. (Lechtzin Decl. Ex. 36, September 10, 2015 Deposition of Lee Ann Kaminski ("L. Kaminski Tr.") at 15, 28-29.) The Kaminskis purchased their home for $267,000, of which $135,000 was financed with a mortgage. (Id. at 31-32.) In order to consolidate various debts, on February 24, 2006, the Kaminskis refinanced their home with a 30-year, fixed rate mortgage in the amount of $344,250, and a maturity date of March 1, 2036. (Id. at 44-46; Lechtzin Decl. Ex. 11, February 24, 2006 Kaminski Mortgage at Ocwen005086-5102.) This loan was amortized over a term of 360 months. (Nieves Tr. at 56-57.) Under the terms of this loan, the monthly payment was $2,772.58 for the first 120 months, and thereafter the amount would increase to $3,076.64. (L. Kaminski Tr. at 51.)

The Kaminskis fell behind on their loan in 2007, when Mrs. Kaminski's job as a long-term substitute teacher came to an end, and Mr. Kaminski lost his job. (Id. at 56-57.) In May 2007, the Kaminskis entered into a forbearance agreement with Ocwen, which called for them to make increased monthly payments of $3,456 for twelve months so they could cure their delinquency. (Id. at 60-63.) Although Mr. Kaminski found new employment, the Kaminskis

were unable to make all of the forbearance payments. (Id. at 64-65.) They entered into a second forbearance agreement in January 2008, which contained a "Modification Contingency" that increased the principal balance of their loan to $367,716.11, and had a fixed interest rate of 8.63 percent. (Id. at 66-70.) To receive this modification, Ocwen required the Kaminskis to pay a reinstatement amount of $27,565.33, and to make a down payment of $6,902.24. (Id. at 71-72.) In June 2009, the Kaminskis entered into a new loan modification agreement that increased their principal balance to $387,168.50, and provided an initial monthly payment of $2,237.12. (Lechtzin Decl. Ex. 37, June 2009 Home Affordable Modification Agreement effective July 1, 2009.)

By letter dated March 9, 2011, Ocwen offered the Kaminskis a "STREAMLINED LOAN MODIFICATION," which provided a monthly payment of $1,979.95, including escrow items such as property taxes. (Lechtzin Decl. Ex. 12, March 9, 2011 Letter enclosing draft Loan Modification Agreement ("Kaminski Loan Modification Agreement") at Ocwen006480-6483.) The Loan Modification Agreement enclosed with this letter stated that, if the Kaminskis accepted Ocwen's offer, the interest rate of their loan would be modified to 2 percent, the new principal balance would be $377,555.05 (as compared to the original principal amount of $344,250), and their new monthly principal and interest payment would be $1,143.32. (Id.; Blanchard Tr. at 66-67, 101.) The Kaminski Loan Modification Agreement did not provide any principal forgiveness. (Blanchard Tr. at 92.)

Ocwen 30(b)(6) witness Nieves testified that the Kaminski Loan Modification Agreement is based on a standard template document that Ocwen has used to modify mortgages on properties located in New Jersey. (Nieves Tr. at 25-29, 59-60; Lechtzin Decl. Ex. 1, December 21, 2015 Class Certification Report of Brian C. Becker ("Becker Report") ¶¶ 36, 38.) The

Kaminski Loan Modification Agreement contains a "Balloon Disclosure" provision that provides:

> The loan modification for which you have applied contains a balloon provision. This means that even if you make all payments full and on time, the loan will not be paid in full by the final payment date. A single balloon payment will be due and payable in full on 9/1/2036, provided that all payments are made in accordance with the loan terms, and the interest rate does not change for the entire loan term.

(Kaminski Loan Modification Agreement at Ocwen006483.)  Although the Kaminskis' loan was originally amortized over a period of 360 months, under the Kaminski Loan Modification Agreement the loan is amortized as though it is payable over a period of 480 months.  (Blanchard Tr. at 104-06.)  This change in the amortization term is not disclosed in the Kaminski Loan Modification Agreement.  (Id. at 115-17.)  The Kaminski Loan Modification Agreement provides that "[a]ll covenants, agreements, stipulations, and conditions in your Note and Mortgage will remain in full force and effect, except as herein modified. . . ." (Loan Modification Agreement at Ocwen006481.)

Ocwen's March 9, 2011 letter to the Kaminskis was a "blind modification offer," meaning that Ocwen solicited the Kaminskis for a modification rather than the Kaminskis applying to Ocwen for a modification.  (Blanchard Tr. at 43-44, 46; Nieves Tr. at 31.)  According to Ocwen's records of a phone call with Mrs. Kaminski, as of March 21, 2011, the Kaminskis had not received the modification offer, even though the March 9 letter stated that they needed to respond to the offer by March 23.  (Blanchard Tr. at 158-60.)  Ocwen then sent the offer via email.  Although the Kaminskis had only two days to consider the offer, if they had stated that they needed more time, Ocwen representatives had the authority to extend the offer.  (Id.)  The Kaminskis accepted Ocwen's offer by signing the Kaminski Modification Agreement

on March 24, 2011, and returning it to Ocwen.  (Blanchard Tr. at 48; Lechtzin Decl. Ex. 13, executed Kaminski Loan Modification Agreement Ocwen005127-5129.)

Under the terms of the Kaminski Loan Modification Agreement, if they made all of their scheduled payments in full and on time, they would owe a balloon payment of $173,421.59 at the loan's maturity date of September 1, 2036.  (Blanchard Tr. 129-31.)  Mrs. Kaminski testified that she did not know the amount of the balloon payment before she signed the Kaminski Loan Modification Agreement and that, if she had known the amount of the balloon payment, she would not have signed it.  (L. Kaminski Tr. at 117-20; 149.)  Mr. Kaminski testified that he did not ask Ocwen about the balloon disclosure before signing the Agreement, and that he "would not know how -- what formula to use, how to amortize.  I'm not the financial expert.  I would not know how to arrive at a dollar value based on my situation."  (Lechtzin Decl. Ex. 38, September 10, 2015 Deposition of Mark E. Kaminski ("M. Kaminski Tr.") at 80-81.)  He also testified,

> I realize that a balloon payment, the amount could be less or more depending on us making our payments on time through the course of the loan.  It was tacked on, it's tacked on to the back end of the loan which is due [and] payable in 2036. And I don't know how they derive the number based on our situation, so I have no other recourse.

(Id. at 81.)  Both Plaintiffs expressed concerned that they will be unable to make the balloon payment when it comes due.  (L. Kaminski Tr. at 150; M. Kaminski Tr. at 94.)

Ocwen admits that the Kaminski Loan Modification Agreement "did not include an amortization schedule."  (Lechtzin Decl. Ex. 39, Ocwen Response to Request for Admission ("Ocwen Kaminski Admission") No. 7.)  Ocwen also admits that the Balloon Disclosure "does not state the dollar amount of any balloon payment that would be due on September 1, 2036, under the terms of the Kaminski Modification Agreement."  (Id. No. 11; Blanchard Tr. at 119; Nieves Tr. at 86.)  Ocwen further admits that the Balloon Disclosure "does not state the method

by which the balloon payment that would be due at the loan's maturity date of September l, 2036 will be calculated." (Ocwen Kaminski Admission No. 12; Blanchard Tr. at 155.) Moreover, Ocwen's "cover letter dated March 9, 2011, enclosing the Kaminski Modification Agreement, did not provide express instructions as to how the Kaminskis could calculate the amount of the estimated minimum balloon payment due and payable on September 1, 2036." (Ocwen Kaminski Admission No. 15.) Nor did the Modification Agreement itself "provide express instructions as to how the Kaminskis could calculate the amount of the estimated minimum balloon payment due and payable on September 1, 2036." (Id. No. 16.) Ocwen admits "that on or around the time the Kaminski Modification Agreement . . . was sent to the Kaminskis, Ocwen was able to calculate the estimated minimum balloon payment amount at the time of the loan's maturity date, if the Kaminskis made all scheduled monthly payments due under the Kaminski Modification Agreement in full and on time." (Id. No. 13.)

After the Kaminskis filed the instant lawsuit, Ocwen stopped sending them monthly statements for their mortgage and no longer allows them to view information concerning their loan on Ocwen's website. (Blanchard Tr. at 174-76.) Mrs. Kaminski testified that she cannot access her account online or make payments online, but must send her payments to Ocwen via certified mail. (L. Kaminski Tr. at 143.)

### C.    Expert Evidence

#### 1.    Plaintiffs' Expert Dr. Brian C. Becker

Plaintiffs have retained Dr. Brian C. Becker to "evaluate whether (a) members of the proposed class shared common experiences as a result of policies and practices that [Ocwen] applied uniformly, which caused the same types of damage to all members of the proposed class, and whether (b) such putative members of the proposed class can be readily identified using data

maintained by Ocwen." (Becker Report ¶ 1.[3]) He concludes that that putative Class members can be identified using common methods applied to Ocwen's electronic records, that Ocwen's electronic records can be queried to extract the borrowers whose loan modification processes meet the Class definition, and that damages can be calculated for each Class member using common methods applied to Ocwen's electronic records. (Id. ¶¶ 4, 10-12.)

Dr. Becker's method for identifying class members relies upon searchable electronic data maintained by Ocwen that can be exported, sorted, and analyzed. (Id. ¶ 18.) Specifically, he relies on (1) Ocwen's RealServicing system, which includes borrower and loan information, payment history, comments and the amount and due date of each borrower's balloon payment; (2) Ocwen's LRM, which is Ocwen's decision engine used to determine a loan's eligibility for a modification or alternative loan resolutions such as a short sale or deed in lieu of foreclosure; and (3) Ocwen's CIS, which is another database maintained by Ocwen that stores images of certain letters and documents sent to and received back from borrowers, and retains information on prior servicers, payment history, customer communications, the mortgage document, the note document, and modification documents (including actual copies of the modification agreements sent to and received from borrowers). (Id. ¶¶ 21-23.) Finally, Dr. Becker asserts that RealDoc,

---

[3] Dr. Becker is the President of Precision Economics, LLC, an economics firm focused in the areas of litigation, regulation, and public policy. (Becker Report ¶ 5.) Prior to founding Precision Economics in 2001, Becker worked as a consulting economist in both economic consulting and public accounting firms, focusing on international economics. Over the past seven years, the majority of his valuation work has concerned financial transactions, including lending rates, guarantees, and receivables financing. He has testified before the U.S. International Trade Commission, the Canadian International Trade Tribunal, the Federal Court of Australia, the U.S. Tax Court, the Tax Court of Canada, and the Delaware Chancery Court. He has published more than two dozen papers/book chapters and has served as a Visiting Professor at Johns Hopkins University, The George Washington University, and Marymount University. He earned a Ph.D. and M.A. in Applied Economics from the Wharton School of the University of Pennsylvania; and his B.A. in Applied Mathematics and Economics from The Johns Hopkins University. (Id.)

another database maintained by Ocwen, stores the templates of modification agreements sent to and received back from borrowers.  (Id. ¶ 24.[4])

Dr. Becker opines that Ocwen's own analysis of its loan-level data on its loan modifications provides evidence that methods exist which can be commonly applied on a class-wide basis to identify Class members.  (Id. ¶ 26.)  He notes that Ocwen's data analyst, Paul Britton, produced a table in which he presented the results of queries of Ocwen's internal loan-level data, including data contained within RealServicing, to identify modified loans that met each of the following aspects of the Class definition:  (1) borrowers in Pennsylvania or New Jersey, and (2) borrowers Ocwen placed into non-HAMP modification agreements with balloon payment features between January 1, 2009 and September 30, 2015.  (Id.)  Britton's query identified 11,157 non-HAMP modifications in Pennsylvania between January 2009 and September 2015 that had a balloon payment feature, and identified 8,454 non-HAMP modifications in New Jersey between January 2009 and September 2015 that had a balloon

---

[4] We note that the record does not support Dr. Becker's assertion that Ocwen's databases include actual copies of modification agreements "sent to and received from borrowers."  Becker cites page 38 of the deposition transcript of Ocwen's Rule 30(b)(6) witness Paul Myers. Although Myers discusses the CIS system, he does not assert at page 38 that it records copies of modification agreements that were merely "sent" to borrowers.  (Myers Tr. at 38.)  He also cites pages 26-29 and 66-67 of the deposition transcript of Ocwen Rule 30(b)(6) witness Max Nieves. In describing information in Ocwen's LRM database, Nieves states that the information is initially entered when a customer gives Ocwen a "Request for Mortgage Assistance" form.  After Ocwen employees review certain data, "then the agreement is systematically sent to the mailing address that we have."  (Nieves Tr. at 29.)  This is the only time Nieves used the word "sent" in relation to an "agreement" and he does not specify if the system records agreements that were sent but never signed by the borrower.  He also did not specifically testify that Ocwen's RealDoc database stores "templates of modification agreements sent to and received back from borrowers"; even if he had, there is no evidence that storing a template is the same thing as storing actual agreements sent to borrowers.

This distinction is key since borrowers to whom modification agreements were only "sent" — in contrast to those who actually signed one — are included as members of the FDCPA Class.  Evidence, or the lack thereof, that Ocwen recorded borrowers to whom it "sent" modification agreements is, accordingly, relevant to whether that Class can be ascertained.

payment feature. (Id.) Becker opines that he can identify class members by further refining Britton's query by: (1) identifying those borrowers located in a state included in the Class definition with a modification featuring a balloon payment, and (2) then identifying those borrowers who did not receive a disclosure of the amount of the balloon payment in their modification agreement. (Id. ¶¶ 28-30.) He asserts that, based on the documents produced and deposition testimony in the case, "it is likely that all of Ocwen's standard in-house modification agreements with balloon payments made until late 2013 in Pennsylvania and New Jersey would meet the Class definition."[5] (Id. ¶ 31.) Becker states that this same data can be used on a class-wide basis to establish whether or not there is a violation of state and federal consumer protection laws under Plaintiffs' theories, and that the named Plaintiffs are members of the class. (Id. ¶¶ 34-35.)

On the issue of damages, Dr. Becker opines that Ocwen's records contain information on each putative Class member's payment terms, including unpaid principal balance, monthly payment amount, interest rate, and the remaining term of the loan that would be sufficient to generate an appropriate formula to measure the damages applicable to Plaintiffs' claims. (Id. ¶ 39.) To calculate damages, he first assumes "that Class members' expectation of the balloon payment and monthly payments would have been the balloon payment and monthly payments that would have occurred had the modified loan been amortized over the previously disclosed

---

[5] Becker notes that "it is possible that there may be some modifications without disclosed balloon payment amounts that were not based on a template. Therefore, a systematic data query of Ocwen's database for modifications based on template codes may yield an incomplete list of modifications that meet the Class definition." (Becker Report ¶ 32.) He opines that, "[e]ven if these modifications that are not based on templates cannot be identified as having a disclosed balloon payment amount through a systematic data query, it would still be possible to identify all of Ocwen's modifications that were not based on a template (i.e., had no template code) and had a balloon payment through a systematic data query." (Id.) His calculation method would examine the language of these particular modifications using the images of those modification agreements in Ocwen's CIS database. (Id.)

amortization term."[6]  (Id. ¶ 40.)  He asserts that damages through the earlier of (1) the date on

which the last payment on the loan was made, or (2) the date when damages are awarded, can be

defined as "the present value difference to each Class member from his position with the

modification in its actual state and the but-for modification with the same terms except with an

amortization schedule corresponding to the last disclosed amortization term prior to the

modification with the undisclosed balloon amount."[7]  (Id. ¶ 41 (emphasis in original).)  He

calculates that, while Lisa Abraham suffered no damages — because the amortization term in her

modification agreement did not change from the last disclosed amortization term — the Caves

suffered damages of $6,173.15 and the Kaminskis suffered damages of $30,240.12.[8]  (Id. ¶¶ 44-

45.)

    Dr. Becker opines that, all things being equal, a loan amortized over a longer term will

have a lower monthly payment than a loan amortized over a shorter term.  That lower monthly

payment, however, results in the loan principal being paid off at a slower rate than would occur

---

[6] Becker's model relies on the pre-modification amortization term on the ground that the borrower's original loan documents all provide that their terms remain in force if not otherwise modified.  Since the loan modification did not disclose a new amortization term or provide a balloon disclosure that estimated the balloon payment due at the end of a newly-created amortization schedule, Becker insists that a but-for world requires that the pre-modification amortization term be used because Class members' expectation of the balloon payment and monthly payments would have been the balloon payment and monthly payments that would have occurred had the modified loan been amortized over the previously disclosed amortization term.  (Becker Report at ¶ 40.)

[7] In constructing this but-for amortization schedule for purposes of calculating damages, Becker makes several assumptions:  (1) that each Class member would have agreed to the higher monthly principal and interest payment from this but-for amortization schedule at the time they entered the loan modification; (2) that each Class member would have made her but-for principal and interest payments at every interval at which she made her actual principal and interest payments; and (3) that each Class member would have made the same extra principal payments in the but-for world as he did in the actual world.  (Becker Report ¶ 43.)

[8]  These figures assume that the loan remains payable over its entire term, i.e., the borrower does not sell the home and the loan is not refinanced.

if a larger monthly payment were made.  Because the principal balance is paid off more slowly over the longer amortization term,

> the interest being charged each month is larger than what would be charged if the principal balance were paid off faster, as would occur if the loan payments were calculated over a shorter amortization term.  Therefore, more interest will be paid over the life of a loan if payments are made according to a longer amortization term than would be paid if payments are made according to a shorter amortization term.

(Id. ¶ 46.)  Further, because the principal is paid off more slowly when payments are made according to an amortization schedule with a longer term, "a larger balloon payment is required at the loan maturity than would be required if payments were made according to an amortization schedule with a shorter term."  (Id. ¶ 47.)  Becker calculates that the Caves' balloon payment under the but-for amortization schedule would be $13,558.37 less than the balloon payment recorded in Ocwen's RealServicing system; for the Kaminskis, the balloon payment under the but-for amortization schedule would be $130,390.67 less than the balloon payment recorded in Ocwen's RealServicing system; Abraham's balloon payment would be the same since her amortization term did not change.  (Id. ¶ 48.)

Dr. Becker recognizes, however, that "for many Class members, damages will be awarded before loan maturity.  For those Class members, neither the difference between actual and but-for balloon payments nor the difference between actual and but-for principal and interest payments through maturity would be the measure of damages."  (Id. ¶ 50.)  He has developed an equation to capture the measure of damages that can be used for borrowers who paid either the exact amount of their required monthly modified payments, who paid more than their required monthly modified payments, or who paid fewer required monthly modified payments.  He opines that, for each scenario, his equation

> represents the amount that would place the borrower in the financial position the

borrower would have been in at the date on which damages are awarded if a modification had occurred using the previously disclosed amortization term by compensating the borrower for differences between the values of the actual balances and what the balances would have been if a modification had been implemented with regard to the outstanding principle balance and any accrued interest. To this difference in principal balance in Equation [1], one adds the difference between the actual principal and interest payments and what the principal and interest payments would have been if a modification had been implemented using the previously disclosed amortization term. Thus, Equation [1] compensates Class members by calculating the but-for impact of Ocwen's failure to implement modifications using the previously disclosed amortization term on both the Class members' financial "stocks" and "flows" – the stocks being the principle balance and the flows being the Class members' monthly payments.

(Id. ¶ 52.) Under this equation, as of October 2015, he calculates damages for Abraham to be $0.00, for the Caves to be $50.36, and for the Kaminskis to be $3.58. (Id. ¶¶ 52-55.)

2.    Defendant's Expert Joseph J. Floyd

Ocwen has retained Joseph J. Floyd to evaluate the proper method of identifying whether the named Plaintiffs and putative class members suffered ascertainable financial losses, as well as to review and comment on the Becker Report. (Forbes Decl. Ex. A, January 27, 2016 Expert Report of Joseph J. Floyd ("Floyd Report") at 3.[9]) Like Dr. Becker, Floyd opines that the most appropriate method to evaluate whether a borrower incurred financial damages due to the receipt

_____

[9] Floyd is the founder and President of Floyd Advisory LLC, a consulting firm. He previously served as Managing Director of Huron Consulting Group and as the partner in charge of Arthur Andersen's Financial Consulting practice in New England. He has a Bachelor of Business Administration degree from the University of Massachusetts at Amherst, and a Juris Doctor degree from Suffolk University Law School. He is a licensed Certified Public Accountant in New York and has earned the American Institute of Certified Public Accountants' ("AICPA") Accreditation in Business Valuation ("ABV") and Certification in Financial Forensics ("CFF"). He is a Certified Fraud Examiner ("CFE"). He has worked on numerous financial analysis engagements, valuation assignments, financial reporting projects, and other similar assignments; he has also been qualified as an expert on accounting and financial issues in the United States District Courts in Connecticut, Massachusetts, and Virginia, in the United States Bankruptcy Courts in New York and Massachusetts, and in the trial courts of various states. He has also appeared before the U.S. Securities and Exchange Commission ("SEC") to discuss and explain the underlying facts, accounting treatment, and reasons for restatement of public registrants' previously filed financial statements. (Floyd Report at 3-4.)

of a loan modification agreement is a "but-for" analysis. (<u>Id.</u> at 4, 16.) In applying his approach, Floyd assumes that borrowers could not remain current on their pre-modification loan terms and, therefore, would face imminent foreclosure without the loan modification since, if the borrower was not having problems, it is unlikely that a modification would have been offered. (<u>Id.</u>) Accordingly to Floyd, following their receipt and acceptance of loan modification agreements, Plaintiffs benefited from comparatively lower monthly payments and lower interest rates; continued to benefit from the home's appreciation; avoided the adverse consequences of foreclosure and loss of their home; and avoided the adverse consequences of potential bankruptcy filings. (<u>Id.</u> at 5.) He asserts that "[e]ach of these factors is financially favorable to the Plaintiffs and appears contrary to the existence of any possible financial harm or damage that may have arisen from the provision of the loan modification agreements by Ocwen." (<u>Id.</u>)

On the issue of damages, Floyd posits that Dr. Becker's analyses and calculations are

> based on a flawed premise that the alleged failure to disclose the estimated amount of the loan modification balloon payment due at the loan maturity date and the loan amortization term caused the Plaintiffs to suffer financial damages. In my opinion, A) the loan amortization term only impacted the calculation of the monthly payment; an amount agreed to by the Plaintiffs and B) the Plaintiffs had access to all of the information needed to determine their balloon payment at any point in time. Therefore, the alleged failure to disclose the amount of the loan modification balloon payment and the loan amortization term would not cause the Plaintiffs to suffer ascertainable loss or financial damages.

(<u>Id.</u>) He adds that Dr. Becker's analyses and conclusions regarding the Plaintiffs' alleged damages are based on a flawed and incomplete comparison because Becker

> invents a new loan product – one with no apparent basis in the evidence – and calculates damages based solely on that hypothetical loan. Therefore, Dr. Becker's report not only ignores the benefits of the loan modifications actually received by the Plaintiffs, it also attempts to calculate damages based on fictional loan terms.

(Id.)  Floyd, on the contrary, attempts to compare what he opines is "the relevant data – the Plaintiff's financial events and consequences without the modification (such as foreclosure or becoming current with the pre-modification loan terms) as compared with the modification terms" which, he concludes, "indicates that none of the Plaintiffs suffered any ascertainable loss, actual harm, or financial damages."  (Id.)  Finally, Floyd asserts that because each Plaintiffs' financial and economic situations are unique and would require individual considerations to properly evaluate the existence of each member's possible financial damages, if any, the inquiry necessary to determine the existence of financial damages and then perform the calculation of such damages, if any, are individualized and not capable of proof through evidence that is common to the class.  (Id.)

According to Floyd, "the most appropriate method to evaluate whether a borrower incurred financial damages due to the receipt of a balloon loan modification is the 'but-for' analysis which considers the borrower's financial events and consequences without the modification (such as foreclosure or becoming current with the pre-modification loan terms) as compared with the modification terms."  (Id. at 16.)  He identifies several financial events and consequences to a borrower who was provided a loan modification, which, he asserts, would be relevant to whether the borrower incurred damages as a result of the modification.  (Id.)  First, Floyd notes that the borrower's modified monthly payments were reduced after the modification and that the reduction "was in part due to lowered interest rates being provided to the Plaintiffs pursuant to their loan modification agreements."  (Id. (citing Blanchard Tr. at 166).)  He opines that "interest rates represent the 'cost' of funds, and by lowering the interest rate, the borrower is paying less monthly for the use of the monies."  (Id. at 17.)  Second, Plaintiffs received the economic value for the use of their homes — rather than renting other lodging if the mortgage

was foreclosed — which is a significant consideration of the existence and calculation of damages arising from receipt and acceptance of modification agreements since this factor plays a significant role in any individual borrower's decision to enter into the modification agreement. (Id.)  Third, the lower payment option afforded Plaintiffs the ability to pay additional principal if they chose to do so.  (Id.)  Fourth, for many borrowers the amount due under the Plaintiffs' pre-modification mortgage loan terms was not increased, but some borrowers, like the Caves and Kaminskis, owed delinquencies and other fees that were added to the principal balance upon modification, while other borrowers, like Abraham, had a portion of their principal forgiven in the modification.  Fifth, whether a borrower had equity in their home is relevant since, if they did, a traditional sale would have been possible, while the lack of equity and past payment defaults are generally triggers to foreclosure.  Finally, by lowering the monthly payments, the mortgage loans became more affordable thus enabling borrowers to hold and sell their homes at a later date when the market rebounded.  (Id. at 16-18.)  Floyd opines that each of these factors is financially favorable to the Plaintiffs and appears contrary to the existence of any possible financial harm or damage that may have arisen from the loan modification agreements by Ocwen.  Additionally, Abraham, and presumably other putative class members, benefited from the reduction of the principal balance and total outstanding debt of her loan.  (Id. at 18.)

Floyd criticizes Becker's damages model on several grounds.  Using the reduced loan modification interest rate and the previously-applicable loan amortization term, Dr. Becker calculates a new monthly payment and balloon payment amount for a hypothetical loan product. Floyd notes that Becker then compares these amounts to the payments due under the actual loan modification agreement to present his purported measure of financial damages.  (Id. at 19.) Floyd faults Dr. Becker for assuming that all Plaintiffs, and presumably all putative class

members, had an expectation that the amortization term, and the balloon payment, if any, did not change as a result of the modification. As such, Dr. Becker asserts that the Plaintiffs are entitled to recover damages for any excess payments the Plaintiffs will allegedly have to make as a result of the extended amortization term and the resulting balloon payments. (Id. at 20.) Floyd calls this approach

> a mechanistic damage model to hypothesize the impact of maintaining the loan amortization term in place before any modification . . . . The result of Dr. Becker's calculation assumptions is a proposed monthly loan payment that is higher than the modification monthly payment for two of the three named Plaintiffs and the same for one of the Plaintiffs. This phenomenon is caused by his calculation of a revised monthly payment based on the original, pre-modification amortization period, which is shorter than the loan modification amortization period for those two Plaintiffs.

(Id. at 20.)

Next, Floyd faults Dr. Becker's analysis because Becker also assumes that the loan principal payments must still be sufficient to achieve the loan payoff amount before the end of the amortization term, thereby causing an increase in the required monthly principal payment amounts over those reflected in the actual loan modification. A consequence of Dr. Becker's calculated higher monthly principal payments, and the assumption of timely payments for the life of the loan, is a lower hypothetical balloon payment at the end of the contractual mortgage period. Importantly, "under Dr. Becker's assumptions, the Plaintiffs' monthly payments are higher than they actually have made or were required to make under their actual loan modifications, creating an unusual financial presentation of damages." (Id. at 21.) Dr. Becker also assumes that, for his hypothetical loan product, (1) Ocwen and Plaintiffs would have each agreed to these alternate terms; (2) each Plaintiff would have been eligible for a modification based on Dr. Becker's terms; and (3) each Plaintiff would have been able to pay the higher monthly payments on the same dates that the actual loan modification payments occurred or

were due.  Floyd criticizes Dr. Becker's hypothetical loan because neither he nor Plaintiffs offer any evidence that any one of the Plaintiffs was eligible for or could have satisfied those higher monthly payment amounts.  (Id.)  Floyd notes that, under Dr. Becker's hypothetical loan, while Abraham's monthly payment would remain unchanged, the Cave's monthly payment would increase $325.29 and the Kaminski's monthly payment would increase $328.28.  (Id. at 22.)

To calculate damages, Becker first assumes "that Class members' expectation of the balloon payment and monthly payments would have been the balloon payment and monthly payments that would have occurred had the modified loan been amortized over the previously disclosed amortization term."  (Becker Report ¶ 40.)  Floyd criticizes this assumption asserting that the alleged failure to disclose the loan amortization term "would only be relevant to the determination of the minimum monthly payment; an amount the Plaintiffs agreed to and accepted in their loan modification agreements.  (Floyd Report at 23.)  Floyd further opines that, once the monthly payment is established, the determination of the outstanding principal balance is an easy exercise based on the other terms fully disclosed in the loan modification agreement. Since the Plaintiffs' modification agreements told them the new principal balance due, the interest rate, the loan maturity date, and the minimum monthly payment due, Floyd asserts that this information is sufficient to calculate an expected principal balance outstanding amount after each payment, including the estimated balloon payment.  (Id. at 23.)  Floyd has prepared an amortization schedule solely based on information from a modification agreement.  (Floyd Report Ex. B.)  Because borrowers had this information, Floyd asserts that Dr. Becker's analyses and calculations are based on a flawed premise that the alleged failure to disclose the amount of the loan modification balloon payment and the loan amortization term caused the Plaintiffs to suffer financial damages.  (Id. at 24.)

Next, Floyd faults Dr. Becker for failing to address the fact that the Plaintiffs benefited and agreed to the monthly payments under the actual loan modification agreements, which were less than previously owed by the Plaintiffs and lower than the revised amounts calculated by Dr. Becker under his damages approach. (Id.) Floyd calculates that as a result of the loan modification, the net present value benefit realized by the Kaminski Plaintiffs was approximately $96,000.00. (Floyd Report Ex. C.)

3.      Dr. Becker's Reply to the Floyd Report

Dr. Becker asserts that Floyd's but-for alternative to the Ocwen balloon modification — no modification at all and continuation of the prior loan terms — is an inappropriate model. (Lechtzin Decl. Ex. 2, February 12, 2016 Reply Class Certification Report of Brian C. Becker ("Becker Reply") ¶ 6.) Becker asserts that Plaintiffs did not sue because they were "tricked" into a modification; rather they were aware they were entering into a new loan with new terms. He faults Floyd for failing to consider a but-for world where Ocwen maintained the pre-modification amortization term or offered borrowers a modification with a disclosed balloon payment. (Id.)

Dr. Becker rejects the importance of the factors Floyd listed as allegedly benefiting borrowers entering into a modification because those factors also compare the Ocwen modification only to a but-for world continuing the original loan terms. (Id. ¶ 7.) Specific to Floyd's assertions that under the Ocwen modification borrowers enjoyed the offsetting benefits of lowering their monthly payments, avoiding foreclosure and receiving the economic value for the use of their homes, being able to pay additional principal if they chose to do so, lowering — or at least not increasing — the principal balance, and permitting them breathing room until the market stabilized so they could sell the home, Becker opines that that the

> correct counterfactual is not the pre-modification payment; it is the post-
> modification payment had the modification been implemented with the previously

disclosed amortization term. Further, the appropriate comparison is not the overall monthly payment, but the cost of the loan in terms of interest paid []. Under that comparison, as shown in the Becker Report, the borrower does not 'benefit' from Ocwen's failure to disclose because the Kaminskis would have paid less in interest under the previously disclosed amortization term.

(Id. ¶ 7 (internal citation omitted).) Regarding Floyd's assumption that, without the Ocwen modification a borrower would have faced foreclosure and thus benefited from being able to stay in their home, Dr. Becker responds that the question as to whether a borrower would face imminent foreclosure is only relevant to the Floyd Report's assumed but-for world in which Ocwen does not modify the borrower's loan. (Id. ¶ 8.) Becker asserts that this factor is flawed since it assumes the borrower would have received no modification, and without a proper balloon disclosure a borrower could not make an informed decision whether to accept the modification, seek alternate lodging, or try to cure their default through other means such as bankruptcy proceedings. (Id. ¶ 14.)

Dr. Becker contends that a but-for comparison using a "loan modification with alternative terms world" is reasonable and a but-for comparison using a "no modification world" is not reasonable. (Id. ¶ 9.) He asserts that a but-for analysis "requires the construction of what would have happened, not what actually happened, but-for the conduct. An assumed but-for loan modification with alternative loan terms is no more 'hypothetical' or 'fictional', as labeled in the Floyd Report, as the Floyd Report's assumption of no loan modification whatsoever." (Id. ¶ 10.) While Becker concedes that, in the actual world, neither of those "hypothetical" events occurred, both he and Floyd agree that loan servicers offer loan modifications because they expect to benefit from the modification. (Id. ¶ 10 (citing Becker Report ¶ 6; Floyd Report at 5 n.2, 16 n.9).) He asserts that borrowers as well expect to benefit when entering the modification, relative to making no modification. Hence, Becker concludes that an assumption that a loan

modification with alternative terms would have been offered by the servicer but-for the alleged conduct is a reasonable assumption. (Id.)

Dr. Becker reiterates his assertion that a but-for model should incorporate the amortization term of the original loan since modification agreement did not disclose new amortization terms. He contends that this assumption is "consistent with the premise that the loan terms remained unchanged unless otherwise disclosed in the loan modification agreement." He adds that each of the named Plaintiffs' modification agreements at issue in this case includes the following language:

> All covenants, agreements, stipulations, and conditions in your Note and Mortgage will remain in full force and affect, except as herein modified, and none of the your [sic] obligations or liabilities under your Note and Mortgage will be diminished or released by any provisions hereof, nor will this Agreement in any way impair, diminish, or affect any of Ocwen's rights under or remedies on your Note and Mortgage, whether such rights or remedies arise there under or by operation of law.

(Id. ¶ 12 (citations omitted).)

Next, Dr. Becker takes issue with Floyd's assertion that borrowers had access to the data needed to calculate their prospective balloon payment and could easily have done so. He accuses Floyd of attempting to shift the blame for Ocwen's failure to disclose onto the putative class members. Becker contends that calculating a balloon payment is an "easy" exercise only to someone with a high level of financial sophistication and/or experience in the mortgage industry. (Id. ¶ 16.) Becker argues also that "[b]orrowers who become delinquent on their loans, such as Class members, are likely to exhibit even lower degrees of financial literacy, given that studies show that a borrower's numerical ability and financial literacy are negatively associated with the likelihood of becoming delinquent on a mortgage." (Id. (citing Kristopher Gerardi, Lorenz Goette, & Stephan Meier, Numerical ability predicts mortgage default, 110 Proc. Nat'l Acad.

Sci. 11267 (July 9, 2013)).)  He adds that Floyd's allegation that Plaintiffs had the necessary information to determine their balloon payment at any time is inconsistent with the evidence that they in fact did not, and were unable to perform that calculation, as none of the five named Plaintiffs, including Lee Ann Kaminski, a former math teacher, testified that he or she knew how to calculate a balloon payment.  (Id.)

Dr. Becker also criticizes Floyd for failing to address the increased interest payments resulting from the undisclosed change in loan terms.  In critiquing Becker, Floyd focuses on the fact that the Becker model's but-for monthly payments are greater when the but-for amortization term is shorter, relative to the actual monthly payments and amortization term.  Becker responds that Floyd ignores the fact that less total interest over the course of the loan is paid by a borrower when the amortization term is shorter.  (Id. ¶ 21.)

### 4.    Floyd's Supplemental Report

Finally, Floyd has supplemented his original report by including responses to Dr. Becker's deposition, which was held after Floyd submitted his original report.  Floyd notes errors in the Becker Report damages calculations related to:  "(i) the comparison of accrued interest as of the damages date in the actual loan modification terms ('Actual') versus the alternate hypothetical modification scenario in the Becker Report ('Becker But-For'); and (ii) the calculation of the present value of principal and interest ('P&I') differences between the Actual and Becker But-For scenarios."  (Forbes Decl. Ex. B, July 29, 2016 Supplement to the Expert Report of Joseph J. Floyd ("Floyd Supp. Report") at 1.)  Floyd also observes that the Becker Report damages calculation "arbitrarily assumes an investment return equal to the interest rate on the named Plaintiffs' modified loans despite more favorable investment opportunities that were available to Plaintiffs at the time they obtained their loan modifications and thereafter."  (Id.)  In

light of these three observations, Floyd has performed corrected calculations using Becker's own damages model for the named Plaintiffs.

The first error Floyd identifies relates to the consideration of accrued interest owed by the Cave Plaintiffs through the damages date, which is assumed to be October 2015 in the Becker Report. (Floyd Supp. Report at 2.) This portion of the Becker Report damages calculation captures the difference in accrued interest owed by the named Plaintiffs from the date they ceased paying P&I through the damages date in the Actual scenario as compared to the Becker But-For scenario. However, notes Floyd, the Becker Report incorrectly relies on the aggregate interest due based on a loan amortization schedule that assumes that the Cave Plaintiffs have continued to make P&I payments, which never actually occurred. (Id.) The impact of correcting the Becker Report damages calculation for the Cave Plaintiffs to account for this accrued interest error reduces the Cave Plaintiffs' alleged financial losses or damages, as calculated in the Becker Report as of October 2015, from $50.38 to $0.02. (Id.)

The second error Floyd identifies "relates to the Becker Report determination of the present value of P&I differences between the Actual and Becker But-For scenarios for the named Plaintiffs. The Becker Report calculates the present value assuming the named Plaintiffs made their payments on the first day of the month following the payment, without regard for the actual day the payment occurred." (Id.) Correcting the calculation to reflect the dates that actual payments were made by each of the named Plaintiffs, "properly reflects the days that the named Plaintiffs would benefit from the opportunity to invest the differential between the lower Actual monthly payments and the higher But-For monthly payments set forth in the Becker Report." (Id. at 3.) Floyd calculates that after correcting for the accrued interest error discussed above for the Cave Plaintiffs and after correcting for the days omitted from the actual payment date

through the end of the month for the Cave Plaintiffs and the Kaminski Plaintiffs, "the Cave Plaintiffs' alleged 'damages' amount changes from an alleged financial loss of $0.02 (after accounting for the accrued interest error) to a financial benefit of $0.05. . . . [T]he Kaminski Plaintiffs' alleged 'damages' amount changes from a financial loss of $3.58, as posited in the Becker Report, to a financial benefit of $11.92." (Id.) Accordingly, Floyd concludes that, correcting for just these two errors, none of these named Plaintiffs suffered damages.[10]

The third error relates to the Becker Report's assumption of the named Plaintiffs' modified loan interest rate (2%) "as the investment rate of return the named Plaintiffs could realize had they invested the difference between the monthly payment amounts in the Actual and Becker But-For scenarios." (Id.) Floyd notes that Becker conceded in his deposition that if the named Plaintiffs could have invested the savings generated from their lowered monthly payments at a rate higher than his 2% assumption, "that would make the actual world relatively better than the but-for world and would lower or potentially erase the damages here." (Id. (quoting Forbes Decl. Ex. EE, July 20, 2016 Deposition of Dr. Brian C. Becker ("Becker Tr.") at 232).) Floyd opines that "investment rates of return higher than the 2-percent assumed in the Becker Report were available based on conservative and widely-accepted investment vehicles." (Id. at 4.) For example, had the named Plaintiffs invested the incremental funds each month in the Vanguard VGLT exchange-traded fund, Floyd calculates that the Cave Plaintiffs would have received an aggregate financial benefit of $1.13, and the Kaminski Plaintiffs would have received an aggregate financial benefit of $1,350.41, when comparing their Actual modification terms (and the lower monthly payments provided thereby) to the Becker But-For terms (with its higher monthly payments). (Id.)

_____

[10] There is no change for Abraham, whose damages were already determined to be $0 on the ground that her amortization term did not change.

## IV.    OCWEN'S MOTION TO STRIKE

Ocwen has moved to strike portions of the Becker Report as well as references to those portions in Plaintiffs' class certification papers.  Ocwen argues that Becker purports to provide legal opinions regarding the ascertainability, commonality, and typicality class certification requirements.  The Motion is denied.

The United States Court of Appeals for the Third Circuit has joined other Courts of Appeals holding that a plaintiff "cannot rely on challenged expert testimony, when critical to class certification, to demonstrate conformity with [Federal Rule of Civil Procedure] 23 unless the plaintiff also demonstrates, and the trial court finds, that the expert testimony satisfies the standard set out in Daubert [v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993)]."  In re Blood Reagents Antitrust Litig., 783 F.3d 183, 187 (3d Cir. 2015).  The Court held that expert testimony "that is insufficiently reliable to satisfy the Daubert standard cannot 'prove' that the Rule 23(a) prerequisites have been met 'in fact,' nor can it establish 'through evidentiary proof' that Rule 23(b) is satisfied."  Id.

The Daubert analysis governing the admissibility of expert testimony has been codified in Federal Rule of Evidence 702, which provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The proponent of the expert testimony has the burden of establishing its admissibility by a preponderance of the evidence.  Padillas v. Stork-Gamco, Inc., 186 F.3d 412,

418 (3d Cir. 1999) (citing <u>Daubert</u>, 509 U.S. at 592 n.10); <u>see also</u> <u>Mahmood v. Narciso</u>, 549 F. App'x 99, 102 (3d Cir. 2013) (citing <u>In re TMI Litig.</u>, 193 F.3d 613, 663 (3d Cir. 1999)).

There are three requirements for the admissibility of expert testimony pursuant to Rule 702, "'qualification, reliability and fit.'" <u>Calhoun v. Yamaha Motor Corp., U.S.A.</u>, 350 F.3d 316, 321 (3d Cir. 2003) (quoting <u>Schneider v. Fried</u>, 320 F.3d 396, 405 (3d Cir. 2003)). "Qualification requires 'that the witness possess specialized expertise.'" <u>Id.</u> (quoting <u>Schneider</u>, 320 F.3d at 405). The Third Circuit has "'interpreted this requirement liberally,' holding that 'a broad range of knowledge, skills, and training qualify an expert as such.'" <u>Id.</u> (quoting <u>In re Paoli R.R. Yard PCB Litig.</u>, 35 F.3d 717, 741 (3d Cir. 1994) ("<u>Paoli II</u>" ).

The "reliability" prong requires that "the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." <u>Id.</u> (quoting <u>Paoli II</u> at 742 (quoting <u>Daubert</u>, 509 U.S. at 590)). An assessment of "'the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity.'" <u>Id.</u> (quoting <u>Paoli II</u> at 742). In determining whether the reliability requirement is met, courts may examine the following factors where appropriate: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put. <u>See</u> <u>In re Blood Reagents Antitrust Litig.</u>, Civ. A. No. 09-2081, 2015 WL 6123211, at *8 (E.D. Pa. Oct. 19, 2015) (citing <u>United States v. Mitchell</u>, 365 F.3d 215, 235 (3d Cir. 2004)). The reliability prong "applies to all

aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion." ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 291 (3d Cir. 2012) (alteration in original; quotations omitted). Where the expert's "factual basis, data, principles, methods, or their application are called sufficiently into question, . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of the relevant discipline.'" Id. at 294 (alteration in original) (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 149 (1999)).

"Fit" means that "'the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact.'" Calhoun, 350 F.3d at 321 (quoting Schneider, 320 F.3d at 405). Fit pertains "'primarily to relevance.'" Meadows v. Anchor Longwall & Rebuild, Inc., 306 F. App'x 781, 790 (3d Cir. 2009) (quoting Lauria v. Nat'l R.R. Passenger Corp., 145 F.3d 593, 599 (3d Cir. 1998)). "The expert's testimony must 'fit' under the facts of the case so that 'it will aid the [fact finder] in resolving a factual dispute.'" Id. (quoting Lauria, 145 F.3d at 599). This element "'requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.'" Id. (quoting Lauria, 145 F.3d at 600). "In other words, expert testimony based on assumptions lacking factual foundation in the record is properly excluded." Id. (citing Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408, 414 (3d Cir. 2002)).

We reject Ocwen's arguments seeking to strike Dr. Becker's discussion of the ascertainability, commonality and typicality class action requirements. The argument that Dr. Becker lacks specialized knowledge, expertise, or academic training to provide opinions on the search capabilities of Ocwen's proprietary systems or databases is inapposite. Ocwen's own Rule 30(b)(6) witness offered fact testimony on the search capabilities. Becker's opinions relate to how, as an economist, he uses those capabilities to identify members of a class. Becker

specifically states that his method for identifying class members relies upon the searchable electronic data maintained by Ocwen that can be exported, sorted, and analyzed. (Becker Report ¶ 18.) He further asserts that Ocwen's own analysis of its loan-level data on its loan modifications provides evidence that methods exist which can be commonly applied on a class-wide basis to identify Class members. (Id. ¶ 26.) As such, his opinions are based on the methods and procedures of an economist, rather than on his own subjective belief or unsupported speculation, and there is nothing in Ocwen's Motion to suggest that Becker's method of relying on Ocwen's own data is improper or that his conclusions are unreliable.

Ocwen's argument that Dr. Becker's discussion of ascertainability, commonality, and typicality constitute legal conclusions on these class certification issues is also rejected. Expert witnesses are prohibited from rendering a legal opinion because "it would usurp the District Court's pivotal role in explaining the law to the jury." Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 217 (3d Cir. 2006) (citing First Nat'l State Bank v. Reliance Elec. Co., 668 F.2d 725, 731 (3d Cir. 1981)). While an expert is prohibited from rendering a legal opinion, his opinion is not impermissible because it "embraces an ultimate issue to be decided by the trier of fact." United States v. Fulton, 837 F.3d 281, 291 (3d Cir. 2016). The Third Circuit has stated that the key to whether an expert improperly delves into improper legal opinion is whether or not the expert "give[s] his opinion as to what was required under the law, or whether the defendant complied with the [law]." Berckeley Inv. Grp., Ltd., 455 F.3d at 218.

Ocwen's argument lacks merit for several reasons. First, Ocwen concedes that Becker has expressly disclaimed any intention or ability to provide legal opinions. (Ocwen's Mem. in Support of Mot. to Strike (Docket Entry 63) at 8.) Second, Becker is not a lawyer and does not rely on case law, legal treatises, or other legal sources in reaching his opinions. Third, he has not

given an opinion as to what is required by Rule 23. His opinions are confined to an analysis of the factual record to determine whether it demonstrates that class members meeting the class definitions could be identified, and whether they share common features with named Plaintiffs. As such, they are not legal opinions; they are opinions on which a court may rely to reach its own legal conclusions about the class certification requirements. Cf. Romero v. Allstate Ins. Co., 52 F. Supp. 3d 715, 723 (E.D. Pa. 2014) (striking expert report of law professor offered for purposes of defeating class certification where the expert offered no particularized knowledge of any of the factual issues relevant to a class certification analysis, but rather put forth his own legal analysis based on his experience as a legal scholar of the class certification factors); Witt v. Chesapeake Exploration, L.L.C., Civ. A. No. 10-22, 2011 WL 2790174, at *2 (E.D. Tex. July 14, 2011) (striking law professor's report providing a summary of various legal authorities on class certification issues and using his interpretation of these authorities to argue that the requirements for class certification had been met in this case); Woodard v. Andrus, Civ. A. No. 03-2098, 2009 WL 140527, at *2 (W.D. La. Jan. 20, 2009) (rejecting expert report where proffered testimony from law professor was focused exclusively on whether the legal standard for class certification has been satisfied, rather than bearing on some factual inquiry).

Accordingly, the Motion to Strike is denied and the Becker Report is admitted into the class certification record. We examine the merits of Dr. Becker's opinions, including the weight to which his conclusions are entitled, when we discuss the individual Rule 23 issues for which they are offered.

## V.     THE CLASS CERTIFICATION MOTION

The United States Court of Appeals for the Third Circuit requires us to "rigorously assess" the available evidence to assure the prerequisites of Rule 23 are met and to "resolve

factual disputes by a preponderance of the evidence and make findings that each Rule 23 requirement is met or is not met, having considered all relevant evidence and arguments presented by the parties." In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 320-21 (3d Cir. 2008). A plaintiff "must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011) (emphasis omitted). Failure to meet any of Rule 23(a) or 23(b)'s requirements precludes certification. Danvers Motor Co., Inc. v. Ford Motor Co., 543 F.3d 141, 147 (3d Cir. 2008). It is the plaintiff's burden to prove each of the prerequisites under Rule 23(a) and that the class fits within the desired categories of class actions set forth in Rule 23(b) by a preponderance of the evidence. In re Hydrogen Peroxide, 552 F.3d at 307, 316 n. 14, 320 (citation omitted); see Hayes v. Wal-Mart Stores, Inc., 725 F.3d 349, 354 (3d Cir. 2013) ("It is plaintiff's burden to show that a class action is a proper vehicle for this lawsuit"). Rigorous analysis will frequently "entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped. '[T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" Dukes, 564 U.S. at 351 (alteration in original) (quoting Gen. Tel. Co. of SW v. Falcon, 457 U.S. 147, 160 (1982)). The Third Circuit has also held that issue certification under Rule 23(c)(4), like any other certification decision under Rule 23, "must be supported by rigorous analysis." Hohider v. United Parcel Serv., Inc., 574 F.3d 169, 200-02 (3d Cir. 2009).

A.    Ocwen's Preliminary Issues on Loss and Damages

1.    Plaintiffs' Theory of Loss

Preliminary to its arguments on the Rule 23 requirements, Ocwen raises predicate issues, the first of which is that Plaintiffs have proposed fundamentally flawed theories of causation and

ascertainable loss. It asserts that we have already rejected the central theory of Dr. Becker's model and should reject any attempt by Plaintiffs to resurrect it to demonstrate economic loss. This argument has no merit.

Ocwen argues that Plaintiffs' theory of economic loss assumes that Plaintiffs had to pay a greater amount of interest over the life of a loan caused by the "undisclosed extension of the amortization terms under [plaintiffs' and putative class members'] modified loans." (Def. Mem. in Opp. to Mot. to Certify Class (Docket Entry #60) ("Def. Mem.") at 17 (quoting Pls.' Mem. at 51).) According to Ocwen, "[t]he central premise of [Dr. Becker's] theory is the proposition that whether a putative class member suffered ascertainable loss[11] or harm can be determined by a comparison of the terms of the actual loan modification provided to each borrower with the

_____

[11] Ascertainable loss is an element of both the UTPCPL and NJCFA claims. As we have previously stated, the essential elements of a UTPCPL claim are: (1) a deceptive act; (2) "an ascertainable loss of money or property;" (3) that resulted from "the use or employment . . . of a method, act, or practice declared unlawful by the UTPCPL;" and (4) "that the plaintiffs justifiably relied on the deceptive conduct." Abraham v. Ocwen Loan Servicing, LLC, Civ. A. No. 14-4977, 2016 WL 2866537, at *10 n.3 (E.D. Pa. May 17, 2016) (citations omitted). To prove a claim under the NJCFA, a plaintiff must show: "'(1) an unlawful practice, (2) an ascertainable loss, and (3) a causal relationship between the unlawful conduct and the ascertainable loss.'" Harnish v. Widener Univ. Sch. of Law, 833 F.3d 298, 305 (3d Cir. 2016) (quoting Gonzalez v. Wilshire Credit Corp., 25 A.3d 1103, 1115 (N.J. 2011). We have previously held that, where a plaintiff asserts omission-based claims, the "plaintiff must [also] show that defendant (1) knowingly concealed (2) a material fact (3) with the intention that plaintiff rely upon the concealment." Abraham, 2016 WL 2866537, at *11 (internal quotations omitted).

Ascertainable loss is not an element of the FDCPA claim. The essential elements of an FDCPA claim are: "(1) [the plaintiff] is a consumer, (2) the defendant is a 'debt collector,' (3) the defendant's challenged practice involves an attempt to collect a 'debt' as the Act defines it, and (4) the defendant has violated a provision of the FDCPA in attempting to collect the debt." Jensen v. Pressler & Pressler, 791 F.3d 413, 417 (3d Cir. 2015) (citation omitted). The FDCPA provides that an entity that attempts to collect "a debt which was not in default at the time it was obtained by such person" is not a "debt collector" subject to the FDCPA. See 15 U.S.C § 1692a(6)(F)(iii); McAndrew v. Deutsche Bank Nat'l Trust Co., 977 F. Supp. 2d 440, 448 (M.D. Pa. 2013) ("A loan servicer . . . cannot be a 'debt collector' under the FDCPA unless the debt was in default when it was obtained by the servicer.").

hypothetical terms of what Dr. Becker calls a 'but-for' modification that differs from borrower to borrower." (Id. (quoting Becker Report at 22, Pls.' Mem. at 51).) Ocwen notes that Becker creates a "but-for" loan modification model that retains the reduced interest rate, the loan term, and the new unpaid principal balance (including any principal forgiveness) of the actual modification received by each plaintiff, but then shortens the amortization period. Ocwen contends that, although the obvious goal of Becker's model

> is to manufacture some form of assumed causation and measurable damages for each borrower, plaintiffs' hypothetical modification results in increased higher monthly payments and presumes without analysis (or facts), a borrower's actual ability or willingness to pay those higher amounts — neither of which could be established other than by case-by-case examination of each borrower's ability and desire to pay. . . .
>
> Plaintiffs and the Becker Report base these "but-for" modification terms on the unsupported assumption that, in entering their actual loan modifications, putative class members would have "reasonably expected" the amortization period applicable to their modified loans "to have been the same as the previously disclosed amortization term of their loans." Plaintiffs and the Becker Report, therefore, "assume that Class members' expectation of the balloon payment and monthly payments would have been the balloon payment and [higher] monthly payments that would have occurred had the modified loan been amortized over the previously disclosed amortization term."

(Id. at 18 (internal citations to Becker Report omitted; parenthetical and brackets in original).) Ocwen notes that we have already considered and rejected as implausible the assumption that the amortization period applicable to their modified loans was to have been the same as the previously disclosed amortization term of their loans. See Abraham v. Ocwen Loan Servicing, LLC., Civ. A. No. 14-4977, 2014 WL 5795600, at *8 (E.D. Pa. Nov. 7, 2014) (stating that "If a loan's monthly payment is lowered, the term of the loan is not extended, and a balloon payment provision is added, the correct 'mathematical imperative' is that the amortization period of the loan has to change. It is not reasonable, and is thus implausible, for Plaintiffs to plead reliance on a purportedly implied amortization period term in their original loan documents, but then

ignore the equally implicit modification of the amortization period effected by the modification agreements for the purpose of lowering their monthly payments."). Specifically, we found that it was implausible for Plaintiffs to expect that they retained the right to enforce the original amortization period after they accepted the modification that reduced their current payments because that expectation "would destroy the mutual benefits created by the modification, namely reduced monthly payments over the loan term coupled with the balloon payment, in exchange for Ocwen's forbearance on collecting the loan as originally agreed." Id. at *9. In light of our rejection of the assumptions underlying plaintiffs' theory of harm, Ocwen concludes that we should likewise reject that theory here and disregard the Becker Report's opinions regarding the causation and existence of economic loss. In other words, because we have found it implausible that Plaintiffs were entitled to the original amortization period, they cannot, as Dr. Becker proposes, assert a theory of economic loss based upon that assertion.

Plaintiffs respond that our prior decision does not foreclose Dr. Becker's hypothesizing the original amortization term into his model. They argue that we were not addressing the validity of a damages model in our earlier decision, but rather addressing a completely different issue, namely whether Plaintiffs could state a breach of contract claim against Ocwen based upon Ocwen's failure to disclose changes to amortization periods of the Kaminskis' and Caves' loans. (Pls.' Reply in Support of Pls.' Mot. for Class Cert. ("Pls.' Reply") (Docket Entry #70) at 7.) Plaintiffs note that we specifically differentiated the UTPCPL and NJCFA claims — for which Dr. Becker's model is applicable — from the implausible contract claim stating:

> First, unlike the proposed SAC's breach of contract claim — where liability is premised on a specific, non-existent contract term — the new version of the UTCPCL claim merely incorporates an additional factual allegation in support of the previously pleaded theory of the claim. Having previously held that the claim was plausible because it alleged deceptive conduct that was separate and distinct from a breach of contract, namely the failure "to disclose the amount of the

balloon payment or a method by which it will be calculated," Abraham, 2014 WL 5795600, at *4, **the addition of a more specific explanation of what was allegedly not disclosed — the amortization period — cannot detract from the claim's plausibility.**

(Id. at 7-8 (quoting <u>Abraham</u>, 2016 WL 2866537, at *10 (emphasis added in Pls.' Reply)).)

Moreover, they note that we accepted the premise that damages other than contract damages could flow from Ocwen's "failure to disclose the balloon payment that would result from its adherence to the contract." <u>Abraham</u>, 2016 WL 2866537, at *10 (citation omitted); <u>see also</u> <u>id.</u> at *11 (holding that the same reasoning applies to Plaintiffs' NJCFA claim). Accordingly, Plaintiffs argue that Dr. Becker's theory of damages is not foreclosed.

Plaintiffs are correct. Our earlier discussion of the implausibility of the breach of contract claim was grounded in the allegation that Ocwen breached a term that was not contained in the original contract, namely the specific amortization term used to calculate each Plaintiff's original monthly payment. We held that because that term was not contained in the original contract, it could not have been retained in the Loan Modification even though that document provided that all original terms remained in force unless specifically modified. Accordingly, any claim based upon Ocwen failing to apply the original amortization term to the modified loan was implausible.

While Ocwen objects that Becker's attempt to show economic loss by applying the original amortization term to the but-for world is improper since we have already held that there could be no contract liability based upon that "failure," Dr. Becker's purpose is not to create a model to calculate contract damages. He has, however, made clear that his model relies on the pre-modification amortization term on the ground that the borrower's original loan documents all provide that their terms remain in force if not otherwise modified. Since the loan modification did not disclose a new amortization term or provide a balloon disclosure that estimated the

balloon payment due at the end of a newly-created amortization schedule, Becker insists that a but-for world requires that the pre-modification amortization term be used because "Class members could have reasonably expected the amortization term of the modification to have been the same as the previously disclosed amortization term of their loans." (Becker Report at ¶ 40.) Thus, he assumes for his model that "the balloon payment and monthly payments would have been the balloon payment and monthly payments that would have occurred had the modified loan been amortized over the previously disclosed amortization term." (Id.)

Our prior discussion of the contract claim does not impugn Becker's model. While Ocwen disclosed that the modified loans included a balloon payment feature, the remaining claims are based upon Ocwen's alleged failure to disclose in the modification documents both a pro forma calculation of the balloon payment due at the end of the loan term (assuming that all scheduled payments are made when due), as well as the change in amortization schedule that permitted the borrowers to make lower monthly payments while not extending the loan term.[12]

_____

[12] See SAC ¶ 97 (alleging an unconscionable commercial practice in violation of the UTPCPL from the use of Ocwen's Balloon Disclosure, "which, contrary to its name, does not reveal the amount of the balloon payment the borrower will owe at the end of the term of the loan even if the borrower makes all payments in full and on time, and does not disclose how such a balloon payment will be calculated"); ¶ 98 (alleging that unbeknownst to Plaintiffs and the Class, "Ocwen changed the amortization terms of their loans without disclosing this material change in the terms of their loans"); ¶ 99 (alleging that, as a result of this change in the amortization terms, Ocwen's statement in the loan modification agreements that "'[a]ll covenants, agreements, stipulations, and conditions in your Note and Mortgage will remain in full force and effect, except as herein modified....' is false, misleading, and deceptive and constitutes an unfair and unconscionable commercial practice'"); ¶ 114 (alleging deceptive acts or practices in violation of the CFA from Ocwen's representing to Plaintiffs and members of the New Jersey Class that "'[a]ll covenants, agreements, stipulations, and conditions in your Note and Mortgage will remain in full force and effect, except as herein modified...,' when in actuality, Ocwen changed the amortization terms of their loans, as of the effective date of their loan modifications, without disclosing this material change in the terms of their loans."). See also id. ¶¶ 58,77 (alleging that as a result of the changes in the amortization term, Plaintiffs "sustained economic harm including, but not limited to, being required to pay a greater amount

Distinguishing a model proposing to show "benefit of the bargain contract damages" arising from a change in a contract term from a model proposing to show damages from an unconscionable commercial practice resulting from an undisclosed change may only be a difference in semantics. Nonetheless, Becker's damages model does not appear to claim that the Plaintiffs have sustained an ascertainable loss because they did not receive the "benefit of the bargain" of their original amortization schedule after their loan was modified to reduce their monthly payments. Rather, he applies the original amortization schedule to show how the premise of the remaining claims — the failure to disclose a pro forma calculation of the balloon payment due at the end of the loan term (due to the undisclosed amortization change and assuming that all scheduled payments are made when due) — allegedly changed the Plaintiffs' bottom line cost for their modified loans. In other words, Becker's model attempts to isolate the undisclosed amortization change by assuming all of the other terms of the modified loan remain as written, while changing the amortization schedule to calculate the bottom line cost differential if that undisclosed term had not changed. Becker's model therefore does propose a method for ascertaining loss using evidence that is common to the class since the Pennsylvania and New Jersey classes premise membership on receiving a modification that deceptively failed to disclose the amount of the balloon payment that the borrower owed at the end of the term of the loan based on the change to the amortization schedule.

2.      Becker's Model Cannot Be Common Evidence

Ocwen next contends that Plaintiffs' theory is incapable of proof through evidence that is common to the class, rather than individual to its members because the proposed theory/methodology would require multiple individualized steps for each of the putative classes.

---

of interest than they would have been required to pay under a loan amortized over" their original amortization periods).

These steps include: (1) establishing the "previously disclosed" or "last disclosed" amortization period for each putative class member, (see Becker Report at 23-24, 26 ("because the amortization term was not disclosed, Class Members could have reasonably expected the amortization term of the modification to have been the same as the previously disclosed amortization term of their loans")); (2) reviewing what, if any, amortization period had been disclosed to each putative class member, whether in their original loan documents, any prior modification agreements, or through verbal disclosure. (See Becker Tr. at 163-64 (stating in pertinent part that "certainly you would need to have some proof of disclosure to all the Class Member's to make that calculation); 165-67 (hypothesizing that, although he looked at the named Plaintiff's individual loan documents, there could be a database "disclosing that in Ocwen's files that would list all of these potential Plaintiffs and would show their most recent loan modification and the amortization terms"); (3) creating a "but-for" loan modification for each putative class member based upon an amortization schedule using individualized loan terms for each putative class member; (4) individually comparing the "but-for" amortization schedule and total "but-for" monthly P&I payments to be made over the life of the "but-for" loan with the actual amortization schedule and the actual monthly P&I payments to be made over the life of the actual loan (Becker Report at 24-26, 29); and (5) determining the difference between the actual and "but-for" modification P&I payments over the life of the loan and calculate the present value of that difference. (See id. at 29-33.) Ocwen contends that this process would have to be individually repeated for each putative class member.

Plaintiffs respond that,

Ocwen attempts to obscure the effectiveness and relative simplicity of Dr. Becker's methodology by asserting that it would require evaluation of data points unique to each Class member's loan. . . . In reality, all that is required is determining the effect of the change in a single variable – the amortization term.

Specifically, Dr. Becker's formula compares the terms of the modified loan – which Ocwen possesses – and the terms of the "but-for" modification, which is the same as the modified loan, with the sole exception of the amortization term. If the amortization term was changed at the time of the modification, then the "but-for" modification would be based on the amortization term that Ocwen applied to the loan immediately prior to the modification. Ocwen does not deny that its databases recorded the pre- and post-modification amortization terms. Indeed, Ocwen has produced this data for each of the Plaintiffs. Once the actual and "but-for" modification terms are determined, the only thing that remains is to apply a mathematical formula to compare the two scenarios. No individual proof by Class members is required to do this – just a transfer of loan data from Ocwen to a claims administrator that is capable of implementing Dr. Becker's formulaic methodology.

(Pls.' Reply at 71-72.) Additionally, Plaintiffs point out that there would be no need to use this methodology to calculate individual damages for the Pennsylvania and FDCPA Classes, as they are entitled to statutory damages under the UTPCPL[13] and FDCPA[14]; only the New Jersey Class,

---

[13] The UTPCPL provides that,

(a) Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 31 of this act, may bring a private action to recover actual damages or one hundred dollars ($100), whichever is greater. The court may, in its discretion, award up to three times the actual damages sustained, but not less than one hundred dollars ($100), and may provide such additional relief as it deems necessary or proper. The court may award to the plaintiff, in addition to other relief provided in this section, costs and reasonable attorney fees.

12 P.S. § 201-9.2

[14] The FDCPA provides in pertinent part that,

any debt collector who fails to comply with any provision of this subchapter with respect to any person is liable to such person in an amount equal to the sum of--(1) any actual damage sustained by such person as a result of such failure; (2)(A) in the case of any action by an individual, such additional damages as the court may allow, but not exceeding $1,000; or (B) in the case of a class action, (i) such amount for each named plaintiff as could be recovered under subparagraph (A), and (ii) such amount as the court may allow for all other class members, without regard to a minimum individual recovery, not to exceed the lesser of $500,000 or

involving approximately 8,454 loans, would require individual damage calculations. (Id. at 8.) This process, they assert, is no different from applying uniform mathematical formulae to implement plans of allocation in an antitrust or securities class action, which are routinely approved by courts.

We find that Ocwen's common proof argument is meritless. The allegation that the measure of each class members' loss is different does not control whether there is a common method through which it may be ascertained that each members' suffered an ascertainable loss. See Neale v. Volvo Cars of N. Am., LLC, 794 F.3d 353, 375 (3d Cir. 2015) (stating that post-Comcast, "'individual damages calculations do not preclude class certification under Rule 23(b)(3)'" (quoting Comcast Corp. v. Behrend, 133 S.Ct. 1426, 1437 (2013) (Ginsburg, J. & Breyer, J., dissenting) (citing 2 William B. Rubenstein, Newberg on Class Actions § 4:54 (5th ed. 2012))) (collecting cases). The Neale Court specifically held that it is "a misreading of Comcast" to interpret it as "preclud[ing] certification under Rule 23(b)(3) in any case where the class members' damages are not susceptible to a formula for classwide measurement." Id. at 375 (quoting In re Deepwater Horizon, 739 F.3d 790, 815 & n.104 (5th Cir. 2014)). Rather, the Neale Court agreed with sister circuits that "Comcast does not mandate that certification pursuant to Rule 23(b)(3) requires a finding that damages are capable of measurement on a classwide basis." Id. at 375 n.10 (collecting cases). Dr. Becker's Report provides a common mathematical formula for which various values for each class member garnered from Ocwen's databases may be inputted. The fact that the formula must be applied separately to each class member does not mean that the formula is not common evidence.

---

1 per centum of the net worth of the debt collector. . . .

15 U.S.C. § 1692k.

3. <u>Becker's Theory of Harm is not Supported by the Record</u>

Ocwen next argues that Plaintiffs' method for determining ascertainable loss and calculating the value of that loss suffers from a number of fundamental flaws that impact our rigorous analysis of both the weight and credibility of Plaintiffs' theory and the Becker Report's conclusions. (Def. Mem. at 21.)

a. <u>Plaintiffs did not Expect a Shorter Amortization Period</u>

Ocwen first asserts that Dr. Becker's "but-for" comparison lacks factual support since none of the named plaintiffs "has testified that they would have 'expected' a shorter amortization period"; rather, they testified that they "would **not** have entered into the actual modification had the estimated amount of the balloon payment been disclosed." (<u>Id.</u> (emphasis in original; footnote omitted).) On this basis, Ocwen contends, "the more appropriate 'but-for' scenario for assessing harm" should be to examine each plaintiff's and putative class member's actual pre-modification loan terms. (<u>Id.</u>)

> Plaintiffs respond that
>
> Ocwen is wrong. The enormous balloon payments under the modified loans are the result of extending the amortization terms. Dr. Becker's Report demonstrates that such balloon payments would be substantially lower for the Caves and the Kaminskis under the "but-for" scenarios. [] Moreover, Dr. Becker's analysis, unlike that of Ocwen's expert, takes into account the actual terms of the Modification Agreements, which provide that "[a]ll covenants, agreements, stipulations, and conditions in your Note and Mortgage will remain in full force and effect, except as herein modified. . . ." [] Thus, Plaintiffs and the Classes were justified in believing that the amortization terms of their loans would remain unchanged.

(Pls.' Reply at 9-10 (internal citations omitted).) We find that whether the named Plaintiffs or class members "expected a shorter amortization period" is inapposite. Plaintiffs' claims are based on the allegedly deceptive failure to disclose the longer period and the pro forma balloon payment amount that results from it. Ocwen does not explain how Plaintiffs could have expected

information they claim was deceptively withheld from them.  The fact that Plaintiffs testified that they would not have entered into the actual modification had the estimated amount of the balloon payment been disclosed does not impugn Dr. Becker's attempt to show ascertainable harm from that allegedly deceptive omission; it arguably support it.

b.     Becker Assumes Eligibility

Second, Ocwen argues that, while the damage theory assumes each putative class member would have been eligible for a modification based on the "but-for" terms, would have agreed to those terms, and would have been able to pay the higher monthly payments,[15] neither Plaintiffs nor Dr. Becker provide any support for these assumptions.  Further, Dr. Becker testified that he has no knowledge as to whether putative class members could have afforded or would have accepted the higher "but-for" monthly payments.[16]  Ocwen notes that Becher considered the borrowers' abilities to pay the higher but-for payment to be outside of the scope of his assignment and irrelevant to his analysis.  (See Becker Tr. at 202-03 (testifying that "I

---

[15] See Forbes Decl. Ex. EE, July 20, 2016 Deposition of Brian C. Becker, Ph.D. ("Becker Tr.") at 225-26 (stating in response to the proposition that if a borrower could not afford the higher monthly payments called for in his but-for model that "[a]t this stage I haven't been able to analyze that.   All I've been able to do is assume but if the other assumptions come into play I would have to think about that and whether and how that would come into play.  But since the differences aren't that significant it hasn't been a source of focus between the monthly payments for the but-for and the actual world.").)

[16] See Becker Tr. at 280 ("Q.  It's fair to say that your conclusions and calculations for the Kaminski's [sic] and the Cave's [sic] are based on the assumption that both the Kaminski's [sic] and the Cave's [sic] could have afforded and would have accepted the higher but-for modification terms that you posit for them; isn't that correct?  A.  I don't know that I'm assuming they would have accepted it, per se, but I'm assuming that from — that we can use that from a calculation perspective for damages.  Q.  And it's correct, is it not, for any putative Class Member you have no information as we sit here today as to whether or not they could either have afforded or would have accepted any but-for higher monthly payment of interest and principal that you would posit for them; isn't that correct? . . .  THE WITNESS:  As I sit here today, no." .  . . .  Q.  Right.  And you only know that by looking at the individual circumstances of any given putative Class Member; isn't that correct? . . .  THE WITNESS:  Or looking at Ocwen's analysis of each of those individual Class members in a database.  Yes.

haven't been asked to opine on that at this time" in relation to putative class member's ability to pay higher monthly payments), 207-08.) Dr. Becker, however, has admitted that determining whether a putative class member could afford the higher "but-for" monthly payment amounts would depend on circumstances specific to the loan at issue and that "[e]ach case would be different." (Id. at 209-10 (putative class members "have all different abilities and willingness and levels of paying and some that [are] able to pay, don't, and some that [are] unable to pay still do . . . but it wasn't an assignment I was asked to do yet").) Ocwen argues that it is implausible to assume that:

> any borrower would want to make the higher monthly payment called for by Dr. Becker's theory when in actuality and practicality, the whole purpose of modifying a loan is to give the borrower the lowest possible monthly payment obligation. However, none of the above could be established without the individual testimony of each individual borrower - the credibility of which would have to be measured by the fact-finder - as well as the testimony of Ocwen as to whether any borrower was qualified for the hypothetical "but-for" modification calling for a higher monthly payment.

(Def. Mem. at 22.) Plaintiffs respond that:

> Again, Ocwen is incorrect. Ocwen's argument would make sense only if Plaintiffs were seeking implementation of the "but-for" modifications as the remedy for the Classes. Of course, that is not the remedy Plaintiffs seek, and Plaintiffs' damages theory does not depend upon such assumptions. Dr. Becker's damages methodology is an economic model, based upon sound economic theory, created to measure the harm inflicted by Ocwen's unfair and deceptive practices.

(Pls.' Mem. at 10.)

We find that whether a class member would have been eligible for a modification based on the but-for terms, would have agreed to those terms, and would have been able to pay the higher monthly payments, misses the point of Dr. Becker's model and does not diminish the weight we afford his opinion. Becker is attempting to demonstrate that class members suffered ascertainable harm from the modifications they actually entered into, not that they should have

received — or even may have wanted — the but-for modification assumed in his model.  As a method of showing how borrowers' bottom line results were changed by the allegedly deceptive balloon payment omission in the modification they were offered and received, the model is not rendered unsound by failing to cite evidence that borrowers were eligible to receive a loan that, by definition, was never offered to them and that they did not receive.

c.    Becker Ignores Relevant Information

Third, Ocwen argues that Plaintiffs' theory of harm fails to consider several factors relevant to whether a putative class member suffered ascertainable loss as a result of entering into a loan modification agreement that omitted the estimated balloon payment amount.  Those factors include:  (1) whether the putative class member's modified monthly payments are lower than their pre-modification monthly payments; (2) whether the putative class member could afford the pre-modification monthly payments; (3) whether a portion of the outstanding loan debt was reduced or forgiven; and (4) whether the borrower had equity in their home.  (Def. Mem. at 22-23 (citing Floyd Report at 17-18).)  Ocwen notes that Dr. Becker admits that the forgiveness of principal and fees bestows a benefit on borrowers,[17] but "absent from plaintiffs' theory is consideration of the undeniable benefits that the loan modification agreements provided to the named plaintiffs and putative class members by curing their defaults, or avoiding imminently-likely defaults on their loans, bringing their loans current, and avoiding foreclosure and loss of their homes."  (Id. (citing Floyd Report at 24-25).)

_____

[17] See Becker Tr. at 82 ("certainly forgiving principal there's no take from the borrower's perspective.  So that is a net gain or reducing late fees, there is no take from the borrower there").  Becker went on to concede that whether any given borrower received a benefit "can be determined in a general way, but the numbers are different across borrowers.  So you would get a different answer across each borrower."  Id.

We find that Ocwen's criticism is valid and goes to the weight we afford to Dr. Becker's analysis. Dr. Becker has entirely failed to account for the benefits each class member may have received from the loan modification. It stands to reason that they enjoyed financial benefits from being permitted to make lower monthly payments, that they arguably entered into the modification because they could not afford the pre-modification monthly payments, and the record establishes that some borrowers had portions of their outstanding loan debt or fees reduced or forgiven. If the modification permitted class members to remain in their homes when faced with foreclosure, they arguably benefited from conserving their equity and retaining ownership until the housing market recovered. Floyd opines that each of these benefits impacts Dr. Becker's assertion of ascertainable loss. (Floyd Report at 5.)

Dr. Becker's response to Floyd's criticism is unpersuasive. He rejects the importance of the lower monthly payments afforded by the modification because "the appropriate comparison is not the overall monthly payment, but the cost of the loan in terms of interest paid []. Under that comparison, as shown in the Becker Report, the borrower does not 'benefit' from Ocwen's failure to disclose because the Kaminskis would have paid less in interest under the previously disclosed amortization term." (Becker Supplemental Report ¶ 7) (internal citation omitted).) This does not address Floyd's contention that the lower monthly payments provided offsetting benefits for which Becker did not account, and Becker does not assert that those benefits had no value while at the same time he refuses to assign them any value.

In response to Floyd's assumption that, without the Ocwen modification a borrower would have faced foreclosure and thus benefited from being able to stay in his or her home, Dr. Becker explains that the question as to whether a borrower would face imminent foreclosure is only relevant to the Floyd Report's assumed but-for world in which Ocwen does not modify the

borrower's loan. (Id. ¶ 8.) Becker asserts that this factor is flawed since it assumes the borrower would have received no modification, and without a proper balloon disclosure a borrower could not make an informed decision whether to accept the modification, seek alternate lodging, or try to cure their default through other means such as bankruptcy proceedings. (Id. ¶ 14.) Rather than defend his own model, Becker simply criticizes Floyd's model. We find that Floyd's criticism that Becker failed to account for the positive impact of the borrowers' receipt of loan modifications is aptly drawn. However, this criticism alone does not support a finding that Plaintiffs cannot show an ascertainable injury using evidence that is common to the class. Because these arguments challenge the weight of Plaintiffs' expert evidence, not its fit or reliability, it merely informs our rigorously analyze the evidence.

### d.     Becker's Calculation Errors

Finally, Ocwen points to flaws identified in the Floyd Supplemental Report concerning Plaintiffs' method for determining ascertainable loss for the Caves and Kaminskis. (Def. Mem. at 24 (citing Floyd Supplement Report 2-4).) Floyd identifies (1) an error in the calculation of accrued interest for the Caves and (2) an error in the application of the appropriate date on which to calculate the present value of plaintiffs' P&I payments. (Floyd Supplemental Report at 2-3.) The Floyd Supplement Report also (3) corrects the Becker Report's "arbitrarily-chosen 2% investment rate of return that the plaintiffs could have realized had they invested the difference between the monthly payment amounts in the actual and "but-for" worlds, and applies proper investment-rates-of-return available during the relevant time periods."[18] (Def. Mem. at 24

---

[18]  Ocwen argues the 2% rate is flawed noting that Dr. Becker testified that "as a general rule the higher rate at which the Caves and the Kaminskis could invest to the degree that they were investing that money and getting more than 2 percent or 3 percent, that would make the actual world relatively better than the but-for world and would lower or potentially erase the damages here." (See Becker Tr. at 232.)

(citing Floyd Supplemental Report at 3-4).)  Ocwen notes that, in correcting these flaws, the

Floyd Supplemental Report calculates that the Kaminskis' Loan Modification Agreement

provided them a $1,350.41 financial benefit and the Caves' Loan Modification Agreement

provided them a $1.13 financial benefit.  (<u>See</u> Floyd Supplement Report at 5.)  Thus, it concludes

that even under Plaintiffs' theory, none of the named Plaintiffs have suffered an ascertainable

loss of money or property.

Plaintiffs respond only to the assertion that the 2% discount rate was improper and do not

address the other two errors.[19]  On the discount rate, Plaintiffs argue that:

> Ocwen's entire argument is based upon an extremely high, cherry-picked
> "investment rate of return" that Mr. Floyd identified with the benefit of hindsight.
> Floyd Tr. at 158 (agreeing, "I did use information historically realized, yes.").
> Mr. Floyd is handicapping a race that's already been run.  Mr. Floyd admitted that
> over the same time period, there were investment vehicles that lost money.  []
> Mr. Floyd admits that his cherry-picked investment vehicle – a particular
> Vanguard Fund – is not a risk free investment, and is subject to interest rate risk,
> income risk and credit risk, among other things.  []  Moreover, Mr. Floyd had no
> idea whether Plaintiffs saved any money that they could have invested, and that
> he is merely suggesting a hypothetical "investment opportunity."  []  Furthermore,
> Mr. Floyd did not consider whether Plaintiffs would have had sufficient funds to
> open a brokerage account that would have allowed them to purchase shares of his
> preferred Vanguard fund, or whether brokerage fees and commissions for trades
> would have eroded their investment returns.

(Pls.' Reply at 10 (some internal citations omitted).)  We reject Floyd's criticism that Becker's

discount rate was too low.  If the borrowers had used their "freed-up" capital to make additional

principal payments, their rate of return on that "investment" would equal the interest rate they

were paying on their modified loans, which for Abraham and the Kaminskis was 2%, and for the

Caves was 2% for the first 60 months and 4.5% thereafter.  This provides some basis for

---

[19]  The Court asked Plaintiffs' Counsel at oral argument if Dr. Becker made calculation
errors.  (N.T. 5/16/17 at 29.)  Counsel responded "he might have made some arithmetic errors. . .
.  We think that the arithmetic mistakes are attributable primarily to the fact that Dr. Becker
couldn't go in and use Ocwen's proprietary, real-servicing system to run these figures.  Dr.
Becker had to reconstruct everything."  (<u>Id.</u> at 29-31.)

Becker's use of the 2% discount rate. Assuming that borrowers would enjoy a higher than 2% discount rate would only be a valid criticism if, in the abstract, borrowers chose to forego reducing debt in favor of some other investment. Plaintiffs aptly assert that, while one may choose a better investment return in hindsight, it is not reasonable to expect a borrower to always make better forward-looking choices.

Ocwen's arguments on the other two errors, which we fully credit, change the bottom line "loss" result for the Caves and Kaminskis. Floyd has created a chart to display his corrections:

| Plaintiff | Financial loss or benefit to the named Plaintiffs per Becker Report | Financial loss or benefit to the named Plaintiffs per Becker Report Corrected for Accrued Interest | Financial loss or benefit to the named Plaintiffs per Becker Report Corrected for Accrued Interest and Omitted Days | Financial loss or benefit to the named Plaintiffs per Becker Report Corrected for Accrued Interest, Omitted Days, and Assuming Investment in ETF (VGLT) |
|---|---|---|---|---|
| Cave | $50.36 loss | $0.02 loss | $0.05 benefit | $1.13 benefit |
| Kaminski | $3.58 loss | no change | $11.92 benefit | $1,350.41 benefit |
| Abraham | $0 | no change | no change | no change |

(Floyd Supplemental Report at 5 (internal footnotes omitted).) The undisputed calculation errors reduce the Caves' financial "loss" as found by Becker's from $50.36 to a net benefit of $0.05. The Kaminski's "loss" of $3.58 as found by Becker becomes a net benefit of $11.92 when the correction is made. Thus, even without considering the discount rate, the errors in Becker's findings are (1) relevant to the Kaminskis' ability to serve as class representatives and (2) call into question whether Becker's model may serve as common evidence of ascertainable loss for the New Jersey Class for whom statutory damages are not available.

Overall, we partially credit Ocwen's arguments concerning the weight we accord to Dr. Becker's conclusions. Becker has failed to account for benefits each class member may have received from the loan modification, and his calculation errors call into question the Kaminskis' ability to serve as class representatives since they may have suffered no ascertainable loss to support a claim that does not provide for statutory damages. For Abraham, who suffered no ascertainable loss from her loan modification because her amortization period was not extended and her principal was forgiven, and for the Caves, for whom the correction shows they suffered no monetary loss, we conclude that the faults with Becker's conclusions is not determinative since these Plaintiffs assert that they can show ascertainable loss with regard to the classes that Abraham and the Caves seek to represent in the form of an "informational injury" — discussed more fully below — which allows those Classes to receive statutory damages in lieu of actual monetary losses.

B.      <u>Ocwen's Preliminary Issues on the Proposed Class Definitions</u>

In addition to making preliminary arguments about the Plaintiffs damages model, Ocwen also asserts preliminary arguments concerning the class definitions.

1.      <u>The Pennsylvania and New Jersey Classes are Overbroad</u>

Ocwen first argues that the Plaintiffs' proposed Pennsylvania and New Jersey Classes are overbroad and should not be certified because Plaintiffs have failed to include ascertainable loss, causation, and justifiable reliance in the class definitions. Because each of these are essential elements of the UTPCPL and NJCFA claims, Ocwen contends that the classes may contain members who have no right to recover relief from Ocwen. (Def. Mem. at 25.) Second, it argues that since, under Dr. Becker's model, some Plaintiffs like Abraham have no ascertainable loss because their loan modification did not change the amortization period, they had their interest

rates lowered, or they had debt forgiven, a class definition that fails to exclude such members is improper.  (Id. at 26.)  Finally, Ocwen also incorporates its earlier arguments regarding the benefits the Plaintiffs have received but ignored, and the individualized calculations needed to show ascertainable loss  as additional reasons why the classes are overbroad.  (Id. at 27.)

Plaintiffs respond that Ocwen's argument overlooks the United States Supreme Court's decision in Tyson Foods, Inc. v. Bouaphakeo, which teaches that, "for purposes of class certification, only the named plaintiff needs to have an ascertainable loss," and a proposed class is not improperly certified where it "may include members who have not sustained any compensable loss."  (Pl. Reply Mem. at 11-12 (citing 136 S. Ct. 1036, 1049 (2016) (stating in Fair Labor Standards Act class action that a court is permitted use of representative sample evidence to establish class-wide liability of defendants and leaving open the possibility that workers who could not prove that they were denied overtime wages and have no legal right to any damages can nevertheless share in class recovery).  Plaintiffs contend that there is no bar to class certification because Dr. Becker's submissions demonstrate that the Kaminskis and the Caves have sustained actual monetary losses.

Plaintiffs' citation to Tyson Foods is unavailing.  Plaintiffs elide over the fact that the case was an opt-in collective action under the Fair Labor Standards Act, not a Rule 23 class action.  Case law suggests that Tyson Foods is inapplicable to Rule 23 classes since "Rule 23 actions are fundamentally different from collective actions under the FLSA."  Genesis Healthcare Corp. v. Symczyk, 133 S. Ct. 1523, 1529 (2013) (citation omitted); see also Halle v. W. Penn Allegheny Health Sys. Inc., 842 F.3d 215, 224 (3d Cir. 2016) (noting "unfortunate side effect of the often blurred lines between" Rule 23 and FLSA, and stating that "[w]hen a named plaintiff files a complaint containing FLSA collective action allegations, the mere presence of the

allegations does not automatically give rise to the kind of aggregate litigation provided for in Rule 23.")

One "fundamental[] difference" between Rule 23 and FLSA collective actions is that, in the latter plaintiffs must "opt-in" to the class, rather than "opt-out," which occurs in a Rule 23(b)(3) class action. Halley, 842 F.3d at 225; Bobtyk v. Durand Glass Mfg. Co., Inc., 50 F. Supp. 3d 637, 642 (D.N.J. 2014). In addition, in a Rule 23 class, plaintiffs must establish that "the putative class meets the threshold requirements of Rule 23(a) as well as one of the three Rule 23(b) categories," while in an FLSA collective action, plaintiffs must only establish that they are "similarly situated." Bobtyk at 641-42. Every plaintiff who opts in to a collective action is a party, whereas unnamed class members in Rule 23 class actions are not. Halley at 225. The holding in Tyson Foods — that only the named plaintiff needs to have an ascertainable loss and a proposed class is not improperly certified where it may include members who have not sustained any compensable loss — is fundamentally at odds with the Rule 23 predominance, typicality, and adequacy requirements that depend upon the named plaintiff having the same legal claims as those absent class members who will be bound by the result of the litigation.

Second, Plaintiffs argue that the Third Circuit has rejected the notion that a class cannot be certified because it is purportedly "overbroad." (Pls.' Reply at 12 (citing Byrd v. Aaron's Inc., 784 F.3d 154, 160 (3d Cir. 2015), as amended (Apr. 28, 2015) (reversing on abuse of discretion grounds the magistrate judge's ruling that the "classes were 'overly broad' because not 'every [user of a] computer upon which Detective Mode [spyware] was activated will state a claim under the ECPA for the interception of an electronic communication.'").) This is also a misinterpretation of precedent. The Byrd Court held only that overbreadth should not be injected into the ascertainability analysis. See Byrd, 784 F.3d at 168-69. But, the Third Circuit affirmed

that overbreadth is "a potential predominance problem" rather than an ascertainability issue, and "[t]o the extent Defendants meant to challenge any potential differences between the proposed class representatives and unnamed class members, such differences should be considered within the rubric of the relevant Rule 23 requirements — such as adequacy, typicality, commonality, or predominance."[20] Id. at 167, 169.

Although Ocwen raises the overbreadth issue as a preliminary reason to deny certification, we find that its various parts are more appropriately considered with respect to ascertainability, cohesion, and the Rule 23(b) requirements to which they relate.[21]

---

[20] In response to Ocwen's overbreadth argument, Plaintiffs additionally argue that they have properly asserted their standing to bring their claims based on a theory that they have suffered an informational injury. This argument is curious since Ocwen's overbreadth contention does not implicate constitutional standing, but rather asserts that the class contains members who suffered no ascertainable loss and thus have no plausible claim to relief under the statute. (See Def. Sur Reply in Opp. to Pls.' Mot. for Class Cert. (Docket Entry #73-2) at 2 ("Plaintiffs improperly conflate their inability to establish 'ascertainable loss,' an essential element of their UTPCPL and NJCFA claims, on a class-wide basis, with 'injury-in-fact' for Article III standing purposes."); see also id. at 3 ("Ocwen has not challenged either of these proposed state classes on Article III grounds, and thus, discussion of 'informational injury' is a red herring").) Ocwen's standing argument is separate from its overbreadth argument, is limited to the FDCPA Class, and raises completely different issues that do no overlap. We discuss this issue later.

[21] We do address one preliminarily argument outside the Rule 23 rubric: Ocwen's contention that Plaintiffs failed to make ascertainable loss, causation and reliance part of the class definitions. We reject this argument. Had Plaintiffs incorporated those essential elements of their statutory claims into the class definition it would have created an improper failsafe class. A fail-safe class is "one that is defined so that whether a person qualifies as a member depends on whether the person has a valid claim." Messner v. Northshore Univ. HealthSystem, 669 F.3d 802, 825 (7th Cir. 2012); see also, e.g., Slapikas v. First Am. Title Ins. Co., 250 F.R.D. 232, 250-51 (W.D. Pa. 2008) (defining fail-safe class as one "that impermissibly determines membership upon a determination of liability"); Bell v. Cheswick Generating Station, Genon Power Midwest, L.P., Civ. A. No. 12-929, 2015 WL 401443, at *4 (W.D. Pa. Jan. 28, 2015) (defining fail-safe class as one that '"requires the court to address the central issue of liability in the case"') quoting Jackson v. Se. Pa. Transp. Auth., 260 F.R.D. 168, 182 (E.D. Pa. 2009))). A fail-safe class presents ascertainability problems because membership "beg[s] the ultimate question underlying the defendant's liability in the case," and "such liability-begging definitions are administratively infeasible, as the inquiry into class membership would require holding countless hearings

2. <u>Time-barred Claims</u>

Ocwen next argues that the FDCPA class cannot be certified because the Caves' claim under the FDCPA is time-barred. According to Ocwen, the Caves, who are the only named Plaintiffs asserting that claim, <u>see</u> SAC ¶ 103, did not include the claim in any pleading until February 14, 2013. The claim, it continues, accrued on July 8, 2011, the date the Caves entered into their loan modification. Ocwen argues that the claim is thus time-barred under the one year statute of limitation applicable to FDCPA claims. <u>See</u> 15 U.S.C. § 1692k(d). We reject this argument.

The Caves included a FDCPA claim in their initial class action complaint filed on July 20, 2011 in the related action styled <u>Cave v. Saxon Mortgage Services, Inc., et al.</u>, Civ. A. No. 11-4586 ("<u>Cave I</u>"). Paragraph 70 of the initial complaint in <u>Cave I</u> alleged that the Ocwen

> modification offer did not include an amortization schedule, but it did contain a 'BALLOON DISCLOSURE,' which advised Plaintiffs that the modified loan will have a balloon feature such that even if Plaintiffs make all payments in full and on time, their loan will not be paid in full by the final payment date. Instead, a single balloon payment will be due on December 1, 2035. However, this purported disclosure does not reveal the amount of the balloon payment or even how such a payment will be calculated. In essence, this balloon payment is a financial black hole.

---

resembling 'mini-trials.'" <u>Newberg on Class Actions</u> § 3:6 (5th ed.). A class definition that requires a determination on the merits before membership may be ascertained "creat[es] what the Supreme Court called [a] 'one-way intervention.'" <u>Zarichny v. Complete Payment Recovery Servs., Inc.</u>, 80 F. Supp. 3d 610, 624 (E.D. Pa. 2015) (quoting <u>Am. Pipe & Constr. Co. v. Utah</u>, 414 U.S. 538, 547 (1974)).

If Plaintiffs had sought to incorporate the ascertainable loss, causation, and reliance elements of the statutory claims into the class definitions, the classes were certified, and Ocwen then prevailed on those claims at trial, no class would have existed and the putative class members, unbound by any judgment, would be free to pursue individual claims. "Class actions are generally binding on absent class members," but a fail-safe class "impermissibly skirts the bar of res judicata." <u>Zarichny</u>, 80 F. Supp. 3d at 624.

(<u>Cave I</u>, Docket Entry 1 ¶ 70.) In Count IV of Plaintiffs' initial complaint, titled "Violation of the Fair Debt Collection Practices Act," the Caves incorporated the Balloon Disclosure allegations and specified that they were asserting a class claim. (<u>Id.</u> ¶¶ 123-24.) The initial complaint further alleged that Ocwen "violated 15 U.S.C. § 1692f(1) by attempting to collect an amount from Plaintiffs that is not expressly authorized by the agreement creating the debt," and "violated 15 U.S.C. § 1692e(2)(A) by sending Plaintiffs communications that misrepresented the amount and legal status of Plaintiffs' mortgage debt." (<u>Id.</u> ¶ 128.)

The February 2013 date referenced by Ocwen in its Memorandum was the date Plaintiffs filed their First Amended Complaint ("FAC") in <u>Cave I</u>. (<u>See</u> Civ. A. No. 11-4586, Docket Entry 60.) Count IV of the FAC reasserts the FDCPA claim, and Paragraphs 118-119 of FAC Count IV are identical to Paragraphs 123-124 of Count IV of the original complaint. By stipulation of the parties entered on August 11, 2014 in response Ocwen's Motion to sever claims against it that were included in the <u>Cave I</u> FAC, the Caves' claims against Ocwen were severed from <u>Cave I</u>, consolidated with the claims separately filed by Abraham in Civ. A. No. 14-1776, and assigned a new docket number by the Court "in order to avoid duplicative litigation and inconsistent rulings." (Civ. A. No. 11-4586, Docket Entry 85 at ¶¶ 1-2.)

We find that the FAC relates back to the date of the original <u>Cave I</u> complaint because "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading." <u>See</u> Fed. R. Civ. P. 15(c)(1)(B); <u>Glover v. F.D.I.C.</u>, 698 F. 3d 139, 146 (3d Cir. 2012) (reiterating that "relation back of amendments that 'restate the original claim with greater particularity or amplify the factual circumstances surrounding the pertinent conduct'" are proper (citation omitted)). Only where the original pleading "does not give a defendant 'fair notice of what the plaintiff's [amended]

claim is and the grounds upon which it rests,' the purpose of the statute of limitations has not been satisfied and it is 'not an original pleading that [can] be rehabilitated by invoking Rule 15(c).'" Glover, 698 F.3d at 146 (alterations in original) (quoting Baldwin Cty. Welcome Ctr. v. Brown, 466 U.S. 147, 149 n.3 (1984) (internal marks and citation omitted in Glover); and citing 6A Wright et al., Federal Practice & Procedure § 1497 ("Although not expressly mentioned in the rule, . . . courts also inquire into whether the opposing party has been put on notice regarding the claim or defense raised by the amended pleading. Only if the pleading has performed that function . . . will the amendment be allowed to relate back . . . .")). The Caves' amplification of their original FDCPA claim against Ocwen in succeeding complaints clearly relate back to their original filing in July, 2011. Under these circumstances, the Caves have an actionable class claim under the FDCPA against Ocwen and therefore are not rendered incompetent to serve as class representatives on this ground.

### 3. The FDCPA Class Definition is Both Flawed and Overbroad

Citing Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1550 (2016), Ocwen argues that the FDCPA class definition is flawed because it contains putative class members that lack Article III standing. It argues that the Caves allege only that Ocwen violated the FDCPA because the balloon disclosure confused them as to "the correct amount allegedly owed under the mortgage[s]" and made "confusing and deceptive representations about the principal and interest charges and the amounts allegedly owed under the mortgage." (SAC ¶ 106.) It asserts that the Caves have not suffered an actual, concrete injury-in-fact as a result of the allegedly confusing balloon disclosure because the loan modifications provide numerous benefits to borrowers such as the Caves and other putative class members. (Def. Mem. at 29-30 (citing Floyd Report at 23-24; Nieves Decl. at ¶¶ 10-12)). Specifically, Ocwen notes that the Caves' Loan Modification

Agreement reduced their initial monthly P&I payments by over $800.00, reduced their interest rate, cured the Caves' pre-modification delinquency, and removed the threat of foreclosure. Those benefits, it argues, must be considered in assessing any ascertainable loss suffered and, when applied to the Caves, confirm that they have not suffered "any ascertainable loss, actual harm, or financial damages." (Id. at 30 (citing Floyd Report at 25; Floyd Supplement Report at 4-5)).

Ocwen further asserts that, even if the Caves had standing, the proposed FDCPA Class is likely to include putative class members who have suffered no actual, concrete injury-in-fact, and thus lack standing. Ocwen notes that the proposed class definition includes individuals who were merely "sent," but did not actually "enter into" or even "receive," an allegedly confusing modification agreement, and thus suffered no actual and concrete injury-in-fact. Accordingly, it asserts that the class, as defined, is overbroad and cannot be certified.

The Caves respond by relying on their own expert and record submissions to show they have suffered economic harm that was caused by entering into the Modification Agreement, which failed to disclose the actual cost of borrowing. (Pls.' Reply at 16 (citing Becker Report at ¶¶ 52-55)). They point to admissions in the record from Ocwen's representatives to show that they had no way of knowing when they entered into the their Modification Agreement that, even if they made all of their scheduled payments, they would still be obligated to make a balloon payment of $93,524.46 at the loan's maturity date. (See Myers Tr. at 75 ("Q. Does this modification agreement . . . indicate the amount of the balloon that you just referenced, the 93,000 and change? A. No, it does not."), 80-81 ("Q. but at the time this agreement was offered to the Caves, Ocwen had in its possession the information about how much the balloon payment would be if they made their payments in full and on time without prepayments? A. Yes."). The

Caves point out that the record shows that the Modification Agreement does not include instructions as to how they could have calculated the amount of the balloon they will owe at their loan's maturity date.  (Nieves Tr. at 127 ("Q.  Are there any instructions as to how to [calculate the amount of the balloon payment] in the Cave modification agreement?  A.  No. We would hope that they call in.   Q.   Are there any instructions as to how to do that in the balloon disclosure attached to the Cave modification agreement?  A.  No.").  Further, the Caves testified that they would not have accepted the agreement if Ocwen had disclosed the balloon amount.  (S. Cave Tr. at 70, 218-19 ("if I would have been told up front that [the balloon] was $90,000 I would have walked away").)

We find that the Caves have standing to assert their FDCPA claim.  The Spokeo Court, while reiterating that an intangible injury created by a statute is sufficient to satisfy the injury-in-fact requirement, went on to hold that Article III standing[22] requires an injury that is both particularized and concrete even in the context of a statutory violation.   136 S. Ct. at 1549.  Numerous courts have applying Spokeo found a sufficient "injury in fact" to support a FDCPA

_____

[22] To invoke the judicial power under Article III, a litigant  must have standing.  See Hollingsworth v. Perry, 133 S. Ct. 2652, 2661 (2013).  It is the plaintiffs' burden to prove standing.  Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992).  The standing doctrine "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong."   Spokeo, 136 S. Ct. at 1547 (citations omitted).   The "irreducible constitutional minimum" of standing consists of three elements.  Lujan, 504 U.S. at 560.  The plaintiff must prove (1) an injury in fact (2) fairly traceable to the challenged conduct (3) that is likely to be "redressed by a favorable judicial decision."  Hollingsworth, 133 S. Ct. at 2661 (citing Lujan, 504 U.S. at 560-61).  An injury in fact requires "an invasion of a legally protected interest which  is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  Lujan, 504 U.S. at 560 (internal quotation marks and citations omitted); Spokeo, 136 S. Ct. at 1545 ("[T]he injury-in-fact requirement requires a plaintiff to allege an injury that  is both concrete *and* particularized." (emphasis in original)).   "Injury in fact is a constitutional requirement, and '[i]t is settled that Congress cannot erase  Article III's standing requirements by statutorily granting the right to sue to a plaintiff who  would not otherwise have  standing.'"  Spokeo, 136 S. Ct. at 1547-48 (quoting Raines v. Byrd, 521 U.S. 811, 820 n.3 (1997));  see also  Gladstone, Realtors v. Vill. of Bellwood, 441 U.S. 91, 100 (1979) ("In no event . . . may Congress abrogate the Art. III minima").

claim from allegations that a plaintiff suffered an "informational injury" because the character of a debt had been misrepresented. See Prindle v. Carrington Mort. Servs., LLC, Civ. A. No. 13-1349, 2016 WL 4369424, at *4, 9 (M.D. Fla. Aug. 16, 2016) (stating that "[a]s the object of allegedly false, deceptive, and or/misleading representations in connection with the collection of a debt, Prindle has alleged that she 'has suffered injury in precisely the form the [FDCPA] was intended to guard against.' . . . She therefore 'need not allege any additional harm beyond the one Congress has identified.'") (citing Spokeo, 136 S.Ct. at 1549) (emphasis in original; internal citation omitted); see also Pisarz v. GC Servs. Ltd. P'ship, Civ. A. No. 16-4552, 2017 WL 1102636, at *4-5 (D.N.J. Mar. 24, 2017) (collecting cases finding concrete injury in FDCPA claims); Sullivan v. Allied Interstate, LLC, Civ. A. No. 16-203, 2016 WL 7187507, at *5 (W.D. Pa. Oct. 18, 2016), report and recommendation adopted, 2016 WL 7189859 (W.D. Pa. Dec. 9, 2016) (stating "[s]ince Spokeo was decided, the overwhelming majority of courts that have faced Article III standing challenges in FDCPA cases . . . have determined that a violation of the FDCPA produces a 'concrete injury.'") (citing Dittig v. Elevate Recoveries, LLC, Civ. A. No. 16-1155, 2016 WL 4447818, at *2 n.1 (W.D. Pa. Aug. 24, 2016) (finding a concrete injury where plaintiff alleged defendant violated the FDCPA by sending him a collection notice containing a "settlement offer" for a time-barred debt); Irvine v. I.C. Sys., Inc., 198 F. Supp. 3d 1232, 1237 (D. Colo. July 29, 2016) (holding that plaintiff alleged a concrete injury sufficient to confer Article III standing where the defendant allegedly gave plaintiff false information regarding her debt and also allegedly supplied information to creditors regarding the debt without informing the creditors that the debt was disputed); Dickens v. GC Servs. Ltd. P'ship, Civ. A. No. 16-803, 2016 WL 3917530, at *2 (M.D. Fla. July 20, 2016) (finding a concrete injury where plaintiff's only alleged harm stemmed from the defendant's failure to disclose that

certain of plaintiff's rights under the FDCPA had to be exercised in writing)); Quinn v. Specialized Loan Servicing, LLC, Civ. A. No. 16-2021, 2016 WL 4264967, at *4 (N.D. Ill. Aug. 11, 2016) (finding that the failure to provide a debtor with information she was entitled to under the FDCPA is not a mere procedural violation of the statute).

While the Third Circuit has not yet spoken on the issue, it recently decided In re Nickelodeon Consumer Privacy Litig., 827 F.3d 262 (3d Cir. 2016), a case asserting violations of the Video Privacy Protection Act. Plaintiffs in that case alleged that the defendants failed to disclose that they placed "cookies" on the computers of children who used their websites in order to track communications with other websites for the purpose of advertising. Id. at 267-69. In discussing the injury-in-fact requirement of standing, the Third Circuit observed that "in some cases an injury-in-fact may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing," and noted that "Spokeo directs us to consider whether an alleged injury-in-fact 'has traditionally been regarded as providing a basis for a lawsuit,'" and that "Congress's judgment on such matters is . . . 'instructive and important.'" Id. at 273-74 (quoting In re Google Inc. Cookie Placement Consumer Privacy Litig., 806 F.3d 125, 134 (3d Cir. 2015) and Spokeo, 136 S.Ct. at 1549). The Nickelodeon court determined that nothing in Spokeo

> calls into question whether the plaintiffs in this case have Article III standing. The purported injury here is clearly particularized, as each plaintiff complains about the disclosure of information relating to his or her online behavior. While perhaps "intangible," the harm is also concrete in the sense that it involves a clear *de facto* injury, i.e., the unlawful disclosure of legally protected information. Insofar as Spokeo directs us to consider whether an alleged injury-in-fact "has traditionally been regarded as providing a basis for a lawsuit." Google noted that Congress has long provided plaintiffs with the right to seek redress for unauthorized disclosures of information that, in Congress's judgment, ought to remain private.

Id. at 274 (quoting Spokeo, 136 S. Ct. at 1549; Google, 806 F.3d at 134 n.19.). Accordingly, the Third Circuit concluded that the Nickelodeon plaintiffs' allegations with regard to the defendant's use of cookies were sufficient to establish Article III standing. Id.

Finally, in Church v. Accretive Health, Inc., 654 F. App'x 990 (11th Cir. July 6, 2016), a case brought under the FDCPA, the United States Court of Appeals for the Eleventh Circuit held that a claim that a letter sent by the defendant to the plaintiff that did not contain all of the FDCPA's required disclosures sufficiently alleged that the plaintiff "had sustained a concrete — i.e., 'real' — injury because she did not receive the allegedly required disclosures." Id. at 995. The Eleventh Circuit explained that:

> The invasion of Church's right to receive the disclosures is not hypothetical or uncertain; Church did not receive information to which she alleges she was entitled. While this injury may not have resulted in tangible economic or physical harm that courts often expect, the Supreme Court has made clear an injury need not be tangible to be concrete. [] Rather, this injury is one that Congress has elevated to the status of a legally cognizable injury through the FDCPA. Accordingly, Church has sufficiently alleged that she suffered a concrete injury, and thus, satisfies the injury-in-fact requirement.

Id. at 995 (internal citations and footnotes omitted).

We find that the Caves have standing to pursue their FDCPA claim. As the case law makes clear, it is sufficient under Spokeo if the FDCPA claim asserts that the character of a debt has been misrepresented since that is the kind of injury the FDCPA was intended to guard against, and no additional harm need be alleged. Ocwen's assertion that the Caves possibly benefited from their loan modification does not negate their having a concrete informational injury from the allegedly deceptive balloon disclosure.

Ocwen's other argument, focusing on putative class members who were merely "sent," but did not actually "enter into" or even "receive," an allegedly confusing modification agreement is more substantial. While Plaintiffs correctly respond that "'[o]nce threshold

individual standing by the class representative is met, a proper party to raise a particular issue is before the court, and there remains no further separate class standing requirement in the constitutional sense'" (Pls.' Reply at 18 (quoting <u>In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions</u>, 148 F.3d 283, 306-07 (3d Cir. 1998) (citing 1 Newberg on Class Actions § 2.05 at 2–29 (3d Ed.1992)))), Ocwen's argument vis-à-vis this aspect of the class definition is not concerned with constitutional standing. Rather, Ocwen argues the class definition is overbroad. As noted earlier, the Third Circuit has held that over breadth is "a potential predominance problem" and, "[t]o the extent Defendants meant to challenge any potential differences between the proposed class representatives and unnamed class members, such differences should be considered within the rubric of the relevant Rule 23 requirements — such as adequacy, typicality, commonality, or predominance." <u>Byrd</u>, 784 F.3d at 168-69. Accordingly, we will return to this problem when discussing the particular Rule 23 requirement.

### 4.    Entitlement to Injunctive Relief

Ocwen's next set of issues raise preliminary challenges to class certification of Plaintiffs' claims for injunctive relief. In support of their request to certify the proposed Pennsylvania and New Jersey Classes under Rule 23(b)(2), Plaintiffs request prohibitory injunctive relief that includes: (1) a declaration that the balloon disclosure provision is unlawful; and (2) an injunction prohibiting Ocwen from offering loan modification agreements with balloon disclosure provisions that fail to state the estimated amount of the balloon payment. (<u>See</u> Pls.' Mem. at 44.) Plaintiffs also request mandatory injunctive relief that would require Ocwen to: (1) collect data, draft, and send separate disclosures to each individual putative class member providing: (a) the minimum estimated amount of the balloon payment applicable to that putative class member's loan at the time he or she obtained the loan modification agreement; (b) the

manner in which the balloon payment is calculated for that putative class member's loan; (c) the sums that comprise the estimated amount of that putative class member's balloon payment; and (d) the estimated amount of that putative class member's balloon payment at the time the disclosure is made; (2) offer each putative class member the option to rescind his or her loan modification agreement and return to pre-modification loan terms; and (3) provide each putative class member the option to apply for a new loan modification. (See id.)

a.      <u>The UTPCPL does not Provide for Injunctive or Declaratory Relief</u>

Ocwen first argues that the UTPCPL does not provide for injunctive or declaratory relief; rather "'the only remedy available to private litigants under the UTPCPL are monetary damages.'" (Def. Mem. at 32 (quoting <u>In re Soto</u>, 221 B.R. 343, 357 (Bankr. E.D. Pa. 1998))). The statute provides that a private plaintiff may "bring a private action to recover actual damages or one hundred dollars ($100), whichever is greater." 73 Pa. Stat. § 201-9.2. The UTPCPL also allows for treble damages and, in the Court's discretion, "such additional relief as it deems necessary or proper," as well as costs and attorney fees. <u>Id.</u> The plain statutory language authorizes only the Pennsylvania Attorney General or a district attorney to seek injunctive or declaratory relief. <u>See</u> 73 Pa. Stat. § 201-4[23]; <u>see also</u> <u>Goleman v. York Int'l Corp.</u>, Civ. A. No. 11-1328, 2011 WL 3330423, at *10 n.6 (E.D. Pa. Aug. 3, 2011) (J. Baylson) ("[T]he UTPCPL authorizes only the Attorney General and District Attorney, not a private plaintiff, to seek . . . injunctive relief . . . ."). Accordingly, Ocwen argues that neither Plaintiffs nor the Pennsylvania Class are entitled to injunctive relief under the statute. We agree.

---

[23] Section 201-4 provides: "Whenever the Attorney General or a District Attorney has reason to believe that any person is using or is about to use any method, act or practice declared by section 3 of this act to be unlawful, and that proceedings would be in the public interest, he may bring an action in the name of the Commonwealth against such person to restrain by temporary or permanent injunction the use of such method, act or practice." 73 Pa. Stat. § 201-4.

Plaintiffs have failed to cite caselaw to support their assertion that injunctive relief is available to private litigants under the UTPCPL. In <u>Robinson v. Holiday Universal, Inc.</u>, Civ. A. No. 05-5726, 2006 WL 2642323 (E.D. Pa. Sept. 11, 2006), Judge Pratter merely noted in that decision that she could not find cases permitting or denying injunctive relief to private plaintiffs under the UTPCPL and, therefore, determined that she would not dismiss the request for injunctive relief at the pleadings stage. <u>See id.</u> at *8 ("The Court's research has not uncovered any federal court decisions where an injunction requested by a private plaintiff was granted or denied pursuant to the UTPCPL").

Plaintiffs also cite <u>Schwartz v. Rockey</u>, 932 A.2d 885, 894 (Pa. 2007), for the proposition that the "Pennsylvania's Supreme Court permitted plaintiffs to seek the equitable remedy of rescission of their purchase of a property for defendants' violation of the UTPCPL for failing to disclose that the home had been damaged by water infiltration." (Pls.' Reply at 30.) This is a misreading of the case. The issue in <u>Schwartz</u> was whether a prayer for relief seeking contract-based damages forecloses a subsequent amendment substituting an inconsistent, equitable remedy. <u>Schwartz</u> at 894 ("This appeal does not require us to definitively determine whether inconsistent remedies may be simultaneously pursued in a civil action in Pennsylvania, but rather, only whether a complaint containing a prayer for relief seeking contract-based damages forecloses a subsequent amendment substituting an inconsistent, equitable remedy.") The lower court had invoked "the requirement of prompt action which is a prerequisite to the remedy of rescission . . . and determined that Buyers did not act promptly in light of several factors. . . ." <u>Id.</u> (internal citation omitted). The Court determined only that the record made clear that remand was not warranted to consider the availability of equitable relief. <u>Id.</u> at 895 ("On application of this standard to the record before us, we conclude that the Superior Court should not have

disturbed the common pleas court's holding that Buyers failed to pursue rescission with sufficient promptitude to support an award of such remedy."). The Court did not affirmatively state that injunctive relief was available to a private party under the UTPCPL.

Plaintiffs' citation to Agliori v. Metro. Life Ins. Co., 879 A.2d 315 (Pa. Super. Ct. 2005) also fails to persuade. That case involved the issue of whether a life insurance policy holder suffered an "ascertainable loss" within the meaning of the UTPCPL and was therefore entitled to damages where he surrendered two whole life policies in exchange for a new universal life policy. Id. at 320. Although the new policy was worth more at the time it was purchased, the surrendered policies would have appreciated over time if retained. Thus, when the decedent died, the surrendered policies were worth more than the extant policy. The Court held that "[a]scertainable loss must be established from the factual circumstances surrounding each case, and in [the insured's] case the evidence presented indicates that his estate suffered an ascertainable loss due to misrepresentations by [the agent] that induced [the insured] to change his life insurance policy." Id. at 321. While Plaintiffs cite Agliori for the proposition that the UTPCPL, as an anti-fraud statute, should be liberally construed to aid its deterrence function, nothing in that case supports a construction that would violate the express language of the statute limiting the availability of equitable relief to the Attorney General and district attorneys.[24]

---

[24] The only other case cited by Plaintiffs, Slemmer v. McGlaughlin Spray Foam Insulation, Inc., 955 F. Supp. 2d 452 (E.D. Pa. 2013), also does not support their contention. While they assert that Judge Dubois "permitted plaintiffs to request injunctive relief for the substantive claims, one of which was a claim under the UTPCPL's 'catch-all' provision, alleging that defendants engaged in "unconscionable, unfair and deceptive acts and practices," (Pls.' Reply Mem. at 31), there is no indication in the decision that equitable relief was even sought under UTPCPL. Defendants moved to dismiss the UTPCPL claim on three grounds: (1) plaintiffs had not alleged justifiable reliance, (2) plaintiffs had not alleged that they purchased the product at issue from the Defendant, and (3) plaintiffs had not satisfied the particularity requirements of Fed. R. Civ. P. 9(b). Slemmer, at 460. The bulk of the discussion of injunctive relief concerned plaintiffs' stand-alone claim for injunctive relief as a separate count of the

Accordingly, we cannot certify the proposed Pennsylvania Class under Rule 23(b)(2) to the extent that Plaintiffs seek declaratory relief pursuant to the UTPCPL. The Motion to Certify is denied in this respect.

b.    <u>Standing to Obtain Declaratory Relief</u>

Plaintiffs seek to enjoin Ocwen "from offering loan modifications with . . . balloon disclosure provisions" that do not disclose the estimated amount of the balloon payment. (<u>See</u> Pls.' Mem. at 44.) Ocwen argues that Plaintiffs lack standing to seek such relief asserting that the record shows that there is no immediate threat of actual future injury. We reject this argument.

Ocwen asserts that, to have Article III standing to seek this injunctive relief, Plaintiffs must establish an immediate threat of actual future injury. (Def. Mem. at 33-34 (citing <u>ZF Meritor, LLC</u>, 696 F.3d at 301.) It argues that Plaintiffs cannot satisfy their burden to show that the threatened injury is more than "possible future injury," i.e., that it is "'certainly impending . . . with a high degree of immediacy.'" (<u>Id.</u> (quoting <u>McCray v. Fid. Nat'l Title Ins. Co.</u>, 682 F.3d 229, 243 (3d Cir. 2012) (internal quotation marks omitted)).) According to Ocwen, (1) Plaintiffs acknowledge that its current practice is to include the estimated amount of the balloon payment in its in-house loan modification agreements that contain a balloon feature (<u>see</u> Pls.' Brief at 6, 7,

complaint. Judge Dubois stated that "'[a] request for injunctive relief by itself does not state a cause of action . . . . An injunction is a remedy, not a separate claim or cause of action. A pleading can . . . request injunctive relief in connection with a substantive claim, but a separately pled claim or cause of action for injunctive relief is inappropriate.'" <u>Id.</u> at 465 (quoting <u>Jensen v. Quality Loan Serv. Corp.</u>, 702 F. Supp. 2d 1183, 1201 (E.D. Cal. 2010)). He granted the motion to dismiss the stand-alone claim, noting that the dismissal did not affect plaintiffs' "request for injunctive relief in the prayer for relief at the end of the Complaint." <u>Id.</u> The fact that Judge Dubois permitted an undifferentiated request for injunctive relief for plaintiffs' substantive claims — one of which was a claim under the UTPCPL's catch-all provision, in addition to others for which injunctive relief was clearly available — is weak support for the proposition that we should ignore the actual language of the statute limiting such relief to the Attorney General.

39, 46); (2) it implemented its current practice in late 2013 and early 2014 by amending its various template modification agreements; (3) it began including an estimated balloon payment amount in certain of its template disclosures as early as December 2012 and January 2013, with the vast majority of other templates updated or discontinued by January 2014; and (4) Plaintiffs have not offered any evidence or argument that it is likely to revert to using balloon disclosure templates that omit the estimated balloon payment amount.  Ocwen argues that, under McCray, 682 F.3d at 243-44, there is no basis for Plaintiffs' requested prohibitory injunction.  Ocwen also notes that the named Plaintiffs have not argued, testified, or suggested that they are likely to apply for and enter new loan modification agreements from Ocwen that contain balloon payment features and, even if they did, they have not shown that Ocwen is likely to provide them with a balloon disclosure that does not contain the estimated balloon payment amount.  Thus, it contends, Plaintiffs lack standing to seek the prohibitory injunctive relief requested in their Motion, and cannot represent putative classes seeking such relief under Rule 23(b)(2).

Plaintiffs respond that Ocwen's argument misreads the nature of the equitable relief that they seek to certify for class treatment under Rule 23(b)(2).  They note that Ocwen's citations involve prohibitory injunctions, whereas, in this case any prohibitory aspect of equitable relief is incidental to the main relief Plaintiffs request, i.e., "an order that the court declare that the modification agreements violate the UTPCPL, NJCFA and FDCPA.  The primary equitable relief sought here is a written disclosure of the balloon amount, which is not in the nature of a prohibitory injunction."  (Pls.' Reply at 37.)

Plaintiffs are correct that the equitable relief they seek is not primarily prohibitory.  While the SAC states only that Plaintiffs "seek [a] permanent or final injunction enjoining Defendant's agents and employees, affiliates and subsidiaries, from continuing to harm Plaintiffs

and the members of the Class" (SAC § VIIb), the pleading does not suggest that a prohibitory injunction is the only equitable relief Plaintiffs seek.  In their opening Memorandum, Plaintiffs assert five types of injunctive relief and ask that the Court enter an order:

> (1) declaring the balloon disclosure provision unlawful; (2) enjoining Defendant from offering loan modification agreements with such balloon disclosure provisions; (3) requiring Ocwen to provide disclosures to Plaintiffs and the members of the Classes stating: (a) the minimum the balloon payment they were obligated to pay at the inception of their loan modification agreements; (b) the manner in which such balloon payment was determined (e.g., extending the amortization term); (c) the sums that comprise the balloon payment (e.g., principal, interest, or default-related fees and charges); and (d) the present amount of such balloon payment; (4) granting Plaintiffs and the members of the Classes the right, at their option, to rescind the loan modification agreements containing the Balloon Disclosure provision; and (5) notifying members of the Classes that they may apply for new loan modifications under other programs offered by Ocwen.

(Pls.' Mem. at 44.)   Only the second request, to enjoin Ocwen from offering balloon modifications, is prohibitory since it arguably relates to future conduct.  The remaining requests for relief clearly relate to and seek to equitably redress past injuries arising from Ocwen's failure to disclose the pro forma amount of the named Plaintiffs' balloon payments.  Accordingly, there is no basis to determine that the named Plaintiffs lack standing to seek equitable relief, except as we specifically find elsewhere herein.

       c.        <u>Plaintiffs have not Demonstrated an Entitlement to a Mandatory Injunction</u>

Next Ocwen argues that Plaintiffs are not entitled to a mandatory injunction that would require Ocwen to prepare and send loan-specific disclosures to each putative class member and to offer each member the option to rescind his or her loan modification agreement and apply for

a new loan modification; thus the claim cannot be certified for class treatment.[25]   A plaintiff

seeking a permanent injunction must demonstrate:  (1) whether the moving party has shown

actual success on the merits; (2) whether denial of injunctive relief will result in irreparable harm

to the moving party; (3) whether granting of the permanent injunction will result in even greater

harm to the defendant; and (4) whether the injunction serves the public interest.  See Ferring

Pharms., Inc. v. Watson Pharms., Inc., 765 F.3d 205, 210 (3d Cir. 2014); Shields v. Zuccarini,

254 F.3d 476, 482 (3d Cir. 2001).  "Stated differently, the issuance of a permanent injunction is

appropriate where '(1) the plaintiff successfully proves the merits of the case, (2) no available

remedy at law exists, and (3) the balance of the equities favors granting such relief.'"  Vizant

Techs., LLC v. Whitchurch, Civ. A. No. 15-431, 2016 WL 97923, at *25 (E.D. Pa. Jan. 8, 2016)

(quoting Subacz v. Sellars, Civ. A. No. 96-6411, 1998 WL 720822, at *2 (E.D. Pa. Sep. 21,

1998)).  In preliminary stages of a litigation, before the merits are finally determined, the test is

essentially the same, except the first element — success on the merits — focuses on the

"'likelihood of success on the merits.'"  Ferring Pharms., Inc., 765 F.3d at 215 n.9 (quotation and

citation omitted).

Ocwen contends that Plaintiffs do not show compelling circumstances warranting

mandatory injunctive relief under the NJCFA since they have an adequate remedy at law in the

---

[25] As we have already held, declaratory relief is not available to individual plaintiffs
pursuant to the UTPCPL.  However, the NJCFA does permit equitable relief.  See N.J.S.A. 56:8-
19 ("Any person who suffers any ascertainable loss . . . may bring an action. . . .  In any action
under this section the court shall, in addition to any other appropriate legal **or equitable relief**,
award threefold the damages sustained by any person in interest."  (emphasis added)); see also
McNair v. Synapse Grp., Inc., Civ. A. No. 06-5072, 2009 WL 3754183, at *4 (D.N.J. Nov. 5,
2009) (stating "'only the Attorney General [may] bring actions for **purely** injunctive relief.' . . .
This 'does not mean that only a plaintiff who successfully proves ascertainable loss may have
access to the [NJCFA's] remedies of equitable relief and attorneys' fees."  (internal citation
omitted, emphasis added)).  Thus, we limit discussion here to the NJCFA claim even though all
parties raise argument about both statutes.

form of monetary damages, the primary relief available under the NJCFA is actual damages, and the New Jersey Class seeks actual damages. It also argues that Plaintiffs cannot show that they will suffer irreparable harm absent injunctive relief because (1) the named plaintiffs concede that they have already been provided with the estimated amounts of the balloon payments due at the maturity of their loans as well as the applicable amortization periods (see Ocwen Mem. at 35 (citing Pls.' Mem. at 16-17 (stating the amount of the Kaminskis' balloon payment))); (2) the members of the putative classes can also request the information directly from Ocwen if they do not have it already; and (3) beginning at the latest in March 2011, Ocwen's online account website identified loans as "balloon" loans and disclosed the applicable amortization periods. Ocwen asserts that this information, combined with the terms set forth in a putative class member's modification agreement, would permit one to calculate the approximate amount of the balloon payment.

We reject Ocwen's arguments. The availability of monetary damages under the NJCFA does not eliminate the availability of equitable relief. As noted, the statute and case law provide that a private plaintiff may seek both money damages and equitable relief. Further, the class certification record supports a showing of irreparable harm. Plaintiffs have shown that by not receiving critical information concerning their loans, class members will be forced to refinance the unpaid balloon payments in the future when many of them will be of advanced age. Plaintiffs have also shown that members of the class had no easily apparent way of knowing the amount of their balloon payments from the disclosure they received and that the only way to remedy that harm is (1) to provide them with loan-specific disclosures, and (2) offer each member the option to rescind his or her loan modification agreement and apply for a new loan modification. Ocwen argues that rescission of putative class members' loan modification

agreements would result in negative consequences to class members, for example, a return to pre-modification higher monthly payments and higher interest rates, the addition of previously-forgiven amounts of principal back into their unpaid principal balances, and uncured defaults. However, Plaintiffs do not seek court ordered rescission. Rather, they seek the option to rescind the loan modification agreements once members receive proper disclosures. While rescissionary relief presents other class certification obstacles that we address later, Ocwen presents no cogent argument why this type of mandatory injunctive relief is improper under the NJCFA.

C.    Cohesiveness of the NJCFA Class[26]

Rule 23(a) requires Plaintiffs meet four elements for class certification: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. Fed. R. Civ. P. 23(a). If the requirements of Rule 23(a) are met, Plaintiffs seeking to certify a damages class must satisfy additional requirements of predominance and superiority required by Rule 23(b)(3). A class seeking to be certified under Rule 23(b)(2) to receive injunctive relief must be sufficiently cohesive. Barnes v. Am. Tobacco Co., 161 F.3d 127, 143 (3d. Cir. 1998) ("While 23(b)(2) class actions have no predominance or superiority requirements, it is well established that the class claims must be cohesive."). An injunctive relief class must also be properly defined. "A properly defined 'class' is one that: (1) meets the requirements of Rule 23(a); (2) is sufficiently cohesive under Rule 23(b)(2) and [the Third Circuit's] guidance in Barnes, 161 F.3d at 143; and (3) is capable of the type of description by a 'readily discernible, clear, and precise statement of the parameters defining the class,' as required by Rule 23(c)(l)(B) and [the Third Circuit's]

---

[26] The cohesiveness issue is limited to the New Jersey Class since private individuals have no right to injunctive relief under the UTPCPL (eliminating the need to discuss the Pennsylvania Class) and Plaintiffs do not seek injunctive relief under the FDCPA or to certify the FDCPA Class under Rule 23(b)(2).

discussion in <u>Wachtel [ex rel. Jesse v. Guardian Life Ins. Co. of Am.</u>, 453 F.3d 179, 187 (3d Cir. 2006)]." <u>Shelton v. Bledsoe</u>, 775 F.3d 554, 563 (3d Cir. 2015). The existence of disparate factual circumstances of class members will prevent a class from being sufficiently cohesive for Rule 23(b)(2) certification. <u>Gates v. Rohm & Haas Co.</u>, 655 F.3d 255, 264 (3d Cir. 2011) (citing <u>Carter v. Butz</u>, 479 F.2d 1084, 1089 (3d Cir. 1973)).

The cohesiveness requirement protects two interests. The first is protecting unnamed class members, who "are bound by the action without the opportunity to withdraw and may be prejudiced by a negative judgment in the class action." <u>Barnes</u>, 161 F.3d at 143. The cohesiveness requirement protects this interest by ensuring that "significant individual issues do not pervade the entire action because it would be unjust to bind absent class members to a negative decision where the class representatives' claims present different individual issues than the claims of the absent members." <u>Id.</u> (citations and quotation marks omitted). The second interest is to ensure that the litigation remains manageable. If a class is not sufficiently cohesive, "the suit could become unmanageable and little value would be gained in proceeding as a class action if significant individual issues were to arise consistently." <u>Id.</u> (quotation marks, citations, and alterations omitted).

To satisfy the cohesiveness test, we must find that the "class's claims are common ones and that adjudication of the case will not devolve into consideration of myriad individual issues." Newberg on Class Actions § 4:34. "In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." <u>Dukes</u>, 564 U.S. at 360 (emphasis in original). The Third Circuit has held  that any "'disparate factual circumstances of class

members' may prevent a class from being cohesive." Gates, 655 F.3d at 264 (citing Carter, 479 F.2d at 1089). We have the discretion to deny certification in the presence of disparate factual circumstances. Geraghty v. U.S. Parole Comm'n, 719 F.2d 1199, 1206 (3d Cir. 1983). "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted — the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" Dukes, 564 U.S. at 360 (quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U.L.Rev. 97, 132 (2009)).

Plaintiffs argue in their opening brief that the cohesiveness requirement is met since every class member seeks the same injunctive relief from Ocwen, namely that the Court enter an order: (1) declaring the balloon disclosure provision unlawful; (2) enjoining Defendant from offering loan modification agreements with such balloon disclosure provisions; (3) requiring Ocwen to provide disclosures; (4) granting Plaintiffs and the members of the Classes the right, at their option, to rescind the loan modification agreements containing the Balloon Disclosure provision; and (5) notifying members of the Classes that they may apply for new loan modifications under other programs offered by Ocwen. (Pls.' Mem. at 44.) They argue in their Reply Brief that the definition of the New Jersey Class ensures that "each member entered into a loan modification agreement with Ocwen that includes the misleading and deceptive Balloon Disclosure provision, which failed to disclose any pertinent information concerning the amount of the balloon and the method by which it would be calculated. Thus, at a minimum, every Class member suffered an informational injury caused by this deceptive agreement." (Pls.' Reply at 22.) They add that Ocwen deprived every New Jersey Class member of the same type of information required to make their modification agreements not misleading or deceptive and that deprivation of such informational rights violates the NJCFA. (Id.)

Ocwen responds with numerous reasons why the cohesiveness element is lacking. We will discuss each issue in turn.

### 1. Issues Involving Ascertainable Loss and Damages

Ocwen asserts that its liability to each putative class member depends upon that person's ability to prove that he or she suffered an ascertainable loss, and that the loss was caused by the alleged omission of the balloon payment amount. It argues that (1) these essential elements of NJCFA cannot be established with class-wide evidence or on a class basis; (2) under "plaintiffs' theory of loss, the determination of whether any given putative class member suffered ascertainable loss caused by Ocwen requires a putative-class-member-specific analysis that, among other things, would compare that borrower's actual modification terms with the terms of a hypothetical "but for" modification, which are unique to each borrower" (Def. Mem. at 39); and (3) identification of putative class members that have an actual cause of action and are entitled to share in a class recovery depends on the individual factual circumstances of each putative class member. Plaintiffs respond that Ocwen's assertions that there are individual monetary damages issues is a nonsequitur; since the Rule 23(b)(2) Classes do not seek individual monetary damages, "no further inquiry concerning the harm that resulted from the Balloon Disclosures is required. Thus, there are no individual issues as to causation or injury." (Pls.' Reply at 22-23.) Plaintiffs are incorrect.

Ocwen's arguments regarding cohesiveness with respect to class treatment of ascertainable loss is a distinct question from whether the Class is entitled to money damages. Ascertainable loss is an element of the NJCFA that the New Jersey Class must show through common evidence. See Harnish, 833 F.3d at 305. As Harnish teaches,

> when courts speak of "damages," they are often referring to two distinct concepts: the "fact of damage" and the measure/amount of damages. The fact of damage,

often synonymous with "injury" or "impact," is frequently an element of liability requiring plaintiffs to prove that they have suffered some harm traceable to the defendant's conduct — in other words, the "ascertainable loss" and "causal relationship" requirements under the NJCFA. . . .

Id. 305 (citations omitted). We find that the existence of disparate factual circumstances of the New Jersey Class members' ascertainable loss — including whether members had principal forgiven, fees waived, or interest rates reduced — renders the Plaintiffs unable to show how common evidence can establish this element and makes the Class not cohesive. Accordingly, we deny the certification Motion in this regard. For purposes of a complete decision record, we go on to address Ocwen's other cohesiveness issues.

### 2.    Issues Involving the Crafting of Injunctive Relief

Ocwen argues that Plaintiffs' request for injunctive relief is far too individualized to satisfy Rule 23(b)(2)'s standards because Plaintiffs do not seek a single injunction that is applicable to all putative class members; rather they seek a common generalized form of injunction, but one that must be applied separately to each putative class member. This includes their demand that Ocwen provide each putative class member with a disclosure that identifies a number of loan-specific data points regarding that member's loan, including the estimated amount of the putative class member's balloon payment for different periods of time, the manner of calculation of the balloon payment, and the makeup of the balloon payment — none of which are uniform. (Def. Mem. at 40.) It asserts that it would need to (1) identify every putative class member by name, address, and loan; (2) collect the relevant data for each putative class member's loan, which would require it to conduct separate searches through multiple databases that contain current and historical information for each loan; and (3) conduct a manual search of multiple Ocwen systems and individual borrower records, before recording that information and entering it into a template disclosure form. Plaintiffs refute the assertion that they do not seek a

single injunction and argue that Ocwen's argument "attempts to impose an ascertainability requirement upon the Rule 23(b)(2) Classes by complaining that Ocwen would need to identify the members of the Classes in order to provide the requested disclosures." (Pls.' Reply at 25.) They argue that Ocwen's obligation to identify the homeowners who should receive the curative disclosures cannot defeat certification. We agree.

The assertion that Ocwen might have to provide each putative class member with a loan-specific disclosure does not mean that each individual class member would be entitled to a *different* injunction or declaratory judgment. The declaration of rights would be the same for all members of the class, i.e., that the balloon disclosure in Ocwen's loan template was insufficient. The injunction that might result from that finding is also the same, irrespective of the loan-specific data Ocwen would have to consult and use to satisfy it. The class certification record also shows that this information can be readily obtained from Ocwen's databases.

### 3. Rescission is an Inherently Individualized Form of Relief

Ocwen argues that the New Jersey Class lacks cohesion because rescission is an inherently individualized form of relief, the implementation and consequences of which would be fact-specific and unique for each putative class member. It asserts that Plaintiffs offer no explanation as to how Ocwen would implement the rescission option on a class-wide basis. It notes also that courts have held that claims seeking rescission are inappropriate for class treatment. See, e.g. Andrews v. Chevy Chase Bank, 545 F.3d 570, 574 (7th Cir. 2008) ("Rescission is a highly individualized remedy as a general matter. . . . The variations in the transactional 'unwinding' process that may arise from one rescission to the next make it an extremely poor fit for the class-action mechanism."); McKenna v. First Horizon Home Loan Corp., 475 F.3d 418, 427 (1st Cir. 2007) (a declaration of a right to seek rescission "work[s]

against [the] judicial economy and disserves efficiency concerns" at the heart of the class action mechanism by requiring post-relief implementation on an individual basis).  Plaintiffs respond that this assertion "is a red herring, as Plaintiffs do not seek actual rescission of any Class member's modification.  Plaintiffs merely propose providing notice to Class members that because Ocwen gave them modification agreements that contain deceptive provisions that violate consumer protection laws, they may have a right to rescind, which they may pursue individually if they so choose."  (Pls.' Reply at 27.)

We find that the New Jersey Class lacks cohesion to seek a rescissionary remedy.  This type of relief has been held to create serious class certification issues.  As the <u>Andrews</u> court stated,

> certification of a class of persons entitled to seek rescission would be just the beginning.  Each class member individually would have the option of exercising his or her right to rescind, and not all class members will want to do so because it requires returning the loan principle in exchange for the release of the lien and any interest or other payments.  Individual controversies would erupt and likely continue because "the equitable nature of rescission generally entitles the affected creditor to judicial consideration of the individual circumstances of the particular transaction."  <u>McKenna</u>, 475 F.3d at 427 n. 6.  Accordingly, a host of individual proceedings would almost certainly follow in the wake of the certification of a class whose loan transactions are referable to rescission.

<u>Andrews</u>, 545 F.3d at 574.  We reject Plaintiffs' attempt to dismiss this problem as a red herring by attempting to distinguish direct rescissionary relief from an indirect injunction declaring that class members have a right to seek rescissionary relief.  We see no distinction — other than semantics — between Plaintiffs describing the New Jersey Class as one "seeking an option to rescind" and the class in <u>Andrews</u> described as "entitled to seek rescission" or whose transactions are referable to rescission.  While Plaintiffs correctly state that <u>Andrews</u> and <u>McKenna</u> both involved the Truth in Lending Act, and those decisions were concerned in large part with that Act's specific provisions, the <u>Andrews</u> court noted more generally that certifying a

class seeking a declaration to "*initiate* a process of individual rescission" creates both a prudential jurisdictional problem and practical Rule 23 problem:

> Rather than settling the legal relations at issue, a judicial declaration in this situation would be essentially advisory. . . . The rescission remedy is so inherently personal that a court cannot venture further while addressing the plaintiffs as a class; it can do no more than simply declare that a certain group of plaintiffs have the right to initiate rescission, and that is not a form of "final" declaratory relief under Rule 23(b)(2).

Id. at 577. The McKenna court added that certifying a class to seek a declaration of a right to rescissionary relief negates the primary rationales behind the class action mechanism, namely judicial economy and efficiency. Id., 475 F.3d at 427 ("should the need arise for an absent class member to resort to the courts for enforcement of his or her right to rescind, the declaratory judgment would serve that end no more effectively than would a non-class-action suit brought by named plaintiffs alleging identical TILA violations") (citing 1 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 1:1, at 3 (2002)).

Accordingly, because of cohesion issues the New Jersey Class cannot be certified to seek a declaration under the NJCFA that Plaintiffs and the members of the Class have the right, at their option, to rescind the loan modification agreements containing the Balloon Disclosure provision.[27] The Motion to Certify is denied in this respect.

---

[27] To the extent that Ocwen also argues in this section of its Brief that declaratory relief in the form of requiring notification of class members' ability to apply for a new loan modification is not cohesive because it would involve "an application process — i.e., submission of the application, submission of financial information, eligibility review, application related communications, and post-denial dispute resolution — that is unique for each putative class member," (Def. Mem. at 41), we find that the problems regarding rescissionary relief are not applicable. As Ocwen itself notes, applying for a new modification is available to class members as it is to any other borrower. Rather than "rewinding" an existing agreement, a new modification, by definition, constitutes a new agreement and Plaintiffs seek only an injunction mandating notice, and not one mandating that Ocwen grant new loan modifications under other programs that it offers.

4.      Disparate Factual Circumstances

Ocwen next asserts that disparate factual circumstances among putative class members defeats cohesiveness.  It notes that, while the New Jersey Class is defined to include those borrowers who "entered into" balloon mortgages, there is no requirement in the definition that borrowers currently be subject to those mortgages.  Ocwen further notes that of the 8,454 balloon modifications it can identify as having been entered into by New Jersey borrowers, approximately 1,928 of those mortgages no longer have a balloon feature, or have already been terminated, rendering it impossible to offer much of the requested injunctive relief to all members of the putative class.  (Forbes Decl. Ex. JJ, Ocwen Chart of Loan Modifications with Balloon Features.)  It points out that at least one court has denied certification of a class under the NJCFA because "disparate factual circumstances demonstrate[d]" a lack of cohesiveness, in part, because the relief sought would not benefit the entire class.  McNair v. Synapse Grp., Inc., Civ. A. No. 06-5072, 2010 WL 4777483, at *7 (D.N.J. Nov. 15, 2010); see also Glover v. Udren, Civ. A. No. 08-990, 2013 WL 6237990, at *7 (W.D. Pa. Dec. 3, 2013) ("Rule 23(b)(2) certification is inappropriate where many putative class members have nothing to gain from an injunction, and the declaratory relief they seek serves only to facilitate the award of damages." (internal quotation marks omitted)); Kostur v. Goodman Global, Inc., Civ. A. No. 14-1147, 2016 WL 4430609, at *9 (E.D. Pa. Aug. 22, 2016) (rejecting Rule 23(b)(2) class because requested injunctive relief was "a disguised request for individualized monetary damages").

Plaintiffs respond that, while Ocwen identifies New Jersey loans that are no longer active due to transactions such as the sale of the property, refinancing, deed-in-lieu of foreclosure, completed foreclosure, and short sale, contrary to Ocwen's assertion, those loans "would not be part of the Classes, since the definitions of the Class require that such loans have balloon

payments that 'the borrower will owe at the end of the term of the loan.' In the case of terminated loans, there is no balloon payment that 'the borrower will owe' in the future. Thus, such loans are not in the injunctive relief Classes." (Pls.' Reply at 29-30.) They add that, in the event that we disagree and rule that such terminated loans are part of the Class as currently defined, Ocwen's evidence demonstrates that such loans may easily be excluded.

We find that the New Jersey Class's assertion that terminated loans are not part of the class definition is wrong. Membership is based on entry into a balloon loan. The "borrower will owe at the end of the term of the loan" clause highlighted by Plaintiffs describes the nature of the disclosure each member received, not who is a member. As written, if a borrower received the loan the borrower is a member of the class without regard to whether the borrower will actually have to make a balloon payment. Plaintiffs' suggestion that terminated loans be excluded from the class definition as a solution to the cohesiveness issue is ultimately futile, given both the aforementioned reasons and forthcoming discussion addressing the reasons the New Jersey Class cannot be certified.[28]

D.     Ascertainability of a Rule 23(b)(3) Class

"Class ascertainability is 'an essential prerequisite of a class action, at least with respect to actions under Rule 23(b)(3).'" Carrera v. Bayer Corp., 727 F.3d 300, 306-7 (3d Cir. 2013) (quoting Marcus v. BMW of No. Am., LLC, 687 F.3d 583, 592-93 (3d Cir. 2012)); see also Byrd, 784 F.3d at 162 (stating "the ascertainability requirement as to a Rule 23(b)(3) class is

---

[28]     We reject Ocwen's other cohesion arguments because they do not speak to whether the class's claims are common and there is no assertion that they will cause the litigation to devolve into consideration of myriad individual issues. These include its assertions that Plaintiffs improperly request an injunction on one of the elements of its claim, and that the mandatory injunction, if granted, would not provide actual relief because Ocwen has already stopped using the balloon disclosure.

grounded in the nature of the class-action device itself").  The ascertainability element "functions as a necessary prerequisite (or implicit requirement) because it allows a trial court effectively to evaluate the explicit requirements of Rule 23."  Byrd, 784 F.3d at 162.  It is an independent inquiry which, in addition to the Rule 23 requirements, "ensures that a proposed class will actually function as a class."  Id.

To satisfy the ascertainability prerequisite, a plaintiff must show, by a preponderance of the evidence, that the class is "currently and readily ascertainable based on objective criteria," Marcus, 687 F.3d at 593, and we "must undertake a rigorous analysis of the evidence to determine if the standard is met."  Carrera, 727 F.3d at 306.  "[A]scertainability and a clear class definition allow potential class members to identify themselves for purposes of opting out of a class.  Second, it ensures that a defendant's rights are protected by the class action mechanism.  Third, it ensures that the parties can identify class members in a manner consistent with the efficiencies of a class action."  Id.  Accordingly, we must "ensure that class members can be identified 'without extensive and individualized fact-finding or "mini-trials."'"  Id. (quoting Marcus, 687 F.3d at 594).  "[T]o satisfy ascertainability as it relates to proof of class membership, the plaintiff must demonstrate his purported method for ascertaining class members is reliable and administratively feasible, and permits a defendant to challenge the evidence used to prove class membership."  Id.

The Third Circuit recently reiterated the ascertainability inquiry stating:

The ascertainability inquiry is two-fold, requiring a plaintiff to show that: (1) the class is "defined with reference to objective criteria"; and (2) there is "a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition."  [Hayes, 725 F.3d at] 355 (citing Marcus [at] 593-94). . . .  The ascertainability requirement consists of nothing more than these two inquiries.  And it does not mean that a plaintiff must be able to identify all class members at class certification — instead, a plaintiff need only show that "class members *can* be identified."  Carrera, 727 F.3d at 308 n. 2

90

(emphasis added).  This preliminary analysis dovetails with, but is separate from, Rule 23(c)(1)(B)'s requirement that the class-certification order include "(1) a readily discernible, clear, and precise statement of the parameters defining the class or classes to be certified, and (2) a readily discernible, clear, and complete list of the claims, issues or defenses to be treated on a class basis."  Wachtel [at] 187-88. . . .

Byrd, 784 F.3d at 163 (emphasis in original).  The Court added that "a party cannot merely provide assurances to the district court that it will later meet Rule 23's requirements. . . .  Nor may a party 'merely propose a method of ascertaining a class without any evidentiary support that the method will be successful.'"  Id. at 164 (quoting Carrera, 727 F.3d at 306, 307, 311, (internal citation omitted)).

Plaintiffs argue that the proposed Classes are ascertainable.  First, Plaintiffs assert that they have defined these Classes with reference to objective criteria because they have limited each Class to a precise geographic area, a defined category of persons, and provided an identifying template, namely the requirement that a class member have a Loan Modification Agreement with a specific Balloon Disclosure provision.  Second, relying on Dr. Becker's report, they assert that the Classes can be identified using Ocwen's own data, which will provide a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.

Ocwen raises challenges only to the ascertainability of the FDCPA Class, which includes two defining elements that are distinct from the Pennsylvania and New Jersey Classes.  First, the FDCPA Class includes homeowners "for whom servicing of their mortgage loans was transferred to Ocwen at a time when such homeowners **were in default on their loans**"; second, it includes such persons "to whom Ocwen **sent** a standard form template Loan Modification Agreement. . . ."  (Pls.' Mem. at 2 (emphasis added).)  Ocwen argues that Plaintiffs have provided no method or evidence by which it may be ascertained which borrowers' loans "were in

default" when the loans were transferred. It argues, and Plaintiffs concede,[29] that the default issue is significant because the FDCPA applies only to loans that were in default when Ocwen began servicing them.[30] In addition, it asserts that Plaintiffs provide no evidentiary basis to ascertain those borrowers to whom Ocwen "sent" modification agreements — as opposed to borrowers who actually signed modification agreements.[31]

---

[29] See N.T. 5/16/17 at 25.

[30] The substantive provisions of FDCPA apply to "debt collectors." See, e.g., 15 U.S.C. § 1692c(a) (governing how "a debt collector" may communicate with a consumer); § 1692e (providing that "a debt collector" may not use any false, deceptive, or misleading representation). Under the statute, the term "debt collector" does **not** include:

> (F) **any person collecting or attempting to collect any debt owed** or due or asserted to be owed or due another **to the extent such activity** (i) is incidental to a bona fide fiduciary obligation or a bona fide escrow arrangement; (ii) concerns a debt which was originated by such person; (iii) **concerns a debt which was not in default at the time it was obtained by such person**; or (iv) concerns a debt obtained by such person as a secured party in a commercial credit transaction involving the creditor.

15 U.S.C. § 1692a(6)(F) (emphasis added).

[31] Ocwen has presented evidence that it does **not** record the borrowers to whom modification offers were merely "sent." Its Rule 30(b)(6) witness Max Nieves testified:

> Q. If there is a mortgage modification ultimately, do the terms of that modification end up in RealServicing?
> A. In certain cases, yes.
> Q. In what cases would it not?
> A. If we — **we don't track offers**. We track — again, **if a customer is engaging with us, that mod, those mod terms, would autodocument to RealServicing**. **In certain scenarios, again, it is an unsolicited offer, we don't know if the customer is going to accept or not, so we will just autodocument every offer that we provide**. When the customer accepts, there's certain data points that should be in the system of record, but it wouldn't be as defined as our normal process.

(Nieves Tr. at 32-33 (emphasis added).) This evidence supports Ocwen's assertion that its system cannot be used to ascertain borrowers who were "sent" a modification offer, rather than those who actually entered into a modification agreement. Nieves' testimony asserts that Ocwen

Plaintiffs respond that

> Ocwen maintains electronic records that can be readily queried to identify those borrowers to whom Ocwen sent a modification agreement with the Balloon Disclosure provision and its electronic records can be readily queried to determine whether those borrowers' loans were in default when they were acquired. The Becker Report explains how Ocwen obtains and saves detailed information about each and every borrower and concludes that "[b]y applying common and generally-accepted methods to Ocwen's electronic records, it is possible to identify each individual borrower who meet the criteria of the class allegations raised by Plaintiffs." Lechtzin Decl. Ex. 1 at ¶¶ 18, 26-28. **Defendant's argument that it does not know which loans were in default when it acquired the servicing rights is preposterous. There is no way for Ocwen to service a loan if it does not have a record of how much is owed at any given time.** Ocwen's 30(b)(6) witness Paul Myers testified that Ocwen's RealServicing system records borrower and loan information and payment history. Lechtzin Decl. Ex. 19 [Myers Tr. at 18-19, 52]. Ocwen does not dispute that it has all the electronic records necessary to identify members of the FDCPA Class, but only that Plaintiffs have not cited "specific evidence." Plaintiffs have provided the Court with a class definition that uses objective criteria and have also provided a method of identifying individuals in the proposed class by electronically querying Ocwen's records. That is all that is necessary.

(Pls.' Reply at 49-50.[32]) Plaintiffs also argue that the fact that Ocwen knows that the Kaminskis and Abraham are not members of the FDCPA Class, because their loans were not in default when acquired, shows that its records are capable of identifying those who are.

---

only autodocuments "every offer that we provide" in certain scenarios, such as following Ocwen's receipt of the borrower's own request for mortgage assistance.

[32] We note that the deposition designations cited by Plaintiffs in the quoted excerpt do not support their assertion that Ocwen had to have known based on data in its RealServicing system which loans were in default when it acquired the servicing rights. In the first designated pages, Ocwen witness Paul Myers was asked about documents he reviewed about the Caves. He testified that Ocwen's RealServicing system records borrower "[p]ayment history, comments regarding the Cave's loan. . . . Q. And can you tell me what documents you saw on the CIS system? A. Copy of the note, copy of the mortgage, some of the submitted documents by the Caves for their modification review." (Myers Tr. at 18-19.) At the second designated page, he testified to reviewing a transaction history and comments on RealServicing for the Caves. (Id. at 52.) Nothing in this designation describes how Ocwen would generally "have known which loans were in default."

We find that Plaintiffs' arguments are meritless and that they have not demonstrated that the FDCPA Class is ascertainable. First, their assertion that they can rely on Dr. Becker's report to ascertain this Class using Ocwen's own data is wrong. Dr. Becker never offered a specific mechanism for determining membership in the FDCPA Class or opined that Ocwen's data can show that a loan was in default when it was acquired by Ocwen. He only opined on whether the data could be used to identify borrowers in the correct states, whether a loan featured a balloon payment, and whether the amount of a balloon payment was disclosed. (See Becker Report at 13-18.)

Second, Plaintiffs' contention that it is "preposterous" that Ocwen does not know which loans were in default when it acquired the servicing rights is completely inapposite. The burden to show ascertainability falls to the Plaintiffs, not Ocwen. Merely asserting that "Ocwen must know the information" does not satisfy Plaintiffs' burden to show by a preponderance of the evidence that the class is "currently and readily ascertainable based on objective criteria." Marcus, 687 F.3d at 593 (citations omitted). Plaintiffs cannot shift this burden and a rigorous analysis of the evidence shows they have failed to meet their burden of demonstrating the ascertainability of the "in default" element of the FDCPA Class definition.

The same is true of the "sent" element of the definition. Dr. Becker's opinion on this aspect of the FDCPA definition is not supported by the record testimony he cites and Plaintiffs present no evidence or method by which they can ascertain every borrower to whom a modification agreement was sent. To circumvent this problem, Plaintiffs argue that we should reject Ocwen's assertion that it "does not record or track borrowers to whom it sends in-house loan modification agreements." (Pls.' Reply at 61 (quoting Def. Mem. at 48).) They argue that "Ocwen is not off the hook because it failed to keep records that are critical to identify class

members."  (Id. (citing Tyson Foods, Inc., 136 S. Ct. at 1050 ("[I]t bears emphasis that this problem [lack of records] appears to be one of [defendant's] own making.")).)  Plaintiffs also argue that Ocwen "appears to conflate standing with ascertainability."  (Id. at 62.)  We find that none of these counterarguments are meritorious.  First, Plaintiffs provide no evidentiary basis from which we may reject Ocwen's assertion that it does not record or track borrowers to whom it sends in-house balloon loan modification agreements.  Second, Plaintiffs' reliance on Tyson is inapt because, as noted earlier, that case involved a collective action under the FLSA, not a Rule 23 class.  Third, Ocwen is not raising a standing argument, and Plaintiffs' attempt to recast Ocwen's ascertainability argument as one challenging standing attempts to refute it on grounds that are inapplicable.[33]

---

[33]  Plaintiffs appear to recast Ocwen's argument to shoehorn it into the holding of Nepomuceno v. Midland Credit Mgmt., Inc., Civ. A. No. 14-5719, 2016 WL 3392299, at *4 (D. N.J. June 13, 2016).  The defendant in Nepomuceno had argued that plaintiff's proposed class definition was not ascertainable because it included individuals to whom defendant "sent" a collection letter, rather than limiting the class to those who actually received a statement.  2016 WL 3392299, at *4.  Defendant argued that the court would have to first determine whether each proposed member actually received the letter.  Id.  The court rejected defendant's argument, stating:

> [A]s the Third Circuit explained in Byrd v. Aaron's Inc., this sort of argument "conflates the issues of ascertainability, overbreadth (or predominance), and Article III standing."  Plaintiff has provided this Court with a proposed class definition that uses objective criteria and has also provided a method of identifying individuals in the proposed class (review of Defendant's records).  Whether the proposed definition includes individuals who did not receive Defendant's letter does not prevent the individuals in the definition from being identified and, therefore, does not affect whether Plaintiff has satisfied the ascertainability requirement.  Accordingly, this Court finds that Plaintiff has met its burden under the ascertainability requirement.

Id. (citing Byrd, 784 F. 3d at 168-69).  Unlike the plaintiff in Nepomuceno, Plaintiffs here have not provided a method of identifying individuals in the proposed class since they merely speculate without presenting actual evidence that Ocwen's records can identify borrowers who were sent a loan modification but did not actually enter into one.  In addition, the defendant in Byrd actually argued that the proposed class was overbroad because it included putative class

Because Plaintiffs present no evidence as to how to identify putative members of the FDCPA Class, we conclude that this Class cannot be certified and deny the certification Motion is this regard. We will, however, discuss the other certification arguments concerning the class in order to create a complete decisional record.

E.      Rule 23(a) Requirements

1.      Numerosity

Under Rule 23(a), a plaintiff bears the burden of establishing numerosity by a preponderance of the evidence. Marcus, 687 F.3d at 594-95. Plaintiff must prove that the putative class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001) (citing 5 James Wm. Moore et al., Moore's Federal Practice § 23.22[3][a] (Matthew Bender 3d ed. 1999)). We cannot "assume," "speculate," or defer to "common sense" with respect to how many class members exist without evidence. Marcus, 687 F.3d at 595-97. The

members who lacked standing to sue. Id. at 168-69. It was in this context that the Third Circuit held that "Defendants' argument conflates the issues of ascertainability, overbreadth (or predominance), and Article III standing." Byrd, 784 F.3d at 168. Ocwen is not making this type of argument; it argues that Plaintiffs "do not mention how they intend to ascertain this element of the class definition, let alone present specific evidence of an administrativly feasible and reliable process to do so." (Def. Mem. at 48.)

Plaintiffs' reliance on the holding of Blandina v. Midland Funding, LLC, 303 F.R.D. 245 (E.D. Pa. 2014), is also misplaced. Defendants argued in that case that the proposed class definition was overly broad because it included consumers who were "sent," but did not receive the collection letter at issue. The court rejected the argument stating that, "[u]nder the applicable provisions of the FDCPA, a debt collector violates the FDCPA if, inter alia, it "attempt[s] to collect any debt" through the use of any false representation or deceptive means. . . . The statute does not require the receipt of the misleading letter for the conduct to be actionable." Id. at 250 (internal citation omitted; second alteration in original). However, the court also found that, unlike here, discovery "demonstrated [defendants'] ability to identify those consumers in Pennsylvania to whom the collection letter at issue was sent." Id.

plaintiff must produce evidence, direct or circumstantial, specific to the products, problems, parties, and geographic areas actually covered by the proposed class definitions to allow us to make a factual finding on this requirement.  Id. at 596.

Plaintiffs contend that they satisfy this requirement since Dr. Becker has opined that Ocwen's own analysis of its data on its loan modifications in its propriety databases evidences that there were 11,157 non-HAMP modifications between January 2009 and September 2015 that featured balloon payments in Pennsylvania, and 8,454 in New Jersey.  (Pls.' Mem. at 32 (citing Becker Report at ¶¶ 26, 32, Nieves Tr. Ex. 31).)  Ocwen objects to numerosity only with regard to the FDCPA Class.  It argues that Plaintiffs have failed to identify any evidence that anyone other than the Caves fall within the proposed FDCPA Class because, while the proposed FDCPA Class shares some characteristics with the Pennsylvania and New Jersey Classes, it differs in its "in default" and "sent" elements and Plaintiffs have offered no evidence to suggest the number of borrowers who would fall within the FDCPA Class.  (Def. Mem. at 61.)

In response, Plaintiffs argue that

As shown in Plaintiffs' opening brief, Courts are permitted to "accept common sense assumptions" about the numerosity requirement.  In re Linerboard Antitrust Litig., 203 F.R.D. 197, 205 (E.D. Pa. 2001), aff'd, 305 F.3d 145 (3d Cir. 2002) (quoting In re Cephalon Sec. Litig., No. 96-cv-0633, 1998 WL 470160, at *2 (E.D. Pa. Aug. 12, 1998)).  Here, such common sense assumptions strongly support the conclusion that, in addition to Lisa and Scott Cave, there are at least 38 other borrowers in Pennsylvania and New Jersey whose loans were in default at the time they were transferred to Ocwen for servicing.

(Pls.' Reply at 45.)  Plaintiffs go on to assert that Ocwen has identified more than 19,000 borrowers in Pennsylvania and New Jersey who entered into loan modification agreements with the deceptive Balloon Disclosure provision at issue here, Ocwen does not dispute that its electronically stored records indicate that the Caves' loan was in default at the time it was acquired from Saxon Mortgage Services, Inc., and Ocwen reported in public filings that it

acquired 38,000 other mortgage loans from Saxon Mortgage Services, Inc. in 2010, 82,000 non-prime loans from J.P. Morgan Chase, N.A., in 2011, as well as 245,000 other non-prime loans from Barclays Bank PLC.  (Id. at 46.)  They argue that

> Given the hundreds of thousands of sub-prime loans' servicing rights that Ocwen acquired in the class period, many of which were past due at the time they were acquired by Ocwen, there is abundant circumstantial evidence from which to conclude that there are at least 38 other borrowers in Pennsylvania and New Jersey who were in default when Ocwen acquired the servicing rights to their loans and who were sent a modification agreement with a Balloon Disclosure provision like the Caves.

(Id.)

Under Hydrogen Peroxide, we "must make a factual determination, based on the preponderance of the evidence, that Rule 23's requirements have been met.  Marcus, 687 F.3d at 596 (citing Hydrogen Peroxide, 552 F.3d at 307).  Marcus teaches that to determine numerosity we can accept "circumstantial evidence specific to the products, problems, parties, and geographic areas actually covered by the class definition" and, if presented, "rely on 'common sense' to forgo precise calculations and exact numbers."  Id.  But where there is a "complete lack of evidence specific to" the number of persons possibly within the class, a finding that plaintiffs satisfy numerosity "crosse[s] the line separating inference and speculation."  Id. at 597 (also stating "[i]t is tempting to assume that the New Jersey class meets the numerosity requirement based on the defendant companies' nationwide presence.  But the only fact with respect to numerosity proven by a preponderance of the evidence is that [the plaintiff] himself is a member of the proposed class.").

We find that under Marcus, Plaintiffs have failed to prove numerosity of the FDCPA Class by a preponderance of the evidence.  They ask us to accept circumstantial evidence about the number of loans Ocwen acquired nationally from other loan servicers to support a common

sense argument that there "must be" sufficiently large numbers of class members based on the premise that "many" sub-prime loans are past due. But they offer no evidence, direct or circumstantial, to support this underlying premise as it relates to Pennsylvania and New Jersey borrowers that may be members of the FDCPA Class. To accept Plaintiffs' numerosity argument would impermissibly cross the line from inference to speculation. See Marcus, 687 F.3d at 597. Their assertion that there are at least 38 other borrowers in Pennsylvania and New Jersey whose loans were in default at the time they were transferred to Ocwen for servicing and who were sent balloon modifications is noticeably unsupported by any record citation.[34] The certification Motion is denied in this regard.

### 2. Commonality

"A putative class satisfies Rule 23(a)'s commonality requirement if 'the named plaintiffs share at least one question of fact or law with the grievances of the prospective class.'" Reyes v. Netdeposit, LLC, 802 F.3d 469, 486 (3d Cir. 2015) (quoting Rodriguez v. Nat'l City Bank, 726 F.3d 372, 382 (3d Cir. 2013)). "Commonality does not require perfect identity of questions of law or fact among all class members. Rather, 'even a single common question will do.'" Id., (quoting Dukes, 564 U.S. at 359). The commonality inquiry turns on whether "determining the truth or falsity of a common contention . . . will resolve an issue that is central to the validity of each one of the claims in one stroke." Id. at 487 (citations omitted). "What matters to class certification . . . is not the raising of common questions — even in droves — but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the

---

[34] We assume Plaintiffs chose the number 38 because it is close to the cutoff suggested by the Third Circuit in Stewart, 275 F.3d at 226-27. At oral argument we asked Counsel whether the number 38 was supported by evidence in the record. Counsel repeated the speculative assertions contained in the Reply Brief and added "[d]o we have direct evidence of that, no, we do not." (N.T. 5/16/17 at 28.)

litigation." Dukes, 564 U.S. 350 (emphasis and ellipsis in the original). The bar for establishing commonality is "not high" and is "easily met." In re Cmty. Bank of N. Va. Mortg. Lending Practices Litig., 795 F.3d 380, 397 (3d Cir. 2015) ("Cmty. Bank III"); Reyes, 802 F.3d at 486 (citing Baby Neal v. Casey, 43 F.3d 48, 56 (3d Cir. 1994)). Commonality must be established before the predominance element of Rule 23(b)(3) can be considered. Reyes at 486.

Plaintiffs argue that commonality is satisfied because every member of the Classes was sent or entered into a substantially identical template in-house loan modification agreement that included a Balloon Disclosure provision that failed to disclose the amount of the balloon payment, the method by which Ocwen would calculate the balloon amount, and/or changes in the amortization terms. They assert that these standardized template loan modification agreements give rise to questions of law and fact that are common to all members of the Classes, including: (1) whether Ocwen engaged in the course of conduct alleged by Plaintiffs; and (2) whether Plaintiffs and the Classes have sustained damages, and if so, what is the proper measure of those damages. For the Pennsylvania Class, they assert as common questions: (1) whether the uniform terms of the Balloon Disclosure provision constitute fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding in the conduct of trade or commerce, in violation of the UTPCPL; (2) whether the Court may infer justifiable reliance upon the balloon modification agreements on the basis of material omissions concerning the amount of the balloon payment and how it would be calculated; (3) whether Plaintiffs and members of the Pennsylvania Class sustained ascertainable losses as defined under the UTPCPL; (4) whether the court can award statutory damages to members of the Pennsylvania Class pursuant to the UTPCPL; and (5) whether the Court can enter injunctive relief pursuant to the UTPCPL. For the New Jersey Class, Plaintiffs assert as common questions: (1) whether the uniform terms of

the Balloon Disclosure provision constitute an "unlawful practice" in violation of the NJCFA; (2) whether Ocwen's conduct constitutes "deception . . . or the knowing concealment, suppression, or omission of any material fact with intent that [members of the New Jersey Class] rely upon such concealment, suppression, or omission" in violation of the NJCFA, N.J.S.A. § 56:8-2; (3) whether the Court may award treble damages to members of the New Jersey Class pursuant to the NJCFA; and (4) whether the Court can enter injunctive relief pursuant to the NJCFA. Finally, for the FDCPA Class Plaintiffs assert as common questions: (1) whether the uniform terms of the Balloon Disclosure provision constitute actionable communications under 15 U.S.C. § 1692e; (2) whether the uniform terms of the Balloon Disclosure provision constitute a "false, deceptive, or misleading representation" in violation of the FDCPA, 15 U.S.C. § 1692e(2)(A); (3) whether the uniform terms of the Balloon Disclosure provision would deceive or mislead the "least sophisticated debtor"; and (4) whether the court may award statutory damages to the FDCPA Class pursuant to the FDCPA. Thus, Plaintiffs conclude that the Classes satisfy Rule 23(a)'s commonality requirement. (Pls.' Mem. at 40-41.)

We find that Plaintiffs satisfy the commonality requirement. Although Ocwen argues that there are no common questions (see Def. Mem. at 62-63), its assertions are more appropriately concerned with whether common questions predominate.

### 3. Typicality

The typicality requirement aids a court in determining whether "'maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" Marcus, 687 F.3d at 597-98 (quoting Gen. Tel. Co. of the Sw., 457 U.S. at 158 n.13). Typicality "'screen [s] out class actions in which the legal or factual position of the

representatives is markedly different from that of other members of the class even though common issues of law or fact are present.'" Id. at 598 (quoting 7A Charles Alan Wright et al., Federal Practice and Procedure § 1762 (3d ed. 2005). To determine whether a plaintiff's position is markedly different from the class as a whole, we compare three distinct, though related, concerns: (1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class. Marcus, 687 F.3d at 599.

Plaintiffs assert that the typicality requirement is satisfied because

[a]ll proposed representatives for the Pennsylvania, New Jersey and FDCPA Classes allege that they were harmed by the same unlawful conduct by Ocwen. . . . Their claims are based on standardized form contracts (the Balloon Modification Agreements) that failed to disclose the amount of the balloon payment due at the end of the loan, the method by which such balloon payments would be calculated, and/or changes to the amortization term."

(Pls.' Mem. at 34.) They assert that Abraham and the Caves are typical of the Pennsylvania Class because they had loans serviced by Ocwen and entered into loan modification agreements that contained the same deceptive Balloon Disclosure provision as every other member of the Pennsylvania Class, and thus assert the same legal claims for violations of the UTPCPL as all other members of the Pennsylvania class. (Id. at 35.) The Caves, like all other members of the FDCPA Class, were sent communications from Ocwen which would be confusing and misleading to the "least sophisticated debtor." The Kaminskis, like every other member of the New Jersey Class, had their mortgage serviced by Ocwen and entered into a loan modification

agreement that contained the same deceptive Balloon Disclosure provision as every other member of the New Jersey Class.  (Id.)

Ocwen responds that the typicality requirement has not been satisfied because Plaintiffs' assertion that they and the absent class members were harmed by the same unlawful conduct is incorrect.  It argues that not all putative class members, or even all of the named plaintiffs, have suffered actual harm.  Abraham is atypical of the Pennsylvania Class since her Loan Modification Agreement forgave a significant portion of her principal balance, which Ocwen argues, subjects her to the unique defense that she did not suffered actual harm or an ascertainable loss sufficient to satisfy required elements of her claims or establish Article III standing.  (Def. Mem. at 66.)  This conclusion is buttressed by Plaintiffs' concession that, under Dr. Becker's damages model, Abraham suffered no additional cost from her loan modification.  Ocwen also contends that the Caves' UTPCPL claim is deficient because they suffered no ascertainable loss of money or property.  The Kaminskis are also alleged to be atypical of the New Jersey Class because they have suffered no actual harm from the conduct they allege.

Plaintiffs respond that they, like every member of the Pennsylvania and New Jersey Classes have suffered the same "informational injury" from Ocwen's Balloon Disclosure provision.  They rely on Ocwen's admissions that its Modification Agreements and Balloon Disclosure provisions did not disclose the amount of the balloon payment due at the loan's maturity date or the method by which such balloon payments would be calculated (such as by extending the amortization term of the loan from 360 months to 480 months, as Ocwen did in the case of the Kaminski modification).  They argue that "Ocwen's failure to disclose these important terms of the Modification Agreements is an 'informational injury,' which is sufficient to confer Article III standing."  (Pls.' Reply at 13 (citing Church, 654 F. App'x at 995

(recognizing that where plaintiff "did not receive information to which she alleges she was entitled," she sufficiently alleged a "concrete" injury); Quinn, 2016 WL 4264967, at *5 (holding that failure to provide borrower with information required under the FDCPA "constitutes a sufficiently concrete harm for purposes of Article III standing"); Prindle, 2016 WL 4369424, at *11 (holding that plaintiff who alleged misrepresentations in violation of the FDCPA, without any claim of economic loss, had alleged a "concrete" injury sufficient to confer Article III standing)).) Because Plaintiffs assert that "every member of the Pennsylvania and New Jersey Classes had the right under the UTPCPL and the NJCFA, respectively, to all the information necessary to make their modification agreements not misleading or deceptive," they conclude that Ocwen's omission of such information results in identical concrete injuries to themselves and the classes they seek to represent so that they may be certified for injunctive relief even if not every member suffered an ascertainable monetary loss.[35] Additionally, Plaintiffs point out

---

[35] For example, Plaintiffs contend that a class member similar to Abraham, who, under Dr. Becker's analysis, has not sustained a quantifiable monetary loss,

> has an informational injury because when she entered into her modification agreement Ocwen failed to disclose the minimum balloon payment amount she will be expected to pay when she is 77 years old. Accordingly, Ms. Abraham, like all other members of the Pennsylvania Class, is entitled to injunctive relief under the UTPCPL. Indeed, Ms. Abraham testified that if the amount of the balloon payment had been disclosed in the modification agreement, she would not have agreed to it because she would need to take out a new mortgage to pay the $114,236.82 balloon. She stated: "No one is going to give a 77-year-old woman, with rheumatoid arthritis, on disability, even a $100,000 mortgage at that age. It's an impossibility." Lechtzin Decl. Ex. 34 [Abraham Tr. at 350-351].

(Pl. Reply Mem. at 14.) Plaintiffs add that Ocwen's contention that the Caves and the Kaminskis are examples of the overbreadth of the class definitions "is even farther off the mark [since] Dr. Becker has conclusively established that they have already suffered compensable monetary losses in the form of increased interest payments." (Id.) Plaintiffs maintain that because the definitions of the Pennsylvania and New Jersey Classes "include only borrowers who Ocwen deceived by omitting critical information about their loan modification agreements, ascertainable loss is an integral component of the class definitions." (Id. at 15.)

that there is no need for them to rely on individual damages calculations to prove typicality since the Pennsylvania and FDCPA Classes seek statutory damages under the UTPCPL and FDCPA.

Since statutory damages are available under the UTPCPL and FDCPA, see 12 P.S. § 201-9.2, 15 U.S.C. § 1692k, we find that an informational injury is sufficient to permit a finding of typicality for the Caves for the Pennsylvania and FDCPA Classes and for Abraham for the Pennsylvania Class.[36]  As all members of the class would be entitled to receive statutory damages by default if they cannot demonstrate monetary loss, whether or not each named Plaintiffs suffered monetary loss is immaterial to the typicality analysis.  The class representatives' lack of individual losses do not subject them to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation, and their interests and incentives do not fail to align with those of the class.[37]

However, we find that Plaintiffs' informational injury theory does not apply to the question of whether the Kaminskis are typical of the New Jersey Class.  The NJCFA does not provide for statutory damages and the Third Circuit has recognized that establishing an injury-in-fact for Article III standing is not the same as establishing the elements of a statutory claim under the NJCFA:

> Whatever the contours of Article III, the [NJCFA] only permits a private plaintiff to sue when that plaintiff has suffered an "ascertainable loss of moneys or property."  N.J. Stat. Ann. § 56:8–19.  Although we do not reach the merits of [plaintiff's] claims, we nonetheless observe that [plaintiff] nowhere explains how,

---

[36]  Abraham is not typical of the FDCPA Class because, as noted earlier, Plaintiffs have not provided evidence that her loan was in default when Ocwen acquired it.

[37]  The only assertion Ocwen makes regarding the Caves' typicality is that they have not made a payment on their loan in over four years and are severely delinquent.  It argues that they "have inherently different interests and incentives," (Def. Mem. at 67), but Ocwen does not elaborate on these differences.  More importantly, the fact that the Caves are **currently** delinquent does not speak to how they are atypical since Plaintiffs' claims focus on information omitted when the modified loans were originated.

even if constitutional standing can rest on a bare statutory violation, he would
have statutory standing absent the kind of injury that New Jersey law requires.

Finkelman v. Nat'l Football League, 810 F.3d 187, 196 n.65 (3d Cir. 2016).  Because the NJCFA
does not allow for statutory damages, Plaintiffs must show by a preponderance of the evidence
that the Kaminskis' loan modification caused them to suffer an ascertainable loss of money or
property.

Plaintiffs have failed to meet this burden and the Kaminskis are thus barred from
representing the New Jersey Class.  We credit the unrebutted evidence that Dr. Becker
incorrectly calculated that they suffered a $3.58 loss.  Floyd has demonstrated that they actually
received an aggregate monetary benefit of $11.92, even without counting (1) any monetary
benefit based on the disputed evidence of error in Becker's too low alternate investment value, or
(2) the intangible benefits Floyd asserts that they received from (a) the ability to benefit from the
home's future appreciation, (b) avoiding the adverse consequences of foreclosure and loss of
their home, and (c) avoiding the adverse consequences of potential bankruptcy filings.  Since the
Kaminskis suffered no ascertainable loss, they have no claim for money damages under the
NJCFA, making them atypical of the class they seek to represent.  Further, because the case law
construing the NJCFA holds that a claim for purely equitable relief is reserved to the Attorney
General, the Kaminskis cannot represent a class seeking purely injunctive relief either.
Accordingly, the Motion to certify the New Jersey class is also denied because the Kaminskis are
not proper class representatives.

### 4.    Adequacy

The fourth Rule 23(a) requirement is that the representative plaintiffs must "fairly and
adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  Adequacy concerns both
"the experience and performance of class counsel" and "the interests and incentives of the

representative plaintiffs." <u>Dewey v. Volkswagen Aktiengesellschaft</u>, 681 F.3d 170, 181 (3d Cir. 2012) (citing <u>In re Cmty. Bank of N. Va.</u>, 418 F.3d 277, 303 (3d Cir. 2005) ("<u>Cmty. Bank I</u>"). "The principal purpose of the adequacy requirement is to determine whether the named plaintiffs have the ability and the incentive to vigorously represent the claims of the class." <u>Cmty. Bank III</u>, 795 F.3d at 393 (quoting <u>In re Cmty. Bank of N. Va.</u>, 622 F.3d 275, 291 (3d Cir. 2010) ("<u>Cmty. Bank II</u>")). In fact, "'the linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class.'" <u>Cmty. Bank III</u>, 795 F.3d at 393 (quoting <u>Dewey</u>, 681 F.3d at 183). This inquiry is closely tethered to the typicality inquiry, <u>see</u> <u>Danvers</u>, 543 F.3d at 149, and ensures that the named plaintiff's claims "are not antagonistic to the class." <u>Id.</u> at 150 (citing <u>Beck v. Maximus, Inc.</u>, 457 F.3d 291, 296 (3d Cir. 2006)).

Plaintiffs assert that both adequacy prongs are met here since their interests are aligned with those of the Classes they seek to represent, and Class Counsel have the experience, skill and qualifications necessary to conduct complex class action litigation, have pursued the action vigorously, and have no actual or potential conflicts with the Classes. Ocwen makes no argument regarding Class Counsel; its only adequacy arguments mirror its typicality arguments. We find that Plaintiffs satisfy the adequacy element for the Pennsylvania and FDCPA classes, but fail the test for the New Jersey class because the Kaminskis are not proper class representatives.

F.      <u>Rule 23(b)(3) Predominance and Superiority Requirements</u>

A class action can be certified under Rule 23(b)(3) where the court finds that the (1) questions of law or fact common to class members predominate over any questions affecting only individual members, and (2) that a class action is superior to other available methods for

fairly and efficiently adjudicating the controversy.  Fed. R. Civ. P. 23(b)(3).  The Rule provides that the following matters are pertinent to these findings: (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action.  Id.

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action."  Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 809 (2011).  We "must examine each element of a legal claim 'through the prism' of Rule 23(b)(3)."  Marcus, 687 F.3d at 600 (quoting In re DVI, Inc. Sec. Litig., 639 F.3d 623, 630 (3d Cir. 2011)).  To obtain class certification, "[a] plaintiff must 'demonstrate that the element of [the legal claim] is capable of proof at trial through evidence that is common to the class rather than individual to its members.'"  Id. (citation omitted).  If proof of an element of the legal claim "'requires individual treatment, then class certification is unsuitable.'"  In re Hydrogen Peroxide Antitrust Litigation, 552 F.3d at 311 (quoting Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 172 (3d Cir. 2001)).  Plaintiffs also must show "that the damages resulting from that injury were measurable on a class-wide basis through use of a common methodology."  Comcast Corp., 133 S. Ct. at 1430 (citation omitted). A model purporting to serve as evidence of damages in a class action must measure only those damages attributable to the theory upon which liability is premised.  Id.  Where the damages evidence does not translate the relevant "'legal theory of the harmful event into an analysis of the economic impact of that event,'" the Comcast Court determined that common questions could not predominate over individual ones.  Id. at 1435 (quoting Federal Judicial Center, Reference

Manual on Scientific Evidence 432 (3d ed. 2011)).  The superiority requirement "asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication.'"  In re Processed Egg Prods. Antitrust Litig., 284 F.R.D. 278, 293-94 (E.D. Pa. 2012) (quoting In re Prudential, 148 F.3d at 316.

Plaintiffs argue that the proposed Classes meet the predominance and superiority requirements of Rule 23(b)(3) because each of the Classes asserts a single claim under a state or federal consumer protection statute concerning uniform Balloon Disclosure provisions in standard Ocwen in-house Modification Agreements.  They assert that we can determine by reference to evidence that is common to each member of the Classes whether the Balloon Disclosure provision violates each of these consumer protection laws.[38]

Regarding the FDCPA claims, Plaintiffs assert that courts have found that such claims based upon a defendant's deceptive or misleading letter or other standardized form are suited for class treatment.  See (Pls.' Mem. at 44 (citing Weiss v. Regal Collections, 385 F.3d 337, 345 (3d Cir. 2004) ("[r]epresentative actions . . . appear to be fundamental to the statutory structure of the FDCPA.  Lacking this procedural mechanism, meritorious FDCAP claims might go unredressed because the awards in an individual case may to too small to prosecute an individual action.")

---

[38]  Plaintiffs assert that several fact common issues predominate including that (1) every member of the Classes received and accepted an in-house loan modification agreement that was based upon a standardized electronic template; (2) prior to 2014, Ocwen's template Balloon Disclosures did not disclose the dollar amount of any balloon payment due at the loan's maturity date; (3) Ocwen admits that the Modification Agreements do not include instructions as to how Plaintiffs could have calculated the amount of the balloon they will owe at their loan's maturity date; (4) Ocwen further admits that the Balloon Disclosure does not state the method by which the balloon payment that would be due at the loan's maturity date will be calculated; and (5) Ocwen admits that it did not include amortization schedules with the loan modification agreements.  (Pls.' Mem. at 46-47.)  Plaintiffs contend that common facts concerning Ocwen's loan modification agreements can be established by evidence that is common to the Classes, in satisfaction of Rule 23(b)(3)'s predominance requirement, and obviates the need for loan-by-loan inquiries.

(abrogated on other grounds, <u>Campbell-Ewald Co. v. Gomez</u>, 136 S. Ct. 663 (2016), as revised (Feb. 9, 2016); <u>see also</u> <u>Jacobson v. Persolve, LLC</u>, Civ. A. No. 14-735, 2015 WL 3523696, at *7 (N.D. Cal. June 4, 2015) (holding that class treatment would be "the most efficient manner" to adjudicate whether the allegedly defective form collection letter violated the FDCPA – a question that could be answered for the entire class "in one fell swoop.").) Plaintiffs assert that the FDCPA Class satisfies the predominance requirement because of the following common questions of law and fact: (1) whether the uniform terms of the Balloon Disclosure provision constitute actionable communications under 15 U.S.C. § 1692e; (2) whether the uniform terms of the Balloon Disclosure provision constitute a "false, deceptive, or misleading representation" in violation of the FDCPA, 15 U.S.C. § 1692e(2)(A); (3) whether the uniform terms of the Balloon Disclosure provision would deceive or mislead the "least sophisticated debtor"; and (4) whether the court may award "actual damages sustained" and/or statutory damages to the FDCPA Class pursuant to the FDCPA. (<u>See</u> Pls.' Mem. at 48.)

Regarding the UTPCPL claim, Plaintiffs allege that common questions predominate because the claim focuses on Ocwen's uniform conduct, as opposed to personal characteristics of the individual Pennsylvania Class members. Plaintiffs contend that Ocwen violated the UTPCPL when it failed to disclose the amount of the balloon payment in the loan modification agreements, the method by which the balloon amount would be calculated, or how Plaintiffs and the Pennsylvania Class could calculate the amount. Thus, they assert, if Plaintiffs can prove that Ocwen had duties to make these disclosures but failed to do so, then Ocwen's liability for violating the UTPCPL will be established as to the entire Pennsylvania Class.

Regarding the NJCFA claims, Plaintiffs argue that the New Jersey Class satisfies the predominance requirement because of the following common questions of law and fact

predominate: (1) whether the uniform terms of the Balloon Disclosure provision constitute an "unlawful practice" in violation of the NJCFA; (2) whether Ocwen's conduct constitutes "deception . . . or the knowing concealment, suppression, or omission of any material fact with intent that [member of the New Jersey Class] rely upon such concealment, suppression, or omission" in violation of the NJCFA, N.J.S.A. § 56:8-2; and (3) whether the Court may award treble damages to members of the New Jersey Class pursuant to the NJCFA.

Finally, Plaintiffs assert that common questions as to damages predominate because Dr. Becker has opined that a common formula may be used to determine damages for the Classes utilizing data maintained by Ocwen based on his but-for methodology that quantifies the harm that resulted from Ocwen's failure to disclose the balloon payment amount and extension of amortization terms.

### 1. Ascertainable loss

Ocwen raises several arguments to refute a finding of predominance.[39]  First, it asserts that whether borrowers suffered ascertainable losses or actual harm is an individual question defeating predominance.  (Def. Mem. at 51 (citing Harnish, 833 F.3d at 305).)  It argues that Plaintiffs' insistence that they can calculate the amount of damages on a class-wide basis does not relieve their burden to show the existence of ascertainable loss on a class-wide basis.  (Id.)  Ocwen argues that individualized inquiries into class member-specific evidence are unavoidable in determining the "fact of damage" for each putative class member, defeating certification whether the "fact of damage" is analyzed under plaintiffs' damages theory or Ocwen's countervailing methodology.  It notes that plaintiffs concede that Abraham has not suffered any

---

[39]  Ocwen's superiority arguments repeat its predominance arguments.  We discuss them together.

ascertainable loss of money or property under their own theory.  (See Becker Report at 25, 30-31; Pls.' Mem. at 11.)

We reject this argument.  As discussed in the context of typicality, Plaintiffs' assertions that they have suffered a class-wide informational injury permits a finding of ascertainable loss for the Pennsylvania and FDCPA Classes, even though it is not sufficient for the New Jersey Class because the NJCFA does not allow for statutory damages.  Whether or not each member of the Pennsylvania and FDCPA Classes suffered a monetary loss is immaterial since the informational injury provides the "fact of damage."  We agree with those post-Spokeo decisions that have held that, since an informational injury is sufficient to create Article III standing, it is also sufficient to establish the predominance element.  See Miller v. Trans Union, LLC, Civ. A. No. 12-1715, 2017 WL 412641, at *9 (M.D. Pa. Jan. 18, 2017) (holding that informational injury stemming from allegedly inadequate statutorily-mandated disclosures was a predominating common issue, since it eliminated specter of numerous mini-trials with respect to which class members read the disclosures and who, among that set, "was concretely injured by them."); Torres v. Mercer Canyons Inc., 835 F.3d 1125, 1136 (9th Cir. 2016) (holding that predominance element was satisfied where plaintiffs alleged an informational injury theory, since a class member's individual eligibility for employment under an H-2A visa was irrelevant at the liability phase, so long as the plaintiff was denied the opportunity to apply for a job as a result of the defendant's omission; presence of individualized damages calculations did not defeat predominance); Larson v. Trans Union, LLC, 201 F. Supp. 3d 1103, 1109 (N.D. Cal. 2016) (holding that, where information injury sufficiently created Article III standing under Spokeo for the named plaintiff, predominance was satisfied since "the concreteness of each absent class

member's injury, just like the question of liability, could still be resolved without individualized inquiries into how each class member responded to his or her credit report").

2.    Causation

Causation is an element of both the UTPCPL and NJCFA claims.  See Abraham v. Ocwen Loan Servicing, LLC, No. 14-4977, 2016 WL 2866537, at *10 n.3 (E.D. Pa. May 17, 2016) (UTPCPL); Bosland v. Warnock Dodge, Inc., 964 A.2d 741, 749 (N.J. 2009) (NJCFA). Ocwen asserts that common issues cannot predominate because each member of the Pennsylvania and New Jersey Classes must prove the existence of a causal nexus between the alleged omission of the balloon payment amount and the member's ascertainable loss. Irrespective of the relative similarity of Ocwen's balloon disclosures, it contends that Plaintiffs must still show that their ascertainable loss, if any, was actually caused by the absence of the estimated balloon amount before they can recover damages.  It argues that Plaintiffs cannot make this showing with common evidence since the individual facts and circumstances of each putative class member must be examined.  Ocwen urges that we reject the assumptions employed by Plaintiffs to avoid individual scrutiny since such assumptions cannot be unilaterally applied to each putative class member.  Those assumptions include:  (1) that every putative class member did not know the estimated balloon amount or the applicable amortization period when they entered into their modification agreements; (2) that if Ocwen had disclosed the estimated balloon payment amount and amortization period, each putative class member would have rejected the modification; and (3) that if the putative class members were provided with the estimated amount of the balloon payment and they rejected that modification, they nevertheless would have been eligible for, could have afforded, and would have accepted a hypothetical "but-for loan."  (Def. Mem. at 56.)  While Plaintiffs rely on language in an Ocwen training manual that instructs

representatives to tell borrowers that Ocwen "cannot provide a balloon amount which will be due at maturity as the remaining balance becomes the balloon amount," Ocwen points out that the next three sentences of that manual expressly state that if an "estimated balloon payment" is reflected in the system for the borrower, the representative should "advise [the borrower] of the same," with the caveat that the representative should "disclose [that] it is only an estimate [and] [t]he balloon amount depends on how the customer makes the payments." (Lechtzin Decl. Ex. 9 at Ocwen010223.) Ocwen also relies on its own Rule 30(b)(6) witnesses, each of whom testified that the estimated balloon payment amounts are available and that Ocwen employees are trained to provide the information. (Nieves Tr. at 82-83, 87, 126, 198; Myers Tr. at 72, 80-81; Blanchard Tr. at 120.)

The Third Circuit extensively discussed in Marcus how the causation element of the NJCFA impacts the predominance element of Rule 23(b)(3), and when causation may be presumed. Marcus involved alleged misrepresentations about the defects of run flat tires ("RFTs"). The district court found that the plaintiff could prove these alleged defects at trial with common, class-wide evidence. On appeal, defendants argued that "causation, i.e., determining why each class member's tires 'have gone [flat] and been replaced' — will require individualized inquiries that will predominate over any common ones." Marcus, 687 F.3d at 601. The Third Circuit held that the district court abused its discretion when it found that the plaintiff could show, without resort to individual proofs, that the alleged defect caused the class members' damages. Id. at 603.

The plaintiff had defined the class in terms of certain owners and lessees of vehicles with the tires that "have gone flat and been replaced." The plaintiff claimed that all class members were damaged when their RFTs suffered a flat and they were forced to pay for a new tire and

asserted that "[e]ach Class member's damages can be measured by the cost of a replacement Tire." Id. at 603.  The Court held that merely showing damages was not sufficient:

> These damages allegations beg the question of what caused class members' tires to go flat and need replacement.  Causation is pivotal to each of Marcus's claims. . . .  Here the District Court should have addressed an undisputed, fundamental point: any tire can "go flat" for myriad reasons. . . .  Even "defective" tires can go flat for reasons completely unrelated to their defects.  Critically, to determine why a particular class member's Bridgestone RFT has "gone flat and been replaced" requires an individual examination of that class member's tire. . . .  These individual inquiries are incompatible with Rule 23(b)(3)'s predominance requirement.

Id. at 604 (internal citations omitted).

Turning to certification of the NJCFA claim, the Third Circuit noted there were two questions at the core of the analysis:  "(1) Under New Jersey law, what must a plaintiff prove to succeed on an NJCFA claim and what evidence can a defendant put forth to rebut and defeat that claim?; and (2) When a plaintiff seeks to certify an NJCFA claim for class treatment under Rule 23(b)(3), when might common questions of fact fail to predominate over individual ones?"  Id. at 605.  On the first question, while noting that the NJCFA does not require proof of reliance, it nonetheless "'requires a consumer to prove that [his or her] loss is attributable to the conduct that the CFA seeks to punish by including a limitation expressed as a causal link.'"[40]  Id. at 606 (alteration in original) (quoting Bosland, 964 A.2d at 748.  On the second question, the Third Circuit held that the district court erred when it concluded that a "presumption of causation" should apply to the plaintiff's NJCFA claims, and therefore that common issues of fact would predominate.

---

[40]  Violation of the Pennsylvania UTPCPL alleged by the Pennsylvania Class requires both reliance and causation.  See Weinberg v. Sun Co., 777 A.2d 442, 446 (Pa. 2001).  Thus, the discussion of causation in Marcus applies to both the Pennsylvania Class and the New Jersey Class.

The district court held that "a causal relationship between an alleged unlawful practice and a consumer's ascertainable loss may be presumed under the NJCFA when a defendant is alleged to have omitted (rather than affirmatively misrepresented) material information in written representations and when a defendant's marketing statements do not differ from one consumer to another;" thus "Marcus would be able to prove his NJCFA claims with nothing more than evidence of [defendants'] 'unlawful practices.'" Id. at 607 (citation omitted). The Third Circuit rejected this presumption stating:

> What a consumer knew about Bridgestone RFTs prior to purchasing or leasing his or her car is highly relevant to whether that consumer can succeed on an NJCFA claim. The District Court correctly noted that "[t]he relevant issue . . . is whether the class members got less than what they expected." . . . But what a class member "expected" of Bridgestone RFTs and BMWs depends on what information, if any, about the alleged defects was available during the class period and whether that class member knew about it. If a consumer did know about the "defects" but, despite that knowledge, still decided to purchase or lease a BMW at the same price anyway — because, for example, he or she decided that the other safety and convenience benefits RFTs and BMWs offer outweigh the costs of their defects — then the consumer would not have received something less than expected. If the evidence indicates that this could be true for a significant number of class members, then common questions of fact will not predominate. Instead, individual issues about what each class member expected when purchasing or leasing his or her car would swamp the inquiry, making the NJCFA claims inappropriate for class treatment.

Id. at 607-08 (internal citations omitted). Reviewing decisions from the New Jersey Supreme Court, the Third Circuit found that, "before applying a 'presumption of causation' to an NJCFA claim, a court must consider not only the defendants' course of conduct, but also that of the plaintiffs. Specifically, it must consider whether plaintiffs could have known the truth underlying the defendant's fraud." Id. at 610. The Court concluded that the district court erred in granting class certification stating that:

> Before certifying a class, the Court needed to have found (among other things) either (1) that the alleged defects were not knowable to a significant number of potential class members before they purchased or leased their BMWs, or (2) that,

116

even if the defects were knowable, that class members were nonetheless relatively uniform in their decisionmaking, which would indicate that, at most, only an insignificant number of class members actually knew of the alleged defects and purchased or leased their cars at the price they did anyway. These findings cannot be side-stepped. They are necessary to determine whether the predominance requirement is met in this case. See Hydrogen Peroxide, 552 F.3d at 316-18. If class members could have known of the alleged defects and the evidence shows that they do not react to information about the cars and tires they purchased or leased in a sufficiently uniform manner, then individual questions related to causation will predominate.

Id. at 611 (citations omitted). Thus, under Marcus, because causation is an element of the Pennsylvania and New Jersey Class's causes of action, it cannot be presumed. Plaintiffs must demonstrate by a preponderance of the evidence that the amount of the balloon payment was "not knowable to a significant number of potential class members" before they executed the loan modification, or, that if it was knowable, the borrowers' behavior would nonetheless have been uniform.

The record evidence favorable to Plaintiffs demonstrating that the amount of the balloon payment was not "knowable" includes: (1) the fact that the amount or a method to calculate the amount was not provided in the balloon disclosure, and (2) the statement in Ocwen's training manual instructing its representatives to tell borrowers that Ocwen "cannot provide a balloon amount which will be due at maturity as the remaining balance becomes the balloon amount." (Lechtzin Decl. Ex. 8 at Ocwen011487; id. Ex. 9 at Ocwen010223.) The evidence favorable to Ocwen showing that the amount was "knowable" includes the next several sentences in the same manual also instructing representatives to tell borrowers that if an "estimated balloon payment" is reflected in the system for the borrower, the representative should "advise [the borrower] of the same, as long as you disclose it is only an estimate [and] [t]he balloon amount depends on how the customer makes the payments." (Id.) In addition, Ocwen's Rule 30(b)(6) witnesses

each testified that the estimated balloon payment amounts are available and that Ocwen employees are trained to provide the information. Specifically, Max Nieves testified that

> "we get training on — let me just clarify. If the customer requests an amortization schedule, we don't necessarily create it. We know what the conduit is to get it to the customer. . . . [T]ypically the terms are in RealServicing and the agent doesn't even need an Amp schedule since they can provide that data telephonically. If for some reason the terms of the modification or balloon data are not in RealServicing, the agent can't find them . . . the research team would pull that data . . . and provide a writ-up to the customer detailing exactly what the balloon is, the amount, and anything that they inquired about.

(Nieves Tr. at 82-83.) He also testified that if, the Kaminskis called, the balloon payment amount "would be sent to them." (Id. at 87.) Paul Myers testified that "[a]ny borrower could call in and we can easily advise them what the balloon number is. That's a moving number depending whether they make their payments on time, whether they pay them early, late, what have you." (Myers Tr. at 72.) Rashad Blanchard testified that "the borrower doesn't need to make any calculations. They can call and an HRC rep will give it to them." (Blanchard Tr. at 120.)

We find that the evidence preponderates in favor of a finding that the balloon payment amount was knowable. Marcus makes clear that the issue is not "did they know," but rather "could they have known." Id. at 611. Ocwen has shown that any borrower could have learned the amount of the pro forma balloon payment merely by asking. Since the information was knowable, the next question is whether the borrowers' behavior would nonetheless have been uniform. We hold that the evidence preponderates in favor of a finding that borrower behavior would not have been uniform since Ocwen has shown that significant numbers of borrowers benefited from their loan modifications because of lowered interest rates, lowered monthly payments, relief from default and foreclosure to permit waiting for a positive change in the market, and having principal forgiven.

Accordingly, we conclude that individual issues about what each putative class member knew and how they would have acted "swamp the inquiry" on causation, making the UTPCPL and NJCFA claims inappropriate for class treatment because common issues do not predominate.

### 3. Reliance

Plaintiffs concede that the UTPCPL contains a requirement for establishing justifiable reliance. (Pls.' Mem. at 49 (citing Hunt v. U.S. Tobacco Co., 538 F.3d 217, 227 (3d Cir. 2008).) They assert that the reliance element is not incompatible with Rule 23(b)(3) predominance where, as here, the alleged deceptive conduct relates to material omissions. They note that we have already held in this case that a "plaintiff who asserts a UTPCPL claim that is based on a defendant's material omission may be entitled to a reasonable inference of reliance." Cave v. Saxon Mortg. Servs., Inc., Civ. A. No. 11-4586, 2013 WL 460082, at *1 (E.D. Pa. Feb. 6, 2013) (citing Drayton v. Pilgrim's Pride Corp., Civ. A. No. 03-2334, 2004 WL 765123, at *7 (E.D. Pa. Mar. 31, 2004)); see also Grimes v. Enter. Leasing Co. of Phila., LLC, 66 A.3d 330, 337 n.4 (Pa. Super. Ct. 2013), rev'd on other grounds, 105 A.3d 1188 (Pa. 2014) ("when a plaintiff alleges a claim under the UTPCPL catchall provision under the theory of deceptive conduct, the plaintiff need not prove the elements of common law fraud, including 'induce[ment of] justifiable reliance. . . .'" (quoting Bennett v. A.T. Masterpiece Homes at Broadsprings, LLC, 40 A.3d 145, 152 n.5, 154-55 (Pa. Super. Ct. 2012))).

Ocwen argues that that the Pennsylvania Class cannot show reliance through common evidence. Noting that the Third Circuit has stated that class-wide proof of reliance for a fraud-based claim is problematic because "reliance is nearly always an individualized question, requiring case-by-case determinations of what effect, if any, the misrepresentation had on plaintiffs' decision-making," Harnish, 833 F.3d at 309-10, Ocwen argues that Plaintiffs' failure

to explain how they can prove, or how the Court can find, justifiable reliance for each member of the class using common evidence is fatal. (Def. Mem. at 57.) Contrary to Plaintiffs' assertion, Ocwen argues that courts in Pennsylvania have rejected any presumption of reliance under the UTPCPL because a plaintiff "must prove justifiable reliance affirmatively." Hunt, 538 F.3d at 227; see also Debbs v. Chrysler Corp., 810 A.2d 137, 158 (Pa. Super. Ct. 2002) (rejecting presumption of reliance and denying class certification because common law fraud and fraud under UTPCPL require an individualized showing of reliance on a fraudulent statement).

We find that reliance may not be presumed under the UTPCPL. Plaintiffs' citation to our earlier discussion on reliance at the pleading stage is inapposite. That discussion involved whether Plaintiffs' allegations were plausible, not whether reliance may be presumed as part of a predominance inquiry. Second, substantive Pennsylvania case law suggests that such a presumption is not appropriate for establishing the Rule 23(b)(3) predominance requirement. See Klemow v. Time, Inc., 352 A.2d 12, 16 n.17 (Pa. 1976) ("[t]he successful maintenance of a cause of action for fraud includes, *inter alia*, a showing that the plaintiff acted in reliance on the defendant's misrepresentations. Because such a showing would normally vary from person to person, this cause of action is not generally appropriate for resolution in a plaintiff-class action.") (citations omitted); Weinberg v. Sun Co., 777 A.2d 442, 446 (Pa. 2001) ("The UTPCPL's 'underlying foundation is fraud prevention.' . . . Nothing in the legislative history suggests that the legislature ever intended statutory language directed against consumer fraud to do away with the traditional common law elements of reliance and causation.") (citation omitted); Basile v. H & R Block, Inc., 729 A.2d 574, 585 (Pa. Super. Ct. 1999) (excusing proof of individual detrimental reliance against defendant who was a fiduciary, but requiring plaintiffs to "establish reliance as a matter of fact on the basis of the testimony of individual class members" against

non-fiduciary defendant) (reversed on other grounds, 761 A.2d 1115 (Pa. 2000); <u>see also</u> <u>Debbs</u>, 810 A.2d at 157-58 ("It is also quite clear that Pennsylvania state courts have, thus far, not adopted [a presumption of reliance]. . . .  We decline to do so in light of our precedent.  Thus, we conclude that the critical inquiry respecting reliance in [plaintiff's] case is not amenable to class treatment." (citing <u>Klemow</u>, <u>Weinberg</u>, and <u>Basile</u>)).

Because reliance is an element of the UTPCPL claim and cannot be presumed, we find that Plaintiffs cannot show that common questions predominate for that claim.  Plaintiffs' insistence that the proposed Classes meet the predominance and superiority requirements of Rule 23(b)(3) "because each of the Classes asserts a single consumer protection claim concerning uniform Balloon Disclosure provisions" (Pls.' Reply at 60-61), must be rejected.  The predominance inquiry focuses on the elements of the underlying claims, not whether each member of the class asserts the same claim.  <u>Erica P. John Fund, Inc.</u>, 131 S.Ct. at 2184; <u>Marcus</u>, 687 F.3d at 598.  Accordingly, we conclude that the UTPCPL claim cannot be certified for this additional predominance reason.


## VII.    CONCLUSION

After rigorous analysis of the class action issues, we conclude that Plaintiffs' Motion must be denied in its entirety as we find that there are no named Plaintiffs for whom, or proposed Class for which, each and every part of Rule 23 has been satisfied for any claim.  In sum, under Rule 23(a), the New Jersey Class fails the typicality requirement and the FDCPA Class fails the numerosity requirement.  Under Rule 23(b)(2), the Pennsylvania and FDCPA Classes cannot be certified for injunctive relief because the statutes Plaintiffs allege were violated do not allow for injunctive relief; the New Jersey Class cannot be certified because part of the injunctive relief that Class seeks is not appropriate for class treatment (and the part of the claim that is proper

cannot be certified because of other Rule 23 issues).  Under Rule 23(b)(3), the New Jersey and Pennsylvania Classes fail the predominance and superiority requirements.

An appropriate order will be entered denying Ocwen's Motion to Strike and denying Plaintiffs' Motion for Class Certification.

BY THE COURT:

/s/ John R. Padova

John R. Padova, J.